# LAW OFFICE OF RONALD L. KUBY

ATTORNEYS AT LAW
119 WEST 23RD STREET, SUITE 900
NEW YORK, NEW YORK 10011

TELEPHONE: (212) 529-0223
FAX: (212) 529-0644
WWW.KUBYLAW.COM

RONALD L. KUBY

GEORGE WACHTEL
LEA SPIESS

STAFF
SUSAN BAILEY
PROCESS SERVER
LUIS R. AYALA

September 5, 2012

Hon. Kathleen B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
Room 15A
New York, New York
(To be filed and served by counsel of record)

12cv1742-(KBF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED SEP 1 2 2012

Dear Judge Forrest:

I am one of Ms. Jordan's criminal defense attorneys in People v. Jordan, 612/10 (N.Y. Cty., Solomon, J.). I write to supplement ADA O'Connell's highly-misleading letter of August 15, 2012, in which she purports to summarize the status and progress of the case. ADA O'Connell omits mention of her obstructing the normal process of discovery, which has forced the defense to engage in successful, but time-consuming motion practice.

On May 15, 2012, the defense investigators, continuing the process of inspecting evidence, made an appointment to inspect and photograph the electronic devices that had been seized from Ms. Jordan; the session was scheduled for June 1, 2012. On May 24, 2012, ADA O'Connell notified the defense that she would not permit the defense to photograph the items:

> The chain of custody protocol of the unit mandates that once removed from their evidence lockers, such property cannot be returned. The defense has asked that the property be maintained in a secure fashion, particularly since the BlackBerry devices are "locked." The defense knows the models and serial numbers of each device, and it would serve no purpose to disturb the chain of custody to remove them for photographs when you are able to view

1

the generic models of each item via the companys' *[sic]* websites.  We are therefore unwilling to comply with your request.[1]

This was obviously absurd.  There was no legal basis to preclude the defense from exercising its rights under N.Y.C.P.L. §240.20.  But defense counsel was forced to formally move to inspect the devices, which we did on June 12, 2012.  ADA O'Connell answered on June 25, 2012, and on June 29, 2012, by Decision and Order, Justice Solomon granted this Court granted the defense motion, finding the defense proposals to be "reasonable, logical, and practical . . . ."[2]  and ordered the photography and re-imaging be done no later than July 20, 2012.[3]

ADA O'Connell continued to delay.  She failed to inform her expert of the July 20, 2012 deadline; the defense informed the prosecution's expert on July 3, 2012 and immediately was informed of scheduling problems.[4]

On July 11, 2012, the defense was able to photograph the electronic devices.  The defense discovered that one of the seized devices, the Apple iTouch Device, bearing the serial number 1E9470846K2, *was missing*.  No one could provide any explanation as to its whereabouts.[5]  Six weeks were lost while ADA O'Connell made frivolous objections that, if successful, would have prevented the defense from discovering the loss.  Finally, on August 24, 2012, the defense was notified that the item was located.

The re-imaging of the electronic devices was set for July 17, 2012.  When defense investigators arrived at the District Attorney's office, ADA O'Connell, without any prior notice, announced a new rule that prohibited the defense from documenting the imaging, pending further court order.[6]

This latest obstruction was addressed at the July 20, 2012 court session.  The Court directed both parties to simultaneously submit their positions in writing on August 2, 2012.[7]  Defense counsel timely filed and the prosecution filed late, on August 6, 2012.  The matter is currently awaiting decision.  While other matters

---

[1] Letter, ADA O'Connell, May 24, 2012; Exhibit A.
[2] Decision and Order, June 29, 2012; Exhibit B.
[3] Tr., June 29, 2012, at 10, 18; Exhibit C.
[4] Letter, Ronald L. Kuby, July 10, 2012;  Exhibit D.
[5] Tr., July  20, 2012, at 23; Exhibit E.
[6] Letter, Ronald L. Kuby, July 20, 2012; Exhibit F.
[7] Tr. July 20, 2012, at  20-21; Exhibit E.

have been addressed during these past three months, no forward progress can be made on the case until the re-imaging and inspection process is complete.[8]

ADA O'Connell also failed to note that despite the passage of more than twenty-seven months since Ms. Jordan's arrest, the prosecution did not serve a motion for a DNA sample until May 24, 2012. The defense made a preliminary objection on June 11, 2012. However, the prosecution never *filed* the motion with the Court; thus, Justice Solomon had nothing before him to decide when the parties appeared in Court on June 12, 2012.[9] Without explaining why a motion was served but not filed, ADA DeLozier stated that she would be filing the motion.[10]

The motion was filed on June 13, 2012, but the defense was not notified until the June 29, 2012 court appearance that it had been filed.[11] The defense timely responded on July 20, 2012, and the matter is currently awaiting decision.

Thus, a fair characterization of the record is that one week after receiving a stay from this Court, the prosecution engaged in an astonishing pattern of obstruction, delay, serving papers without filing, filing papers without serving, and tardy filing that has actually set us back further than we were on May 17, 2012.

Sincerely,

Ronald L. Kuby

cc:   Alan M. Dershowitz

---

[8] As Justice Solomon put it, "this is the only way to get from Square One to Square two." Tr., June 29, 2012, at 10; Exhibit E.
[9] Tr., June 29, 2012, at 20-22, Exhibit E.
[10] Id. at 22; Exhibit E
[11] Id. at 11-17; Exhibit E

3



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

May 24, 2012

Stephen G. Murphy, Esq.
Hamilton Financial Center
9201 Fourth Avenue
7th Floor
Bay Ridge, NY 11209

Re: People v. Gigi Jordan
Indictment No. 00621/2010

Dear Mr. Murphy :

Enclosed please find a copy of the OCME certified Lab file for FB10-00933. I have also included a paper copy of my proposed swab order with a notice of motion, emailed to you and Mr. Kuby earlier today.

Your investigators have asked that they be permitted to examine the various electronic devices which are in the custody of our forensic computer analysts. The chain of custody protocol of the unit mandates that once removed from their evidence lockers, such property cannot be returned. The defense has asked that the property be maintained in a secure fashion, particularly since the Blackberry devices are "locked." The defense knows the models and serial numbers of each device, and it would serve no purpose to disturb the chain of custody to remove them for photographs when you are able to view the generic models of each item via the companys' websites. We are therefore unwilling to comply with your request.

Sincerely,

Kerry O'Connell
Assistant District Attorney
212 335-4336

cc: Hon. Charles H. Solomon (w/o encl.)
   Ronald Kuby, Esq. (w/encl.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 82
------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,  :     **DECISION AND ORDER**
                                      :     INDICTMENT 621-10
             -against-               :
                                      :
GIGI JORDAN,                DEFENDANT  :
------------------------------------------------------------------x
CHARLES H. SOLOMON, J.:

     In a motion filed on June 12, 2012, defendant moves pursuant to CPL 240.20(1)(f) for the inspection and testing of the electronic devices seized in connection with defendant's arrest.  The People oppose the defendant's application in a response filed June 25, 2012.  Defendant then filed a letter in response to the People's opposition on June 26, 2012.

     CPL 240.20(1)(f) provides that "except to the extent protected by court order, upon demand to produce by a defendant against whom an indictment...is pending, the prosecutor shall disclose to the defendant and make available for inspection, photographing, copying or testing,...(f)any other property obtained from the defendant."  Under this provision, defendant is entitled to inspect and photograph her electronic devices.  The People have expressed concern that the contents of the devices may be altered if a defense expert is permitted to access the drives of the electronic devices.  In their letter of June 26, 2012, defense counsel suggests certain procedures which they contend will alleviate the People's concerns.  Those procedures appear to the Court to be reasonable, logical and practical solutions to the existing problem.

     The People are directed to have their expert mirror an image of the original device in the presence of the defense expert.  That mirrored image will then be provided to the defense expert for forensic testing.  Additionally, the People are directed to make the devices available for photographing.  If any forensic reports were generated by the People's experts in conjunction with their examination of the electronic devices, the People are directed to make these reports available to the defense.  CPL 240.20(1)(c); People v. Sinha, __ NY3d __, 2012 NY Slip Op 05123, 2012 WL 2399697 (June 27, 2012).

     This opinion constitutes the decision and order of the Court.

Dated:  June 29, 2012
      New York, New York

CHARLES H. SOLOMON, J.S.C.

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NEW YORK :  CRIMINAL TERM  PART 82

 3    - - - - - - - - - - - - - - - - - - X

 4    THE PEOPLE OF THE STATE OF NEW YORK      Indictment No.
                                               0621/10
 5                   - against -

 6

 7    GIGI JORDAN,                             CALENDAR CALL

 8

 9                        Defendant.

10    - - - - - - - - - - - - - - - - - - X
      100 Centre Street
11    New York, N.Y.

12    DATE HELD:  JUNE 29, 2012

13    B E F O R E:

14              HONORABLE CHARLES SOLOMON,

15                   J u s t i c e.

16    A P P E A R A N C E S:
          CYRUS R. VANCE, ESQ.,
17        DISTRICT ATTORNEY, NEW YORK COUNTY
          BY: KERRY O'CONNELL,
18            DAVID SZUCHMAN, and MARIT DELOZIER, ESQS.
          For the People
19
          STEVEN G. MURPHY and RONALD KUBY, ESQS.,
20        For the Defendant

21
                                  Anne Love,  CSR,
22                          Senior Court Reporter

23

24

25
```

Aml  6-29-12 JORDAN / Colloquy

1    original hard drive, fully know it would contaminate

2    evidence.  Forensic imaging is the best practice that was

3    introduced by myself to the NYPD when I was appointed the

4    Commanding Officer of their Computer Crimes Unit.

5           This is for the Court, just so the record is

6    complete, in case they decide to do an Article 78 on this

7    extraordinary decision.

8           THE COURT:  It's highly unlikely I guess.

9           But if you want to give that to the Clerk.

10          And I'll read it.

11          That's Number one.

12          My decision has been given to the parties in the

13   case.

14          MS. O'CONNELL:  Thank you for the opportunity.

15          THE COURT:  And I understand this is the only way

16   to get from Square One to Square Two.  That's the way we're

17   going to do it.  That's one issue.

18          Once this is done, then Mr. Murphy can conduct his

19   privilege review of all of the other documents that exist.

20          And then we can talk about scheduling and

21   examination of the defendant.

22          So that's going to be done after we leave today,

23   between today and the next adjourned date, I hope.

24          There's also the issue about that swab order that

25   the D.A, last time we were here that wasn't received by me.

Aml   6-29-12 JORDAN / Colloquy

1    served and filed by the People to the motion to suppress

2    concerning the search warrant.

3            We're going to have the defense response served

4    and filed in court concerning the application to take a swab

5    from the defendant.

6            And also, third thing, this inspection by the

7    defense expert, I do not want to hear that wasn't done.  I

8    don't want to be sitting here July 20 and have some

9    discussion about couldn't be done this day because this

10   person is not available and she's not available, he's not

11   available.

12           I want this done.

13           MS. O'CONNELL:  Your Honor, the defense must

14   supply us with new drives for any items they want mirrored.

15           THE COURT:  Whatever it takes the defense will

16   give you, whatever you need, you can let them know.  .

17           Lot of ways to communicate with them.

18           MS. O'CONNELL:  They know what they need.  They

19   already got it.  They know to get new copies of those very

20   items.

21           THE COURT:  That should not be a problem.

22           MR.  KUBY:  Best Buy is just down the street from

23   me.

24           THE COURT:  Anything else anyone wants to discuss?

25           MR.  KUBY:  What I want to discuss, no.

# LAW OFFICE OF RONALD L. KUBY
### ATTORNEYS AT LAW
119 WEST 23RD STREET, SUITE 900
NEW YORK, NEW YORK 10011

RONALD L. KUBY

GEORGE WACHTEL
LEA SPIESS

TELEPHONE: (212) 529-0223
FAX: (212) 529-0644
WWW.KUBYLAW.COM

STAFF
SUSAN BAILEY
PROCESS SERVER
LUIS R. AYALA

July 10, 2012

Hon Charles H. Solomon
100 Centre Street, Part 82
New York, New York 10007
By Hand

  Re: Update on Electronic Discovery in People v. Gigi Jordan, Ind.
    No. 0621/10

Dear Justice Solomon:

  I write to update you on the status of the electronic discovery inspection process.

  Our expert, Richard Perine, attempted to contact Mr. Brittson on the morning of July 3, 2012 to inform the latter that we were prepared to meet forthwith to begin the photographing, inspection, and forensic analysis of the devices.  Unfortunately, ADAs Szuchman, O'Connell, and DeLozier did not inform Mr. Brittson of the July 20th deadline set by the Court.  Mr. Perine conveyed this information to Mr. Brittson when he reached him on July 5, 2012.  Due to the unavailability on the law enforcement side, we have been forced into the following schedule:

  July 11, 2012: Photographing of all devices.
  July 17 and 19, 2012: Imaging of the computers.

  Moreover, the prosecution has still not approved (despite your Order) the imaging of the cellphones and BlackBerries, so no date for this has been set.  We have been told that, once approved, this may extend beyond the July 20, 2012 deadline.

Given the delay now imposed by the apparent staffing shortage at the Cybercrime Unit, and the resultant inability to make substantive progress within the time set for the next status conference, we question the usefulness of the upcoming court date, assuming both sides file their respective papers in a timely fashion.

On the positive side, the lawyers have remained largely sidelined and the forensic experts on both sides are working and playing well together.

I will continue to update the Court on the progress of this matter.

Sincerely,

Ronald L. Kuby

cc:   ADA Kerry O'Connell
(By Hand and email)

```
 1 │ SUPREME COURT: NEW YORK COUNTY
   │ TRIAL TERM : PART 82
 2 │ ------------------------------------X
   │ THE PEOPLE OF THE STATE OF NEW YORK
 3 │                                        IND.#:
   │                                        00621/2010
 4 │
   │           -against-                    CHARGE:
 5 │                                        MURDER2
   │
 6 │ GIGI JORDAN
   │                                        PROCEEDINGS:
 7 │       Defendant.
   │ ------------------------------------X
 8 │
   │                           100 Centre Street
 9 │                           New York, New York 10013
   │
10 │
   │                           July 20, 2012
11 │
   │
12 │ B E F O R E:      HONORABLE CHARLES SOLOMON,
   │                   Justice of the Supreme Court
13 │
   │
14 │ A P P E A R A N C E S:
   │
15 │
   │
16 │ FOR THE PEOPLE:
   │
17 │            CYRUS R. VANCE, JR., ESQ.
   │            New York County District Attorney
   │            One Hogan Place
18 │            New York, New York  10013
   │            BY:  KERRY O'CONNELL, ESQ.
19 │                 PATRICIA O'CONNOR, ESQ.
   │            Assistant District Attorney
20 │
   │
21 │ FOR THE DEFENDANT:
   │
22 │            RONALD KUBY, ESQ.
   │               -and-
23 │            STEVEN G. MURPHY, ESQ.
   │            For the Defendant - Gigi Jordan
24 │
   │
25 │                                   Theresa Magniccari
   │                                   Senior Court Reporter
```

1          MS. O'CONNELL:  No question that you have the

2     authority to direct it be brought here.

3          MR. KUBY:  There is no question but that you have

4     the legal authority to authorize our expert to do the

5     re-imaging, and he will do it on his own equipment.  If

6     they want to watch, if they want to videotape, if they want

7     notepads with pens to note what he is doing, that's fine.

8     That's our right.  I am trying to accommodate them.  And

9     when I try to accommodate them, all I get, you know, is

10    the game board kicked over all over again.

11         So that's my proposal.

12         THE COURT:  How about the proposal they're making

13    about sending all of this out to have someone not involved

14    in this case do this?

15         MR. KUBY:  There are a couple of problems with

16    that.

17         First of all, it's the defense right to have our

18    own expert test it, not to send it to an independent third

19    party testing.

20         THE COURT:  So you object?

21         MR. KUBY:  I object.  There is actually a reason

22    for my objection, although I don't need to give a reason to

23    vindicate my rights.

24         THE COURT:  You're right.  No, you don't have to.

25         You object to that procedure, sending it to

1    somebody else?

2              MR. KUBY:  Yes.  Right.

3              THE COURT:  The question now is, how is it going

4    to get done.  Either it's going to get done in the District

5    Attorney's office or it's going to get done here.  Those

6    are the only two possibilities, and so the question is

7    where.

8              MR. MURPHY:  Here.

9              THE COURT:  Miss O'Connell, is there a problem?

10   What are we talking about?  We're talking about a computer.

11   We're talking about some attorneys.

12             MS. O'CONNELL:  Various electronic devices.

13             THE COURT:  And various electronic devices.

14             MS. O'CONNELL:  They get hooked up to various

15   other electronic devices.  If you were to order that it

16   take place in this courtroom and they'd be able to

17   videotape it, we would still have the same objection.

18             THE COURT:  You would have the same objection to

19   the videotape?

20             MS. O'CONNELL:  I have a real issue with it

21   happening in this courtroom.

22             THE COURT:  Why?

23             MS. O'CONNELL:  The thing is that we don't know

24   how long each of these devices is going to take to image.

25             THE COURT:  We have plenty of time.  We will set

1    aside a day, two days, whatever it takes to do it.  She has

2    to go to trial at some point.  Right now we're going

3    nowhere fast.

4              MS. O'CONNELL:  I want to put one issue before the

5    Court so the Court understands what I am trying to raise.

6    Once you begin imaging a computer, you have to wait until

7    the computer is completely imaged, until the imaging

8    process is complete.  That could take 24 hours.  Is the

9    Court suggesting that we're going to have personnel, people

10   here sitting in the court for 24 hours?

11             THE COURT:  No, I'm not.

12             MS. O'CONNELL:  That's the reality if this is what

13   the defense counsel is suggesting, that we have it here.

14   We can have it in a controlled environment in our office,

15   which is fine.  To have it up here, you would have to close

16   down the courtroom for potentially as long as 24 hours as

17   it would image.

18             THE COURT:  How would it be done in the District

19   Attorney's office if they did it?

20             MS. O'CONNOR:  In the District Attorney's office

21   they could stay there for however long.

22             THE COURT:  You can't stop and start the next day,

23   it has to be done for 24 hours?

24             MS. O'CONNOR:  I don't know.  You don't know how

25   long each device is going to take until you start the

1     imaging process.

2            MR. KUBY:  Since the People have said they have

3     done this before, right, this is imaging, they said they

4     have done it before, one question might be, well, how long

5     did it take.

6            THE COURT:  Miss O'Connell, again, if it does, in

7     fact, take longer than a court day, I guess we would have

8     to make provisions for someone to be here on overtime,

9     someone from the Court, which I guess we can make.

10    Twenty-four hours is a little bit difficult.

11           MS. O'CONNELL:  We're not saying that it's going

12    to take 24 hours, it could.

13           MR. KUBY:  It could.

14           MS. O'CONNELL:  Please.

15           MR. KUBY:  This is ridiculous, Judge.  Don't you

16    get tired of being lied to.  Last time we were here it was

17    four hours.

18           THE COURT:  Mr. Kuby, please.

19           MR. KUBY:  Now it's 24 hours.

20           MS. O'CONNELL:  Maybe.

21           MR. KUBY:  What's really wrong?

22           THE COURT:  You're saying this could take longer

23    than a court day?

24           MS. O'CONNELL:  I don't know.  I wasn't there the

25    first time it was imaged.

1      THE COURT:  Who was there?

2      MS. O'CONNELL:  The lab technician set the process

3   up.  I don't know whether they stayed continuously in the

4   lab with it or whether they kept a log of how long it

5   took.  We are trying to describe to you that it is not a

6   stop and start kind of thing, so you should be aware of

7   that issue.

8      THE COURT:  Is that relating to the different

9   devices or just the computer?  How about the phones?  How

10  about everything else?

11     MS. O'CONNELL:  I am relatively sure they don't

12  use the same copying devices, so they can do simultaneous

13  devices.

14     MS. O'CONNOR:  It's a simple process for the

15  phones versus the computer.  I am not putting forth that it

16  will take 24 hours.  I wanted the Court to be aware of that

17  potential issue that we have encountered on other forensic

18  cases.

19          Regardless of whether it's in this courtroom or

20  done in our office, videotaping, I believe, is an

21  extraordinary measure.

22     THE COURT:  Videotaping the device?

23     MS. O'CONNELL:  Yes.

24     THE COURT:  No one has told me why.

25          What is the prejudice to anyone, especially the

1    prosecution, if someone is videotaping what is done?  I

2    don't understand.

3                MS. O'CONNOR:  There are a number of reasons.

4                First of all, I believe that it sets a really bad

5    precedent to say we are now videotaping.

6                I think it's beyond the scope of the Court.

7                Second of all, I believe it's a bad precedent, we

8    are now going to be videotaping every one of these

9    processes.

10               As Miss O'Connell stated before, are we now going

11   to allow people to videotape autopsies?  Are we going to

12   allow videotaping of drug testing?

13               I don't believe that this is such an extraordinary

14   case that it needs to have a videotaping process when we

15   have witnesses that are there.

16               Again, the Court has the cross examination

17   process, which has worked very well, and I think that it

18   still should continue.

19               So we're proposing, I think, a very reasonable

20   solution.  That if there is a third party or some outside

21   source that wants to do videotaping and do the forensic

22   processing, that's fine.  We object to having our own

23   employees do it.

24               THE COURT:  We're not going to resolve this right

25   now.

1          MS. O'CONNELL:  We can't make them consent to it.

2     I think it's unreasonable to tell the technicians in the

3     Forensic Computer Lab, you must be videotaped doing this

4     process by the defense.  I think that is an unreasonable

5     thing to ask them.  They don't want to.

6          THE COURT:  They don't want to be videotaped?

7          MS. O'CONNELL:  No.

8          THE COURT:  Mr. Murphy.

9          MR. MURPHY:  I mean, I would just like to say one

10    thing.  You know, you got to ask yourself somewhere along

11    here, what's really wrong here with this stuff.  What's

12    really wrong?  What did they do wrong and what have they

13    messed up that they are fighting against reason so hard and

14    they are fighting against this process going forward.

15    Because all I am thinking to myself, what's really wrong,

16    because unless there is something wrong, unless they did

17    something wrong, unless they lost things, unless they

18    messed up, there is no rational reason for their

19    explanations, their conduct, and it absurd, and it's

20    nothing but dilatory in nature, and I really cannot see how

21    any reasonable person can argue against us asserting our

22    rights.

23          MS. O'CONNELL:  Again, Judge, the fact that they

24    haven't been able to say there was anything wrong with the

25    initial process, Mr. Murphy is right, why are we even doing

1     this.

2                    THE COURT:  Hold on, please.

3                    MR. MURPHY:  We're doing this because they did

4     something wrong, that's my argument.

5                    THE COURT:  Mr. Murphy and Mr. Kuby, please.

6                    MR. KUBY:  I am not going to respond to that.

7                    I want to make our position on the record very

8     clear.  I keep saying it, they're not responding to it,

9     they're responding to another position which we passed.

10    I am not suggesting that their technicians be forced to

11    come in here and perform their operation in front of the

12    Court and be videotaped.  I am not suggesting that.  Why

13    have that argument as to whether you have the authority.

14                   I am suggesting something far more modest.  Our

15    technician will come in here, will do the re-imaging.  He

16    will use his own equipment, or if the District Attorney

17    wants us to use their equipment, that's fine.  Our guy, our

18    party, he'll do these things in front of the Court.  If

19    they want to watch, that's fine, they can watch our expert

20    do his work.  If they want to videotape our expert, he's

21    cool with that, they can even do that.

22                   I am not suggesting you should now compel their

23    expert to do this.

24                   So that's my current position.  I am just trying

25    to deal with this ever shifting pattern of objections.

1    we're not going to come in when you render a decision.

2              THE COURT:  You're on vacation?

3              MR. MURPHY:  Yes, after the 20th I am back.

4              THE COURT:  After the 20th Judge Roger Hayes will

5    be presiding here.  I am not going to have him preside over

6    the case since he is not familiar with it.

7              We're going to have to adjourn.  If it can't be

8    before then, it will be in September for my decisions.

9              Mr. Kuby's response, August 1st.  It doesn't

10   matter to me.

11             MR. KUBY:  August 2nd.

12             THE COURT:  It doesn't matter since we're going to

13   adjourn to September.

14             The question about this other issue, this other

15   issue about the copying, imaging, whatever you are talking

16   about, this has to be decided.  The question is, how is it

17   going to be decided and when.

18             If you wish to submit something from the defense

19   as to your position which you put on the record today, I

20   would like it in writing.  The same with the People, put

21   your position in writing, and then we'll have to make a

22   decision.

23             MR. KUBY:  You want those papers simultaneously

24   filed?

25             THE COURT:  It could be simultaneous.  I think you

 1    each know what the other party's objecting to and why.

 2    There is no need for staggered submissions here.

 3              So I would like on that August date, August 2nd,

 4    we're talking about a date to have papers from both sides

 5    on this issue.

 6              MS. O'CONNELL:  What date?

 7              THE COURT:  August 2nd.  If you need another week,

 8    it's not going to matter since I am not going to decide it

 9    until September because of scheduling, lawyers' vacations

10    and things like that.

11              Do you need more time, prosecution?

12              MS. O'CONNELL:  No, your Honor.

13              THE COURT:  Mr. Murphy?

14              Mr. Kuby?

15              MR. MURPHY:  No, I am not doing it.

16              THE COURT:  I understand that.

17              MR. KUBY:  What was that date?

18              THE COURT:  August 2nd.

19              So you will have your reply, if any, to the

20    People's response filed today.

21              You will have, both sides, your positions in

22    writing about these problems that we have with discovery.

23              Then I will have to have a decision on this.

24              MR. MURPHY:  Okay.

25              THE COURT:  And in the interim, in the interim

1        I don't want to say you can't try to resolve this.

2                MR. MURPHY:  If we can't talk, how can we.

3                THE COURT:  You can do this without actually

4        talking.  You can do it other ways.  If it can be resolved,

5        the experts can get together and talk about this, if there

6        is a way to resolve it, that's fine.  If there is not,

7        that's fine also.

8                MR. KUBY:  There are two other issues, Judge, at

9        least from our perspective.

10               The first is, when our experts went to photograph

11       the evidence on July 11th, which actually worked, one of

12       the devices, the i-Pod touch, was missing, as in could not

13       be found, missing, and I'm sure the People have located it

14       by now.

15               I just would like to accomplish all of these

16       things at once rather than constantly coming back so if we

17       can have some status report as to the location of the i-Pod

18       touch.

19               THE COURT:  Miss O'Connell.

20               MS. O'CONNELL:  I was just informed of this last

21       week.  Honestly, I haven't begun to look for it, so I

22       will.

23               THE COURT:  Just informed that it was --

24               MS. O'CONNELL:  Not with the other property.  I am

25       pretty sure they were on the same voucher.  For some reason

1    it was not with the other property.

2            THE COURT:  This was seized from the hotel

3    room?

4            MS. O'CONNELL:  I don't know which premises, if it

5    was the hotel room.

6            When I have an update, I will make sure to write

7    Mr. Kuby a nice polite letter informing him.

8            MR. KUBY:  Right now the status of that is cannot

9    be found?

10           MS. O'CONNELL:  It's "unknown" to me.  When I

11   know, I will let him know.

12           MR. KUBY:  If we can find some person who might

13   know.  We were told that, you know, these things, they're

14   put in lockers under special procedures and to take them

15   out of a locker, who knows what we risk.  To now discover

16   that one of these devices seized pursuant to warrant is

17   unknown seems to suggest -- I mean, look, I do think it's

18   surprising that they lost one device out of like eight or

19   nine.  No, actually for them, that's pretty good.  But

20   nonetheless, Judge, given the buildup that you have been

21   given about the sacrosanct nature of the process with these

22   devices, I would like to know where it is.

23           THE COURT:  Miss O'Connell is going to respond to

24   that.  She is saying that she can't respond right now.

25           MR. KUBY:  Right.

# LAW OFFICE OF RONALD L. KUBY
### ATTORNEYS AT LAW
119 WEST 23ᴿᴰ STREET, SUITE 900
NEW YORK, NEW YORK 10011

RONALD L. KUBY ·
GEORGE WACHTEL
LEA SPIESS

TELEPHONE: (212) 529-0223
FAX: (212) 529-0644
WWW.KUBYLAW.COM

STAFF
SUSAN BAILEY
PROCESS SERVER
LUIS R. AYALA

Hon. Charles H. Solomon
Supreme Court of the State of New York
Part 82
100 Centre St.
New York, NY

BY HAND

July 20, 2012

Re: People v. Gigi Jordan, 0621/10

Dear Justice Solomon:

I write to request the Court to direct ADA O'Connell to cease her interference with the right of the defense to inspect and test Ms. Jordan's electronic devices, and to

As the Court knows, our experts arrived at the Office of the District Attorney at 10:00 am on July 17, 2012—the first date they could accommodate us. Our experts brought cameras and recording devices to document the condition of the devices, the apparent chain of custody, and the examinations to be performed, as they had during past forensic examinations of evidence. This time, however, ADA O'Connell announced a new rule and that she would not permit the documentation of the imaging; forcing the defense to choose between an examination that did not comport with best practices, or conducting no examination at all, pending further court order.

The reason that experts generally videotape their testing is obvious; if an anomaly is found the tape can be reviewed to determine whether the tester erred in performing some step of the examination, or whether the anomaly is genuine. Imagine, for example, mixing a complex chemical formula that does not yield the

1

expected result. Rather than starting all over again, a videotape allows the tester to make sure all of the steps were properly followed, and in the proper order. This is hardly rocket science

ADA O'Connell has articulated no reason for her latest fit of pique, and no reason is apparent. If ADA O'Connell is concerned that the tape may fall into the hands of terrorists, thereby revealing the way in which hard drives are re-imaged (although a simple Google search has many such depictions), we will agree to maintain the video under seal. Without knowing the basis of her objection, we are left with trying to respond, *ad hoc*, to a target which is both moving and invisible.

The Court should bear in mind that it was the defense that offered to forgo our right to independently test the devices to accommodate ADA O'Connell's irrational insistence that defense fingers never touch them. Our proposal to have the DA's office re-image these devices in the presence of our experts was a good-faith effort to address this concern (without crediting it), so that we can finally move forward. For her to now use that substantial concession to impose new conditions is intolerable and should not be countenanced.

ADA O'Connell's current suggestion—that we use an independent contractor not within the control of the defense—reveals the absolutely baseless nature of her earlier objections. If the Court will recall, ADA O'Connell aborted the scheduled June 1, 2012 inspection based on the truly ridiculous argument that once the devices are removed from their evidence lockers, they "cannot be returned." O'Connell Ltr., May 24, 2012. The defense wasted the month of June litigating the most basic right of discovery and inspection. After the Court ruled in our favor on June 29, 2012, ADA Szuchman asserted that bringing the original devices out of the lockers was "extraordinary," "never done," and raised grave "risk" of the devices being "modified. . . dropped, broken, changed. . . .." Tr., June 29, 2012. When this Court suggested bringing the devices to the courtroom and conduct the re-imaging under the Court's control, ADA Szuchman objected, arguing that the testing must be done in a "controlled environment," Tr., June 29, at 9, conjuring up some sci-fi movie image of an isolation chamber inhabited by technicians in bulky spacesuits with rebreathers.

In stark contrast to these depictions, when our forensic team arrived on July 11, 2012 to photograph the devices, the electronic equipment had been thrown into one unsealed box that did not contain any evidence tape or other chain of custody indications. And now ADA O'Connell suggests that the items that were hitherto

2

so sensitive that the very act of moving them irreparably modifies them can just be packed up and shipped off to a private company.

The defense would like to adopt the Court's suggestion that the testing be conducted in Part 82, and that our experts will observe and videotape. This solution will also have the salutary effect of making sure that if ADA O'Connell decides to kick over the game board with another new rule (no one may wear blue, everyone must say "mother may I" or cannot do anything unless ADA O'Connell says "Simon says"), the Court will be available to speedily rule on such obstructions. And since it is beyond dispute that this Court has the authority to authorize video and still photography in the courtroom, even when it depicts "DANY employees" at work, this objection of ADA O'Connell is resolved as well.

The defense concern is that we will indeed find anomalies that are a product of the failure of the NYPD to follow best practices when they were handling these devices in 2010. ADA O'Connell, as she is wont to do, will then blame the third-party contractor, necessitating a new round of hearings and litigation. Having the DA's office redo what they claim they did originally, while we document those efforts, will avoid wasting more time and will pinpoint the errors made, if any.

These concerns are hardly insignificant, given the fact that the District Attorney's office **has already lost one of the devices**, the Apple ITouch Device, bearing the serial number 1E9470846K2. See, Memorandum of Law in Support of Motion to Suppress, June 29, 2012, at Exhibits B, C, & E. As noted in the referenced exhibits, this device was seized along with several other electronic devices, pursuant to warrant, on February 5, 2010. However, when our forensic team photographed the evidentiary items on July 11, 2012, this device was missing. As of this writing, no one has informed us whether it has been located. Our forensic team noted that this device was described as being a "biohazard" and accordingly, was not accepted for testing by the DA's cyber unit. When the DA's office is able to locate this item, we will need documentation as to chain of custody. And our experts will have to inspect and test this item once it is located. The current MIA status of this item hardly inspires confidence that the other items were handled properly.

Last, notwithstanding this Court's June 29, 2012 order that the DA's office provide us with all forensic reports, the prosecution has failed to do so. Specifically, it appears that the NYPD computer unit was playing with these devices before they were provided to the DA's office, engaging in some forensic examination of their own. We have learned that these NYPD reports were just

3

recently provided to the DA's office (during the past week), and these are incomplete. We require full compliance with this Court's order before our part of this process can be completed.

Over the past two months, Ms. Jordan has been forced to waste funds on experts whose work ADA O'Connell has obstructed at the last moment. Expensive attorney time that should have been spent preparing for trial has been squandered to obtain rulings over issues that we should not have been forced to litigate. And when we prevail, ADA O'Connell just finds a new way to circumvent this Court's rulings. We implore the Court to direct that the electronic devices, and the relevant *dramatis personae*, be brought to Part 82 so that we can get this done.

Sincerely,

Ronald L. Kuby

4