## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GIGI JORDAN, )
)
    Plaintiff, )
)
    v. )    Civil Action No. 14-1485-SLR-SRF
)
RAYMOND A. MIRRA, JR., RAM )
CAPITAL GROUP, LLC D/B/A RAM )
CONSULTING GROUP, LLC, RAM )
CAPITAL II, LLC, RAM REALTY )
HOLDINGS, LLC, JOSEPH A. TROLIO, )
JR., BRUCE KOLLEDA, MARK A. )
KOVINSKY, JOSEPH J. TROPIANO, JR., )
PATRICK J. WALSH, DANIELLE )
STEWART, RENEE M. SIGLOCH, )
FREDERICK FORTE, VIRGINIA L. )
HALL, BARI KUO, and SHELLY )
DEMORA, )
)
    Defendants. )

### REPORT AND RECOMMENDATION

### I.   INTRODUCTION

Presently before the court in this diversity action are the following motions: (1) the

motion to dismiss for failure to state a claim of defendant Patrick Walsh ("Walsh") (D.I. 108);

(2) the motion to dismiss for failure to state a claim of defendants Raymond A. Mirra, Jr.

("Mirra"), RAM Capital Group LLC, RAM Capital II, LLC, RAM Realty Holdings LLC, Joseph

A. Troilo, Jr. ("Troilo"), Bruce Kolleda ("Kolleda"), Mark Kovinsky ("Kovinsky"), Joseph

Tropiano ("Tropiano"), Danielle Stewart ("Stewart"), Frederick Forte ("Forte"), Renee M.

Sigloch ("Sigloch"), Virginia L. Hall ("Hall"), Bari Kuo ("Kuo"), and Shelly Demora

("Demora") (collectively, the "RAM Defendants") (D.I. 112); (3) the motion to amend or correct

the amended complaint filed by plaintiff Gigi Jordan ("Jordan") (D.I. 123); and (4) the RAM

Defendants' motion for leave to file a sur-reply brief regarding Jordan's motion to amend the amended complaint (D.I. 145). For the following reasons, I recommend that the court deny the motions to dismiss without prejudice, grant the motion to amend, and deny the motion to file a sur-reply.

## II.    BACKGROUND[1]

In 1991, plaintiff Gigi Jordan ("Jordan") founded Ambulatory Pharmaceutical Services, Inc. ("APS"), a healthcare company specializing in providing individualized home infusion services. (D.I. 123, Ex. A at ¶ 28) Following the success of APS, Jordan entered into a business relationship with Mirra,[2] in which Jordan ran a subsidiary of Mirra's home infusion company. (*Id.*) On August 1, 1995, Jordan exercised an option to buy out Mirra's interests in APS, leaving her as the sole shareholder of APS. (*Id.* at ¶ 31) On August 29, 1997, Jordan sold APS to Integrated Health Services, Inc. ("IHS"). (*Id.* at ¶ 32)

During this time, Mirra represented to Jordan that defendants Troilo, Molieri, and Kolleda managed, controlled, and implemented Jordan and Mirra's respective business and financial affairs and acted co-equally for Jordan and Mirra as fiduciaries in the execution of their duties. (*Id.* at ¶¶ 33-34) In 1997, Mirra, Troilo, Molieri, and Kolleda organized RAM Capital to serve as a holding company for Jordan and Mirra's joint assets and business ventures. (*Id.* at ¶¶ 35-36) In 2002 and thereafter, Mirra, Troilo, Molieri, Kolleda, Tropiano, Kovinsky, and Eizen

---

[1] For purposes of this background section, the court accepts as true the facts set forth in the proposed second amended complaint. (D.I. 123, Ex. A) The parties agree that differences between the amended complaint and the proposed second amended complaint have no bearing on the analysis for the motions to dismiss. (D.I. 123 at 8; D.I. 131 at 9) Therefore, citation to the second amended complaint is appropriate regardless of the court's recommended outcome on the pending motions.

[2] Jordan and Mirra were also involved in a personal relationship beginning in 1990 or 1991. (D.I. 84 at ¶ 29)

organized various holding companies and trusts to allegedly disguise the actual ownership interests of Jordan's business holdings. (*Id.* at ¶¶ 37-38)

In March and December of 2003, Troilo, Mirra, Molieri, and Kolleda sent Jordan two estate planning memoranda falsely representing that Jordan and Mirra remained equal owners of their joint assets and business ventures. (*Id.* at ¶¶ 39-42) In 2005, defendants gave Jordan a business prospectus falsely reporting the status of Jordan and Mirra's joint business holdings and assets. (*Id.* at ¶ 43) In 2007, Tropiano, Kolleda, Mirra, and Molieri sent Jordan a schedule falsely stating that Jordan and Mirra held equal interests in companies, real estate, and other investments worth more than $241 million. (*Id.* at ¶ 44) Between 1997 and 2009, Tropiano, Kolleda, Mirra, Troilo, Molieri, and Kovinsky sent Jordan various reports and schedules which falsely represented that her business interests, real estate holdings, and assets were co-equally owned with Mirra. (*Id.* at ¶ 45)

Jordan filed the instant action in the Southern District of New York on March 9, 2012. (D.I. 1) The parties filed a joint stipulation to transfer venue to the District of Delaware on December 8, 2014. (D.I. 68) On March 9, 2015, Jordan filed her second amended complaint, alleging causes of action for breach of contract, an accounting, fraud-based claims, breach of fiduciary duty, breach of warranties, unjust enrichment, and conversion. (D.I. 123, Ex. A at ¶¶ 298-351)

## A.     Conversion and Misappropriation of Jordan's Bank Accounts

### 1.     Merrill Lynch Transactions

Jordan opened a Merrill Lynch account based on Mirra's recommendation in 1992. (*Id.* at ¶ 49) Walsh became Jordan's broker and private banker at Merrill Lynch. (*Id.* at ¶ 50) In 1997, Walsh advised Jordan to open two additional Merrill Lynch accounts to participate in a

covered writing account program intended to eliminate losses below the principal amounts invested. (*Id.* at ¶¶ 52-55)

In April 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh to open a new Merrill Lynch account jointly held by Jordan and Mirra. (*Id.* at ¶¶ 56-59) They deposited more than $14 million of Jordan's money into the joint account without Jordan's knowledge or consent. (*Id.* at ¶¶ 60-62) Four months later, in September 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh allegedly forged Jordan's signature on account opening documents for the joint account. (*Id.* at ¶ 63)

In January 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh to convert Jordan's three individual Merrill Lynch accounts into joint accounts held with Mirra. (*Id.* at ¶¶ 65-70) Thereafter, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh opened additional Merrill Lynch accounts jointly held by Jordan and Mirra by forging Jordan's signature on account application forms. (*Id.* at ¶¶ 71-77) Between 2003 and 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature on wire transfer authorizations purporting to authorize Merrill Lynch to transfer Jordan's money to Mirra and various entities owned or controlled by defendants. (*Id.* at ¶¶ 78-80) Between 2003 and 2008, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature on loan applications and wire transfer authorizations, causing Merrill Lynch to loan millions of additional dollars to Mirra, RAM Capital, and other entities owned and controlled by defendants, using Jordan's assets as collateral for the loans. (*Id.* at ¶¶ 81-87)

### 2.    Other Transactions

On August 29, 1997, Jordan sold APS to Integrated Health Services, Inc. ("IHS") in exchange for more than $34 million in cash and stock options. (*Id.* at ¶ 89) Mirra subsequently

urged Jordan to open a Smith Barney brokerage account in March 1998 with the proceeds from the sale. (*Id.* at ¶¶ 90-91) In June 1998, Mirra encouraged Jordan to execute a Smith Barney trading agreement, which was faxed to the account broker. (*Id.* at ¶ 92) Mirra, Troilo, Molieri, Kolleda, and Tropiano then coordinated the liquidation of Jordan's stock in the Smith Barney brokerage account and fraudulently transferred the funds out of the account without Jordan's knowledge or consent. (*Id.* at ¶ 93)

In 1998, Mirra conferred with Jordan regarding an "offshore asset protection" plan involving multiple offshore trusts, LLC's, and bank accounts. (*Id.* at ¶¶ 94-97) Pursuant to Mirra's proposal, both he and Jordan would transfer $7 million to a bank account in Geneva, Switzerland (the "BJB account"), and a Nevis-based LLC named West-Highland Company LLC ("West Highland"), solely owned by Jordan, would be established as the account holder of the offshore account. (*Id.* at ¶¶ 98-99) Jordan signed an agreement in accordance with Mirra's proposal. (*Id.* at ¶ 100) In July 1999, Mirra, Troilo, Molieri, Kolleda, and Tropiano forged Jordan's authorization to transfer the funds in Jordan's Smith Barney account to the BJB account, comprising the total initial funding for West Highland's BJB account. (*Id.* at ¶ 103) In 2001, Mirra fraudulently induced Jordan to assign him a fifty percent interest in West Highland by falsely representing that he had contributed half of the funds deposited into the account. (*Id.* at ¶¶ 102, 105)

## B.    Fraudulent Property Transactions

Defendants also engaged in a scheme to divest Jordan of her equity in several real properties. (*Id.* at ¶ 106) On June 30, 1995, Jordan purchased a property located at 2932 North Atlantic Boulevard in Fort Lauderdale, Florida, for $1.65 million. (*Id.* at ¶ 107) On July 12, 1996, Mirra and Troilo forged Jordan's signature on a warranty deed purporting to add Mirra as

a co-owner of the property and recorded the deed. (*Id.* at ¶¶ 109-111) On April 10, 2002, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signatures on mortgage loan application documents and obtained a $375,000 mortgage on the property. (*Id.* at ¶¶ 112-115) On August 16, 2006, Mirra, Troilo, Kolleda, and Tropiano sold the property for $4.8 million and retained the proceeds. (*Id.* at ¶¶ 116-119)

On June 23, 2000, Mirra, Troilo, Kolleda, and Tropiano caused APS, which was jointly owned by Jordan and Mirra, to purchase a property located at 2937 North Atlantic Boulevard, Fort Lauderdale, Florida, for $660,000. (*Id.* at ¶ 121) On December 27, 2001, Mirra, Troilo, Kolleda, and Tropiano caused the property to be sold for $10.00 to West Highland. (*Id.* at ¶ 123) On April 12, 2004, Mirra, Troilo, Kolleda, and Tropiano sold the property for $1.00 to "Gigi Jordan and her Husband Raymond Mirra." (*Id.* at ¶ 125) Jordan was not advised of the purchase or the sales. (*Id.* at ¶¶ 122, 124, 126) On the same date, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature and authorized Merrill Lynch to wire $345,631.96 to a West Highland account to pay off the mortgage on the property. (*Id.* at ¶¶ 127-128) On April 28, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano forged Jordan's signature on a warranty deed selling the property for $850,000 without Jordan's knowledge. (*Id.* at ¶¶ 129-131)

In 2000, Mirra, Troilo, Kolleda, Kovinsky, and Tropiano incorporated RAM Developers to engage in real estate investments, and falsely represented to Jordan that she was a fifty percent owner of RAM Developers. (*Id.* at ¶¶ 133-135) On April 4, 2001, Jordan provided $4.1 million to RAM Developers to be used to purchase a property located at 352 West End Avenue, New York, New York. (*Id.* at ¶ 136) On April 5, 2001, Jordan permitted the property to be titled in the name of RAM Developers, rather than in Jordan's name individually. (*Id.* at ¶ 139) On July

8, 2002, Mirra, Troilo, Kolleda, Kovinsky, and Tropiano sold the property for $4.35 million. (*Id.* at ¶ 140)

On April 5, 2002, a deed was recorded conveying a property in Concord, Virginia to Jordan and Mirra for $3.265 million. (*Id.* at ¶ 143) On August 27, 2002, Mirra took out a $2 million mortgage from Merrill Lynch on the property without Jordan's knowledge. (*Id.* at ¶ 147) Between February 2003 and June 2004, Mirra, Troilo, Kolleda, and Tropiano bought additional lots to add to the existing acreage of the property without Jordan's knowledge. (*Id.* at ¶ 148) On June 3, 2004, Mirra and Jordan borrowed $3 million from JPMorgan Chase for payment on the purchase of the property. (*Id.* at ¶ 149) On March 31, 2005, the $3 million JPMorgan mortgage was increased by $1 million and converted to a home equity line of credit. (*Id.* at ¶ 151) On June 3, 2005, a loan was obtained on the property from Merrill Lynch in the amount of $2 million. (*Id.* at 160)

On May 31, 2002, Jordan and Mirra purchased a property in North Garden, Virginia for $1.8 million. (*Id.* at ¶ 163) On December 4, 2003, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature on a deed conveying the property from Jordan and Mirra to RAM Realty. (*Id.* at ¶ 164) RAM Realty subsequently subdivided and sold off the Taylors Gap Road Property for $2.151 million. (*Id.* at ¶ 166)

### C.    The Separation and Distribution Agreement

On March 12, 2008, Jordan and Mirra executed a Separation and Distribution Agreement ("SDA"). (*Id.* at ¶ 169) In connection with a merger between Biomed America, Inc. ("Biomed") and Allion Healthcare, Inc. ("Allion"), on March 4, 2008, Mirra, Troilo, Molieri, Kolleda, and Tropiano falsely represented that Jordan's half of the Biomed stock was valued at $4.9 million, when it was actually worth much more than that. (*Id.* at ¶¶ 176-179) Pursuant to the terms of

7

the SDA, Jordan transferred her fifteen percent ownership interest in Biomed to an LLC owned by Mirra for $4.9 million. (*Id.* at ¶ 180) Through this transaction, Mirra received $78 million, $39 million of which was rightfully Jordan's. (*Id.* at ¶¶ 181-182)

Mirra subsequently orchestrated two transactions resulting in the sale of Jordan's ownership interests in APS and Specialty Pharmacy, Inc. to AmerisourceBergen Corporation ("ABC") in 2002 for $30 million. (*Id.* at ¶¶ 185-188) On April 29, 2002, a fraudulent Merrill Lynch account received nearly $15 million in connection with the first transaction. (*Id.* at ¶ 189) In December 2002, Bioservices was acquired by ABC for $159 million, yielding $75 million more than Mirra had reported. (*Id.* at ¶ 191) The actual profits of the sale were routed by Mirra to another unknown account. (*Id.* at ¶ 195)

On March 4, 2008, Mirra, Troilo, Kolleda, and Tropiano falsely represented to Jordan that she had a fifty percent interest in four companies, including VasGene, PrideCare, ARC, and Cancer Innovations, which had no value. (*Id.* at ¶ 197) Defendants falsely represented that the companies had no value to induce Jordan to surrender her rightful interests in the companies and execute the SDA. (*Id.* at ¶¶ 198-199) In February 2008, Mirra, Troilo, Kolleda, and Tropiano falsely represented that RAM Capital had no assets or value, causing Jordan to forfeit her fifty percent interest in the company. (*Id.* at ¶¶ 202-205)

On February 29, 2008, Mirra, Troilo, Kolleda, and Tropiano sent a purportedly complete schedule of the private companies in which Jordan and Mirra held joint interests, but did not disclose the assets of subsidiaries, holding companies, or companies related to RAM Capital. (*Id.* at ¶¶ 206-211) The schedule also failed to disclose other companies in which Jordan and Mirra had joint interests that were active and in good standing at the time the SDA was executed. (*Id.* at ¶ 213)

8

The SDA also misrepresented the total value of the real estate properties jointly held by Jordan and Mirra. (*Id.* at ¶ 216) Specifically, Mirra, Troilo, Kolleda, and Tropiano represented that a Tahoe property bought in 1999 exclusively by Jordan was jointly held, and they bought two properties in Santa Barbara, California titled in the name of RAM Realty, using money stolen from Jordan and Mirra's joint bank account in the spring of 2004. (*Id.* at ¶¶ 220-221, 224-227, 231-235) The SDA also represented that Jordan was responsible for fifty percent of the fraudulent encumbrances on the Concord, Virginia property, and underestimated the value of the property by at least $6 million. (*Id.* at ¶¶ 237-242)

Moreover, the SDA contained misrepresentations and concealments regarding the contributions to West Highland LLC and the liabilities of the Merrill Lynch accounts, indicating that the assets were jointly held and Mirra had contributed half of the funds, and Jordan and Mirra were jointly and severally liable for any liabilities, when in fact the contributions were made solely by Jordan and the liabilities were incurred solely by Mirra. (*Id.* at ¶¶ 245-252) Mirra succeeded in inducing Jordan to surrender fifty percent of the value of the Merrill Lynch asset accounts by falsely assuming fifty percent of the joint liabilities, and Jordan paid Mirra $3.4 million as consideration for his assumption of the liabilities. (*Id.* at ¶¶ 254-255) Mirra, Troilo, Kolleda, and Tropiano also falsely represented that all of Mirra's financial obligations to Jordan prior to January 31, 2003 had been satisfied. (*Id.* at ¶¶ 257-262)

Contemporaneous with the execution of the SDA, Mirra and Jordan entered into a Mutual General Release Document ("Release"), which purported to release defendants from liability arising from their fraudulent conduct. (*Id.* at ¶¶ 264-267) According to Jordan, she reviewed the terms and conditions of the Release in March 2008 and informed her counsel that she wanted a

portion of the Release stricken.[3]  (*Id.* at ¶ 268)  Mirra, Troilo, Kolleda, and Tropiano allegedly

agreed to strike the language and sent signature pages to Jordan's counsel.  (*Id.* at ¶ 270)  Troilo

resent the signature page of the Release for execution without removing the disputed language

from the Release, and neither Jordan nor her counsel reviewed the full version of the Release

prior to its execution.  (*Id.* at ¶¶ 271-277)

### D.    The Conundrum Trust

In December 2002, Mirra and Troilo approached Jordan regarding the establishment of

two grantor retained annuity trusts ("GRATs"), the Hawk Mountain Trust ("HM Trust") and the

Conundrum Trust, for the benefit of Mirra and Jordan's children.  (*Id.* at ¶ 280)  Mirra and Troilo

represented that Jordan would be the settlor of the HM Trust and Mirra would be the settlor of

the Conundrum Trust.  (*Id.* at ¶ 281)  The trusts were allegedly intended to receive the proceeds

expected from the ABC acquisition of U.S. Bioservices, and Jordan was led to believe that she

would still control the assets of the Hawk Mountain LLC and that over $3.5 million would be

saved in capital gains tax.  (*Id.* at ¶¶ 282-283)  Mirra and Troilo falsely represented to Jordan that

she could not act as a protector of her own trust, and she acquiesced to the appointment of Mirra

as protector of the HM Trust.  (*Id.* at ¶¶ 284-285)

In April 2010, Bernard Eizen[4] contacted Jordan's attorneys in his capacity as attorney for

Troilo and Kolleda, as trustees of the HM Trust, and Mirra, as protector, taking a position

directly adverse to Jordan's interests.  (*Id.* at ¶¶ 286-287)  On May 24, 2010, Eizen sent a letter

---

[3] Jordan's proposed amendment centers on which provision remained in the Release despite
Jordan's request to strike it.  In Jordan's amended complaint, she claims that she requested
removal of language from paragraph 5 of the Release.  (D.I. 84 at ¶ 267)  The only modification
in the proposed second amended complaint was to change the quoted excerpt of the Release to
language from paragraph 3.  (D.I. 123, Ex. A at ¶ 267)
[4] Eizen was voluntarily dismissed as a defendant in this action on January 13, 2016.  (D.I. 156)

to Jordan's attorney, falsely stating that Jordan had resigned as protector of the Conundrum Trust and attaching a fraudulent document regarding the resignation. (*Id.* at ¶ 288)  On March 9, 2011, Eizen produced a disclaimer document dated June 30, 2009, which falsely purported that Jordan agreed to disclaim any right her son may have had to benefit from the Conundrum Trust as the adopted child of Mirra. (*Id.* at ¶ 289)  Another fraudulent disclaimer of Jude Mirra's interests in the Conundrum Trust was dated November 19, 2009.  (*Id.* at ¶¶ 291-292)

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6)

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff.  *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

11

When determining whether dismissal is appropriate, the court must take three steps.[5] *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must identify the elements of the claim. *Iqbal*, 556 U.S. at 675. Second, the court must identify and reject conclusory allegations. *Id.* at 678. Third, the court should assume the veracity of the well-pleaded factual allegations identified under the first prong of the analysis, and determine whether they are sufficiently alleged to state a claim for relief. *Id.*; *see also Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The third prong presents a context-specific inquiry that "draw[s] on [the court's] experience and common sense." *Id.* at 663-64; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). As the Supreme Court instructed in *Iqbal*, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

---

[5] Although *Iqbal* describes the analysis as a "two-pronged approach," the Supreme Court observed that it is often necessary to "begin by taking note of the elements a plaintiff must plead to state a claim." 556 U.S. at 675, 679. For this reason, the Third Circuit has adopted a three-pronged approach. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

**B.** **Rule 15(a)**

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been filed, a party may amend its pleading "only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend lies within the discretion of the court. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The Third Circuit has adopted a liberal approach to the amendment of pleadings. *See Dole v. Arco*, 921 F.2d 484, 487 (3d Cir. 1990). In the absence of undue delay, bad faith, or dilatory motives on the part of the moving party, the amendment should be freely granted, unless it is futile or unfairly prejudicial to the non-moving party. *See Foman*, 371 U.S. at 182; *In re Burlington*, 114 F.3d at 1434.

**IV.** **DISCUSSION**

**A.** **Motion to Amend**

In support of her motion to amend the amended complaint, Jordan alleges that the proposed amendment seeks only to correct an inadvertent clerical mistake to avoid potential confusion. (D.I. 123 at 6-7) Specifically, Jordan contends that the amended complaint mistakenly identifies quoted language from paragraph 5 of the Release, whereas the proposed second amended complaint quotes paragraph 3 of the Release as intended in the first instance. (*Id.* at 3-5) Jordan argues that the proposed amendment is not the product of undue delay, bad faith, or dilatory motive because it was brought to Jordan's attention in the RAM Defendants' motion to dismiss, filed less than one month before the instant motion was filed. (*Id.* at 7) Jordan concedes that the factual correction sought in the motion to amend does not affect defendants' motions to dismiss. (*Id.* at 8)

13

In response, the RAM Defendants allege that the proposed amendment is futile because the terms of the Release bar the action regardless of which portion is quoted in the pleadings. (D.I. 131 at 9-12) Moreover, the RAM Defendants allege that the proposed amendment is made in bad faith because discovery in the related RICO action, Civil Action No. 13-2083-SLR-SRF, has revealed that the allegation Jordan seeks to make in the proposed second amended complaint is untrue. (*Id.* at 13-16) The RAM Defendants move for attorneys' fees and costs in connection with the pending motion to dismiss as a result of Jordan's alleged bad faith in raising the motion. (*Id.* at 17-18)

Jordan's first amended complaint alleges that the following excerpt of the Release is at issue:

> Each of Mirra, with respect to the Jordan Settled Claims, and Jordan, with respect to the Mirra Settled Claims, believes after due inquiry that he or she is fully familiar with the facts and circumstances which are sufficient to enable him or her to enter into this Release Agreement, and further acknowledges hereby that he or she is aware that he or she may hereafter discover facts or circumstances in addition to or different from those which he or she now knows or believes to be true with respect to the subject matters of this Release Agreement, but that it is such Party's intention to, and such Party hereby does, fully, finally, completely and forever release, discharge, compromise, settle, satisfy and extinguish any and all such Claims, without regard to the subsequent discovery or existence of such different or additional facts or circumstances. Each of the Parties further expressly acknowledges that the releases set forth herein extend to Claims which are presently unknown, as well as known Claims.

(D.I. 84 at ¶ 267) By way of the proposed second amended complaint, Jordan seeks to replace this quotation with the following language from paragraph 3 of the Release:

> Jordan, for and on behalf of (x) herself, her heirs and beneficiaries, (y) her affiliates and each of their limited and general partners, officers, directors, stockholders, members, managers, employees, attorneys, advisors and agents, and (z) each such foregoing person's or entity's predecessors, successors and assigns (collectively, the "Jordan Releasing Parties"), agrees to and hereby does irrevocably release and forever discharge (a) Raymond A. Mirra, Jr., (b) his heirs and beneficiaries, his affiliates and the officers, directors, stockholders,

14

employees, agents, insurers and attorneys of each such affiliate, and (c) each such foregoing person's or entity's predecessors, successors and assigns (collectively the "Mirra Released Parties") from any and all manner of actions, causes of action, claims, offsets, demands, judgments, complaints, executions, regulatory challenges, losses, damages, expenses, fees, debts, representations, warranties or liabilities of any kind whatsoever, whether arising out of state, federal or foreign law, rule, regulation or equity, whether known or unknown, accrued or not accrued, asserted or not asserted, matured or not matured, suspected or not suspected, fixed or contingent, foreseeable or unforeseeable, direct or indirect (each, a "Claim", and collectively, "Claims"), which the Jordan Releasing Parties ever had, now have or hereafter can, shall or may have or acquire against the Mirra Released Parties, or any of them, by reason of any and all facts, circumstances, transactions, events, statements, representations, warranties, occurrences, acts, or omissions (whether or not knowingly, intentional, reckless or negligent; whether or not based on, due to or resulting from solely the conduct, action, activity, omission or fault of one or more of the Jordan Released Parties; and with or without any conduct, action, activity, omission or fault of the Jordan Releasing Parties), which occurred, arose or existed at any time on or before the date of this Release Agreement.

(D.I. 123, Ex. A at ¶ 267)  The parties agree that the proposed amendment is a minor change that has no bearing on the court's analysis of the pending motions to dismiss before the court.  (D.I. 123 at 8; D.I. 131 at 9)  In view of the recommendation that the court deny the pending motions to dismiss, for the reasons set forth at § IV.B, *infra*, and the liberal standard for amending pleadings in the Third Circuit, the court will permit the proposed amendment.

The court rejects the RAM Defendants' request for sanctions in conjunction with their assertion that the proposed amendment is made in bad faith.  When considering a motion for leave to amend, the court should not grant leave if "the motion is being made in bad faith."  *U.S. ex rel. B&R, Inc. v. Donald Lake Constr.*, 19 F. Supp. 2d 217, 220 (D. Del. 1998).  "The scope of the court's inquiry is therefore limited to whether the motion to amend *itself* is being made in bad faith, not whether the original complaint was filed in bad faith or whether conduct outside the motion to amend amounts to bad faith."  *Trueposition, Inc. v. Allen Telecom, Inc.*, 2002 WL 1558531, at *2 (D. Del. July 16, 2002) (citing *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813

F.2d 610, 614 (3d Cir. 1987) ("[T]he question . . . of bad faith, requires that we focus on the plaintiff's motives for not amending their complaint earlier.")[6]).

Evidence uncovered during document discovery in the related RICO case does not irrefutably prove the RAM Defendants' theory regarding the basis for Jordan's proposed amendment. These documents represent a select portion of the total production in the RICO case, and discovery has not yet commenced in the present action. *See Collins v. Hunter*, C.A. No. 05-624-SLR, 2006 WL 1582220, at *1 (D. Del. June 7, 2006) (noting that submitting exhibits on matters outside the pleadings is more appropriate at the summary judgment stage). Under the Federal Rules of Evidence, cited by the RAM Defendants, the court may judicially notice a fact only if it is not subject to reasonable dispute and "can be accurately and readily determined." Fed. R. Evid. 201(b)(2). Although the RAM Defendants allege that the court may take judicial notice of the documents because there is no dispute over their authenticity or accuracy (D.I. 131 at 12 n.2), Jordan affirms that the parties' interpretation of these documents, and the context in which they are presented, are highly contested (D.I. 138 at 5-6). *See Redick v. E Mortgage Mgmt., LLC*, C.A. No. 11-1260-GMS-CJB, 2013 WL 5461616, at *2 (D. Del. Sept. 30, 2013) (noting that, although judicial proceedings from a different case are considered public records, "a court may only take judicial notice that the other judicial proceedings exist," and "may not make findings of fact based on those other proceedings" absent a motion for summary judgment).

In connection with the briefing on Jordan's motion to amend, the RAM Defendants moved for leave to file a surreply. (D.I. 145) I recommend that the court deny the RAM

---

[6] The RAM Defendants focus their arguments on the alleged falsity of the proposed amendment, and do not challenge the timeliness of the proposed amendment. (D.I. 131 at 12-18)

Defendants' motion for leave to file a surreply. "A Court may grant leave to file a sur-reply if it responds to new evidence, facts, or arguments." *St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) (citing *Belden Techs., Inc. v. LS Corp.*, C.A. No. 08-823-SLR, 2010 WL 11205228, at *1 (D. Del. July 14, 2010); *Walsh v. Irvin Stern's Costumes*, 2006 WL 166509, at *12 (E.D. Pa. Jan. 19, 2006)). The arguments set forth in Jordan's reply brief do not necessitate the filing of a surreply "because they either expound on arguments made in [Jordan's] opening brief, or because they involve content that is directly responsive to arguments made in [the RAM Defendants'] answering brief." *Execware, LLC v. BJ's Wholesale Club, Inc. et al.*, 2015 WL 4275314, at *2 n.3 (D. Del. July 15, 2015), *reversed in part on other grounds by Execware, LLC v. BJ's Wholesale Club, Inc.*, 2015 WL 5734434 (D. Del. Sept. 30, 2015).

The RAM Defendants direct the court's attention to only one apparent discrepancy[7] between Jordan's allegations in her opening and reply briefs regarding which paragraphs of the Release are at issue. In her opening brief and supporting declarations, Jordan alleges that the citation to paragraph 5 of the Release was in error, and the quoted language from the Release should be amended to reflect language from paragraph 3 of the Release instead. (D.I. 123 at 3-4; D.I. 124 at ¶¶ 5-6) In her reply brief and the corresponding declarations, Jordan alleges that objections were raised to the language in both paragraph 3 and paragraph 5. (D.I. 138 at 6-7; D.I. 139 at ¶ 6 n.1; D.I. 140 at ¶¶ 11, 17, 26) The statements made in Jordan's reply brief were made in response to the RAM Defendants' citation to email correspondence produced in

---

[7] The other issues raised by the RAM Defendants in support of their motion for leave to file a surreply, such as Jordan's alleged mischaracterization of certain email correspondence and misapprehension of the applicable legal standard, are not properly before the court because they do not point to new evidence, facts, or arguments unrelated to arguments raised in the opening and answering briefs. (D.I. 145 at 1-3)

discovery in the related RICO action, and do not directly contradict the allegations in the proposed second amended complaint on their face. (D.I. 131 at 14-15) The fact that Jordan declined to pursue claims based on paragraph 5 of the Release in the second amended complaint ultimately goes to the sufficiency of the pleading.

I recommend that the court deny the RAM Defendants' motion for leave to file a surreply brief because the arguments raised in Jordan's reply brief "either expound on arguments made in [Jordan's] opening brief, or because they involve content that is directly responsive to arguments made in [the RAM Defendants'] answering brief." *See Execware, LLC v. BJ's Wholesale Club, Inc.*, 2015 WL 4275314, at *2 n.3 (D. Del. July 15, 2015).

### B.      Motions to Dismiss Under Rule 12(b)(6)

In support of their motions to dismiss, defendants present three primary arguments: (1) the Release bars all of the claims except for the cause of action for declaratory relief, (2) the statute of limitations bars the majority of the claims, and (3) the causes of action sounding in fraud and declaratory relief independently fail to state a claim under Rule 12(b)(6). (D.I. 108; D.I. 112) However, new arguments raised during oral argument that were not addressed in the briefing, internal inconsistencies in the briefing, and efforts to introduce evidence outside of the pleadings lead the court to the conclusion that the issues presented by defendants are more properly resolved on dispositive motions pursuant to Rule 56.

Jordan's counsel raised contentions during the oral argument held on November 10, 2015 that were not addressed in the briefing. (11/10/15 Tr. at 39:18-41:3) Specifically, Jordan's counsel pointed to language in Paragraph 3 of the Release stating that "Jordan is not releasing hereby Mirra from claims that arise under the expressed terms and conditions of and specified in the [SDA]." (11/10/15 Tr. at 39:13-17) Counsel then quoted language from Article 5.3 of the

18

SDA stating that "Mirra represents and warrants that . . . the recognized joint assets listed on Schedule 2.1.1 represents all of the assets to which the parties have a joint interest," and "the recognized joint liabilities listed on Schedule 2.2.2 represents all of the liabilities to which the parties are jointly and/or separately liable." (*Id.* at 40:1-10) According to Jordan, these provisions demonstrate that the Release does not bar claims against Mirra arising from misrepresentations listed on Schedules 2.1.1 and 2.2.2. Because this argument was not addressed in the briefing, defendants were not fully prepared to respond. (*Id.* at 58:6-17)

The court is obligated to construe the facts in the light most favorable to the plaintiff at this stage of the proceedings. Consequently, it would not be appropriate to overlook Jordan's statement raised for the first time at oral argument regarding the interplay between paragraph 3 of the Release and Article 5.3 of the SDA, as it appears to be facially plausible and consistent with the language of the SDA. As a result, the court cannot grant the motions to dismiss based on the language of the Release as they pertain to Mirra. However, defendants should be afforded the opportunity to respond to Jordan's arguments with the benefit of discovery at the dispositive motions stage. The court will therefore defer consideration of this issue until dispositive motions are filed.

Further complicating the court's efforts to discern and assess the parties' positions on the pending motions to dismiss, internal inconsistencies in the RAM Defendants' briefing improperly place the court in the position of speculating as to which arguments the RAM Defendants intended to raise. The RAM Defendants' opening brief in support of their motion to dismiss contains a chart identifying each cause of action and the respective grounds for dismissal alleged. (D.I. 113 at 11) The chart indicates that the causes of action for an accounting, common law fraud, and fraudulent inducement are barred by the statute of limitations, except as

19

to defendant Mirra. (*Id.*) However, the text of the brief suggests that the RAM Defendants believe the statute of limitations does in fact bar the causes of action against Mirra for an accounting, common law fraud, and fraudulent inducement. (*Id.* at 28-32) At this stage of the proceedings, when the court must view the facts in the light most favorable to Jordan, the court declines to speculate as to which arguments the RAM Defendants intended to pursue or abandon.

With respect to the remaining issues raised in the motions to dismiss which are not affected by the above-referenced deficiencies and concerns, I recommend that the court reserve resolution of these issues for summary judgment, after full discovery and the completion of the record. *See C.R. Bard, Inc. v. Angiodynamics, Inc.*, C.A. No. 15-218-SLR, 2016 WL 153033, at *12 (D. Del. Jan. 12, 2016) (denying the motion to dismiss after concluding that the arguments raised were more appropriately addressed on summary judgment). The RAM Defendants have attempted to introduce discovery from the related RICO action in support of the motion to amend the complaint. (D.I. 131 at 13-16) These arguments further persuade the court that the issues presented to the court at this time are more appropriately resolved on summary judgment following the exchange of discovery.

## V.   CONCLUSION

For the reasons discussed above, I recommend that the court (1) deny the motion to dismiss of defendant Patrick Walsh (D.I. 108); (2) deny the motion to dismiss of the RAM Defendants (D.I. 112); (3) grant Jordan's motion to amend the amended complaint (D.I. 123); and (4) deny the RAM Defendants' motion for leave to file a sur-reply brief (D.I. 145).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss

of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874,

878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).  The

parties are directed to the court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72,

dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.


Dated: June  7  , 2016

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE