## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

-----------------------------------------------------------------------X

GIGI JORDAN,

                    Plaintiff,

        -against-

RAYMOND A. MIRRA, JR.,                  **SECOND AMENDED**
RAM CAPITAL GROUP, LLC, D/B/A        **COMPLAINT**
RAM CONSULTING GROUP, LLC,
RAM CAPITAL II, LLC,
RAM REALTY HOLDINGS, LLC,           **C.A. No. 14-01485-SLR-SRF**
JOSEPH A. TROILO, JR.,
BRUCE KOLLEDA,
MARK KOVINSKY,                  **Plaintiff Demands a Trial by**
JOSEPH TROPIANO,               **Jury**
PATRICK WALSH,
DANIELLE STEWART,
RENEE M. SIGLOCH,
FREDERICK FORTE,
VIRGINIA L. HALL,
BARI KUO, and
SHELLY DEMORA

                    Defendants.

-----------------------------------------------------------------------X

      Plaintiff Gigi Jordan ("Plaintiff" or "Jordan"), as and for her Second Amended Complaint

against the Defendants, hereby alleges as follows:

### <u>NATURE OF THE ACTION</u>

      1.    This action involves a massive series of interrelated fraudulent schemes

perpetrated against Plaintiff by her long-term business partners, attorneys, accountants, trustees

and advisors, who conspired together and abused their positions of trust to steal millions of

dollars in cash and other assets from Jordan

      2.    In particular, Plaintiff seeks to recover more than $225,000,000.00 that

Defendants Raymond A. Mirra, Jr. ("Mirra"), Joseph A. Troilo, Jr. ("Troilo"), Joseph T. Molieri

("Molieri"), Bruce Kolleda ("Kolleda"), Bernard Eizen ("Eizen"), Mark Kovinsky ("Kovinsky"),

Joseph J. Tropiano, Jr. ("Tropiano"), RAM Capital Group, LLC d/b/a RAM Consulting Group,

LLC and RAM Capital II, LLC ("RAM Capital"), RAM Realty Holdings, LLC ("RAM Realty"),

Patrick Walsh ("Walsh"), Danielle Stewart ("Stewart"), Renee M. Sigloch ("Sigloch"), Frederick

Forte ("Forte"), Virginia Hall ("Hall"), Shelly Demora ("Demora"), and Bari Kuo ("Kuo")

(collectively the "Defendants") stole from her through numerous acts of fraud and forgery.

3.      The Defendants fall into the following categories:

(i)     Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM
        Capital, RAM Realty, and Walsh forged Plaintiff's signature, or caused it to be
        forged, on the documents that enabled them to exercise control over Plaintiff's
        assets; transferred Plaintiff's assets to themselves or for their benefit, forged loan,
        lines of credit, and mortgage documents using Plaintiff's assets to collateralize
        such loans, and then fraudulently concealed their transfers of her money. These
        Defendants also abused their positions of trust and their fiduciary duty to the
        Plaintiff to defraud her of her rightful interests in valuable companies.

(ii)    Defendants Stewart, Sigloch, Forte, Hall, Demora and Kuo were employed by
        and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen,
        Kovinsky, Tropiano, RAM Capital, and RAM Realty, and related companies
        owned or controlled by the defendants, and knowingly falsely notarized and
        witnessed many of the forgeries of Plaintiff's signature enabling the Defendants
        to exercise control over Plaintiff's assets and enact the fraudulent transfers of
        Plaintiff's assets.

4.      As discussed more fully herein, the Defendants at all relevant times have known

that:

(i)     Plaintiff did not sign the documents that were used by the Defendants to enact the
        fraudulent transfers of her assets; and

(ii)    The documents used by the Defendants to enact the fraudulent transfers of
        Plaintiff's assets were fraudulent forgeries created by the Defendants.

5.      As such, the Defendants do not now have – and never had – any right to the more

than $225,000,000.00 that they stole from Plaintiff through their fraudulent transfers of

Plaintiff's assets.

6.     The Defendants' series of interrelated fraudulent schemes commenced at least as early as 1997 and has continued uninterrupted since that time.

7.     As the result of the Defendants' fraudulent schemes, Plaintiff has incurred damages in excess of $225,000,000.00.

## THE PARTIES

### I.     Plaintiff

8.     Plaintiff Jordan resides in New York and is a citizen of Nevada. She is currently incarcerated by the New York City Corrections Department at Rikers Island, East Elmhurst, New York.

### II.     Defendants

9.     Defendant Mirra resides in and is a citizen of Pennsylvania. Mirra owned and controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Mirra forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

10.     Upon information and belief, Defendant Troilo is a licensed attorney who resides in and is a citizen of Pennsylvania. Troilo controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Troilo forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

3

11.     Upon information and belief, Defendant Molieri is a licensed attorney who resides in and is a citizen of Pennsylvania. Molieri controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Molieri forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

12.     Upon information and belief, Defendant Kolleda is a certified public accountant who resides in and is a citizen of Georgia. Kolleda controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Kolleda forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

13.     Upon information and belief, Defendant Kovinsky resides in and is a citizen of Maryland. Kovinsky controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Kovinsky forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

14.     Upon information and belief, Defendant Tropiano resides in and is a citizen of Pennsylvania. Tropiano controlled Defendants RAM Capital and RAM Realty, and supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Hall, Demora, and Kuo engaged. Tropiano forged Jordan's signature, or caused it to be forged,

on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

15.     Upon information and belief, Defendant Eizen is a licensed attorney who resides in and is a citizen of Pennsylvania. Eizen supervised and directed the fraudulent activities described herein in which Walsh, Stewart, Sigloch, Forte, Hall, Demora, and Kuo engaged. Eizen forged Jordan's signature, or caused it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

16.     Upon information and belief, Defendant Walsh resides in and is a citizen of Pennsylvania. Walsh – a broker at Merrill Lynch – aided and abetted, and conspired in, the Defendants' interrelated schemes by facilitating the transfer of Plaintiff's assets from Merrill Lynch accounts to or for the benefit of the Defendants, and by forging Jordan's signature, or causing it to be forged, on the documents that enabled the Defendants to exercise control over Plaintiff's assets, and then transfer Plaintiff's assets to or for the benefit of the Defendants.

17.     Defendants RAM Capital are Delaware limited liability companies with their principal places of business in Delaware. RAM Capital was owned and controlled by Defendant Mirra, and also was controlled by Defendants Troilo, Molieri, Kolleda, Kovinsky, and Tropiano, and was used by the Defendants as a vehicle to fraudulently transfer Plaintiff's assets to or for the benefit of the Defendants.

18.     Defendant RAM Realty is a Delaware limited liability company with its principal place of business in Delaware. RAM Realty was owned and controlled by Defendant Mirra, and also was controlled by Defendants Troilo, Molieri, Kolleda,  Kovinsky, and Tropiano, and was

used by the Defendants as a vehicle to fraudulently transfer Plaintiff's assets to or for the benefit of the Defendants.

19.     Upon information and belief, Defendant Stewart resides in and is a citizen of Pennsylvania. Stewart was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Stewart falsely notarized and witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

20.     Upon information and belief, Defendant Sigloch resides in and is a citizen of New Jersey. Sigloch was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Sigloch falsely notarized and witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

21.     Upon information and belief, Defendant Forte resides in and is a citizen of Pennsylvania. Forte was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Forte falsely notarized and witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

22.     Upon information and belief, Defendant Hall resides in and is a citizen of New Jersey. Hall was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Hall falsely notarized and

6

witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

23.     Upon information and belief, Defendant Demora resides in and is a citizen of New Jersey. Demora was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Demora falsely notarized and witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

24.     Upon information and belief, Defendant Kuo resides in and is a citizen of Pennsylvania. Stewart was employed by and/or associated with Defendants Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, RAM Capital, and RAM Realty. Kuo falsely notarized and witnessed many of the forgeries of Plaintiff's signature that enabled the Defendants to exercise control over Plaintiff's assets and to enact the fraudulent transfers of Plaintiff's assets to or for the benefit of Defendants.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

26.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1404, as this case has been transferred to the District of Delaware pursuant to 28 U.S.C. § 1404, and also pursuant to

28 U.S.C. § 1391, as the District of Delaware is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      The Business Relationship and Partnership Between Jordan and Mirra**

28.     In 1991, Jordan established a company called Ambulatory Pharmaceutical Services, Inc. ("APS"). Jordan developed and implemented the business model for APS, which quickly became an enormously successful niche company involved in the home healthcare industry, specializing in providing home infusion services.  Jordan met Mirra and formed a business partnership, with Jordan running a local subsidiary of his home infusion company.

29.     Shortly after initiating their business relationship, Jordan and Mirra became involved in a personal relationship.

30.     By 1994, APS was earning approximate net proceeds in excess of $1,000,000.00 per month and, by 1995, its net proceeds had increased to approximately $2,000,000.00 to $2,500,000.00 per month.

31.     On or about August 1, 1995, Jordan exercised an option to buy out Mirra's interests in APS. Mirra requested and Jordan agreed to pay $150,000.00, leaving Jordan as the sole shareholder of APS.

32.     On August 29, 1997, Jordan sold APS to Integrated Health Services, Inc. ("IHS"). Jordan, as sole owner and stockholder of APS, was to receive in excess of $34,000,000.00, approximately $18,125,000.00 in cash and $16,125,000.00 in IHS stock. Jordan agreed to incrementally limit her sale of the stock over a one-year period following the sale.

33.     In 1997, Mirra and his associates, Troilo, Molieri, and Kolleda, falsely represented to Jordan that it would be in her interests to join Mirra in organizing RAM Capital to serve as a holding company for Mirra and Jordan's assets and business ventures. This misrepresentation by Mirra, Troilo, Molieri, and Kolleda, upon which Jordan reasonably relied, sought to induce Jordan to relinquish direct supervision of her own assets and to entrust them to RAM Capital, so that they could exert control over Jordan's assets and siphon them off for their benefit.

34.     At the time of said misrepresentation, Mirra, Troilo, Molieri, and Kolleda each and all were fiduciaries of Jordan's, as they were her partner, attorneys and accountants.

35.     As a direct and proximate consequence of this misrepresentation, Jordan consented to the formation of RAM Capital and, in 1997, Mirra, Troilo, Molieri, and Kolleda organized RAM Capital, purportedly to serve as a holding company for Mirra and Jordan's assets and business ventures.

36.     As represented to Jordan, strictly as a technical matter, RAM Capital was jointly owned by Jordan and Mirra; in reality its assets were effectively dominated by Mirra, Troilo, Molieri, Kolleda, and their associates.

37.     Subsequently, in 2002 and thereafter, Mirra, Troilo, Molieri, Kolleda, Tropiano, Kovinsky, and Eizen organized a complex scheme of multiple additional holding companies and trusts, both domestic and offshore, to disguise the actual ownership interests in Jordan's business holdings from Jordan and other interested parties, and conceal the fact that they were simultaneously siphoning Jordan's assets to or for the benefit of the Defendants.

38      These entities included RAM Capital, LP ("RAM Capital I"), RAM Consultants, LLC ("RAM Consultants"), RAM Equity Holdings, LLC ("RAM Equity"), RAM Business

Holdings, LLC ("RAM Business Holdings"), RAM Developers, Inc. ("RAM Developers"), RAM Group, Inc. ("RAM Group"), Biomed America, Inc. ("Biomed"), Parallex LLC ("Parallex"), Allion Healthcare, Inc. d/b/a Biomed Healthcare Holdings, Inc. ("Allion"), VasGene Therapeutics, Inc. ("VasGene"), Stone Ridge Enterprises, LLC ("Stone Ridge"), Logic Medical Solutions, Inc. ("Logic Medical"), Apogenics Healthcare, Inc. ("Apogenics"), Advanced Research Corporation ("ARC"), Pridecare, Inc. ("Pridecare"), AAA Paving and Grading, Inc. ("AAA Paving"), Physician Oncology Network, Inc. ("Physician Oncology Network"), West Highland Company, LLC ("West Highland"), Indago HealthCare, Inc. ("Indago"), Atlas Medical Equipment, Inc. ("Atlas"), Cancer Innovations, Inc. ("Cancer Innovations"), Delta Pharmaceuticals, Inc. ("Delta Pharmaceuticals"), US Bioservices, Inc. ("Bioservices"), and Atlas Respiratory Services, Inc. ("Atlas Respiratory").

39.     On March 26, 2003, Troilo – in collusion with Mirra, Molieri, and Kolleda – sent Jordan an "Estate and Asset Protection Planning Model" memorandum, in which he falsely represented that Jordan and Mirra remained equal owners of their various joint assets and business ventures. The memorandum falsely set forth that:

> Enclosed please find the finalized global structure for you (and Gigi's) financial and property holdings (with the exception of the NY apartment building).  ***The concept is that Gigi and yourself will have an equal interest in all entities and holdings.***"

(Emphasis added.)

40.     The March 26, 2003 memorandum also falsely stated that the:

> organization of all entities [into which Jordan's and Mirra's purportedly joint assets would be placed] will involve the issuance of 2 forms of ownership interest.  All shares, membership interests or ownership units will include both voting and non-voting components. ***Gigi and yourself will own all of the voting units and the non-voting units will be held by the various holding companies that will own the assets.***

(Emphasis added).

41.     In addition, a "Ray Mirra And Gigi Jordan Business Holdings And Estate Planning Overview" of December 2003, prepared by Defendants Troilo, Kolleda, and their associates, falsely represented to Jordan that she maintained co-equal ownership with Mirra of: RAM Equity, Stone Ridge Enterprises, Pridecare, and RAM Capital.

42.     These representations that Jordan's ownership interests in these company assets and investments were being maintained through various holding companies jointly and co-equally owned by she and Mirra were materially false. Nonetheless, the "Estate and Asset Protection Planning Model" alleged joint ownership by Jordan and Mirra of RAM Developers Inc., RAM Realty, RAM Capital, LP, and RAM Group, Inc. However, Jordan's tax return for 2003 only reflected an ownership interest by Jordan in RAM Developers and RAM Realty with no mention of RAM Capital, LP or RAM Group, Inc.

43.     In late 2005, in a similar vein, the Defendants proffered to Jordan a business prospectus falsely reporting the status of Jordan and Mirra's joint business holdings and assets entitled: "Ray Mirra / Gigi Jordan Asset Holdings – Nov 05 and 2006 Outlook". This report detailed the "Mirra/Jordan" real estate holdings, actively managed holdings, cash and investments, and equity holdings, and contended that Jordan and Mirra's joint assets had a market value of $167,969,000.00, debt of $13,610,000.00, and a "Net FMV" (fair market value) of $154,359,000.00. In each instance the "Entity" purportedly holding the asset category referenced in the report was identified as "Ray and Gigi", a company or holding company, to which it was reported to Jordan she held a 50% ownership interest with Mirra. Finally, the prospectus offered a pie chart graphic entitled "Ray Mirra / Gigi Jordan 'Cash & Investments Summary November 2005'" valuing their passive investments in equities, government securities, bonds and cash.

11

44.     In 2007, Tropiano and Kolleda – in collusion with Mirra and Molieri – prepared and sent to Jordan a purported "Raymond Mirra & Gigi Jordan Schedule of Net Assets," which falsely stated that Jordan and Mirra held equal interests in companies, real estate, and other investments that were worth more than $241,000,000.00.

45.     Between 1997 and 2009, Tropiano and Kolleda – in collusion with Mirra, Troilo, Molieri, and Kovinsky – periodically prepared and sent Jordan financial reports, memoranda, accounting schedules, business outlooks, investment summaries and the like, all of which falsely represented that her business interests, real estate holdings, and assets were co-equally owned with Mirra.

46.     Jordan reasonably relied on these representations, which Mirra, Troilo, Kolleda, Tropiano, Molieri, Kovinsky, and Eizen made, or caused to be made, to induce Jordan to continue to believe that she and Mirra were equal partners, and to rely on Mirra, Troilo, Kolleda, Tropiano, Molieri, and Kovinsky to manage her assets.  Moreover, to conceal the fact that Mirra, Troilo, Kolleda, Tropiano, Molieri, and Kovinsky were converting Jordan's assets to or for the benefit of the Defendants.

47.     At all relevant times herein, Mirra, Troilo, Tropiano, Kolleda, Molieri, and Kovinsky were entrusted by Jordan with the creation and management of her asset accounts, payment of her expenses, supervision of her tax accountants, management of her legal transactions, maintenance of her business and financial records, and management of her investment properties from both a legal and accounting standpoint.

48.     At all relevant times herein, Jordan placed her full trust in and relied upon Mirra, Troilo, Tropiano, Kolleda, Molieri, and Kovinsky to manage her business and financial affairs, in their capacity as her fiduciaries.

**II.**   **The Defendants' Interrelated Fraudulent Schemes**

**A.**   **The Fraudulent Merrill Lynch Scheme**

49.     In 1992, on Mirra's recommendation, Jordan commenced a personal banking relationship with Merrill Lynch by opening up a Merrill Lynch account number 870-74110 solely in her own name (the "Jordan Merrill Lynch Account 74110").

50.     Walsh, who at the time was a Merrill Lynch broker and who was personally recommended to Jordan by Mirra, became Jordan's broker and private banker at Merrill Lynch.

51.     By 1997, after APS was sold, Jordan held approximately $26,000,000.00 in the Jordan Merrill Lynch Account 74110, including $18,000,000.00 from the IHS deal and $8,000,000.00 that she had accumulated from her business activities over the preceding five years.

52.     In 1997, Walsh contacted Jordan to offer her the opportunity to participate in an investment program that Walsh described as a "covered writing account."  According to Walsh, under this program, Merrill Lynch would assume the risk of all losses in each covered writing account below the principal amounts invested, and in return would capture for itself any returns in each covered writing account in excess of seven percent.

53.     Walsh informed Jordan that, to participate in the covered writing account program, she would need to establish two more Merrill Lynch accounts in addition to her original Jordan Merrill Lynch Account 74110.

54.     Based on Walsh's representations, on June 20, 1997, Jordan opened a first covered writing account under Merrill Lynch account number 870-14B97 (the "First Covered Writing Account 14B97"), and on December 1, 1997, Jordan opened a second covered writing

account under Merrill Lynch account number 870-14H02 (the "Second Covered Writing Account 14H02").

55.     Each of the First Covered Writing Account 14B97, the Second Covered Writing Account 14H02, and Jordan's Merrill Lynch Account 74110, were held in Jordan's name, alone.

**1.     The Fraudulent Creation and Funding of the First Jordan-Mirra Joint Merrill Lynch Account**

56.     In early 2002, Defendants Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh were aware of the fact that Jordan soon would receive $14,650,000.00 in connection with the sale of interests in her companies to US Bioservices.

57.     To covertly gain control of this money, and to conceal their plan of conversion form Jordan and other interested parties, on April 26, 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh, with whom they had a long and lucrative business relationship, to facilitate the conversion and misappropriation of Jordan's assets.

58.     In furtherance of the conspiracy, Walsh misrepresented to Merrill Lynch that he had the authority to open an account under Merrill Lynch account number 870-12K37, which would be jointly held by Jordan and Mirra (the putative "First Jordan-Mirra Joint Account 12K37").

59.     In reliance on this misrepresentation, and Walsh's imprimatur, Merrill Lynch opened the First Jordan-Mirra Joint Account 12K37.

60.     Concomitantly, Defendants Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh caused the First Jordan-Mirra Joint Account 12K37 to be funded with the $14,262,000.00 in proceeds from the sale of Jordan's interest in her company to US Bioservices, making these funds accessible for further conversion and misappropriation by the Defendants.

14

61.     In reliance on this misrepresentation, and Walsh's imprimatur, Merrill Lynch funded the First Jordan-Mirra Joint Account with $14,262,000.00 of Jordan's money.

62.     Neither Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano nor Walsh sought or obtained Jordan's consent or authorization before opening the First Jordan-Mirra Joint Account 12K37, nor did Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano nor Walsh seek or obtain Jordan's consent or authorization before funding the First Jordan-Mirra Joint Account 12K37 with approximately $14,262,000.00 of Jordan's assets.   In fact Jordan had no knowledge the account existed, because Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh fraudulently concealed its existence from her.

63.     After fraudulently causing the First-Jordan Mirra Joint Account 12K37 to be opened and funded in April 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh, to conceal the creation of the account and diversion of the funds, forged Jordan's signature, or caused it to be forged on account opening documents for the First Jordan-Mirra Joint Account 12K37 dated four months later on or about September 9, 2002, to undergird the false and fraudulent contention that Jordan had authorized this account.

64.     As a direct and proximate result of these fraudulent acts, Jordan was damaged in the amount of $14,262,000.00 as nearly all of these funds were ultimately fraudulently converted to the Defendants.

**2.      The Fraudulent Conversion of Jordan's Personal Merrill Lynch Accounts Into Accounts Held Jointly With Mirra**

65.     In January 2003, unbeknownst to Jordan, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano conspired with Walsh, to engage in a successful scheme to convert Jordan's three Merrill Lynch accounts, held solely in her individual name, to joint accounts by adding Mirra's name to the accounts as "joint account holder" with Jordan.

15

66.     Toward that end, in or about January of 2003, Walsh contacted Jordan by telephone and advised her that Merrill Lynch had instituted new procedures that required Jordan to execute a revised account opening document with respect to the Jordan Merrill Lynch Account 74110, the First Covered Writing Account 14B97, and the Second Covered Writing Account 14H02.

67.     In particular, Walsh falsely represented to Jordan that the new Merrill Lynch policy required an account opening document that explicitly identified the Jordan Merrill Lynch Account 74110 as the "master" account and the First Covered Writing Account 14B97 and Second Covered Writing Account 14H02 as "sub" accounts.

68.     In fact, Walsh, conspiring with Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano, sought Jordan's execution of the document to create a new account opening document that would falsely and fraudulently memorialize Mirra as a joint owner of the Jordan Merrill Lynch Account 74110, the First Covered Writing Account 14B97, and the Second Covered Writing Account 14H02.

69.     Toward that end, in January 2003, Walsh faxed Jordan a new account opening document for the Jordan Merrill Lynch Account 74110, the First Covered Writing Account 14B97, and the Second Covered Writing Account 14H02, which listed Jordan as the sole account-holder. Jordan relied on Walsh's false representations as to the reasons for execution of these documents, signed the account-opening document in January 2003 and sent it back to Walsh.

70.     Thereafter, in collusion with Walsh, Mirra signed his name onto the account-opening document on a signatory line for a "co-applicant," which Jordan had left blank when she signed the form. In doing so Mirra falsely and fraudulently added himself to the Jordan Merrill

16

Lynch Account 74110, the First Covered Writing Account 14B97, and the Second Covered Writing Account 14H02, as a joint account-holder on all three accounts. Mirra executed the account-opening document without Jordan's knowledge or consent.

3.      **The Fraudulent Creation of the Subsequent Purported Joint Jordan-Mirra Merrill Lynch Accounts**

71.      Having successfully converted the Jordan Merrill Lynch Account 74110, the First Covered Writing Account 14B97, and the Second Covered Writing Account 14H02 to purported "joint" accounts, Defendants Mirra, Molieri, Troilo, Kolleda, Kovinsky, Tropiano, and Walsh opened three more "joint" asset accounts at Merrill Lynch with Jordan and Mirra listed as co-applicants. In each and every case, Defendants Mirra, Molieri, Troilo, Kolleda, Kovinsky and Tropiano – in collusion with Walsh – forged Jordan's signature or caused it to be forged on the account application forms submitted to Merrill Lynch.

72.      On August 25, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky and Tropiano again conspired with Walsh to open yet another purported joint Jordan-Mirra account under Merrill Lynch account number 870-20610 (the "Second Jordan-Mirra Joint Account 20610").

73.      Thereafter, in June 2005, Mirra, Troilo, Molieri, Kolleda, Kovinsky and Tropiano again conspired with Walsh to open two additional purported joint Jordan-Mirra accounts under the Merrill Lynch account numbers 870-10363 (the "Third Jordan-Mirra Joint Account 10363") and 870-10364 (the "Fourth Jordan-Mirra Joint Account 10364").

74.      The Second Jordan-Mirra Joint Account 20610, the Third Jordan-Mirra Joint Account 10363, and the Fourth Jordan-Mirra Joint Account 10364 – like the First Jordan-Mirra Joint Account 12K37 – were falsely and fraudulently represented as being jointly-held by Jordan and Mirra.

75.     Neither Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano nor Walsh sought or obtained Jordan's consent before opening the Second Joint Jordan-Mirra Joint Account 20610, the Third Jordan-Mirra Joint Account 10363, or the Fourth Jordan-Mirra Joint Account 10364, nor did they inform her of their actions.

76.     Instead, on August 25, 2003, Walsh – conspiring with Mirra, Troilo, Kolleda, Kovinsky, and Tropiano – falsely represented to Merrill Lynch that he had the requisite authority from Jordan to open the Second Jordan-Mirra Joint Account 20610.

77.     Furthermore, in June 2005, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature, or caused it to be forged, on the account opening documents for the Third Jordan-Mirra Joint Account 10363 and the Fourth Jordan-Mirra Joint Account 10464, so as to conceal the existence of these accounts from Jordan.

**4.      The Subsequent Fraudulent Bank and Wire Transfers**

78.     Having undertaken the above-referenced series of false and fraudulent acts, the Defendants began to shuttle Jordan's assets among the accounts and out of the accounts to themselves and their entities, while simultaneously concealing the transfers from Jordan through forged and fraudulent wire transfer authorizations.

79.     For instance:

(i)      On or about February 19, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $300,000.00 from the First Jordan-Mirra Joint Account 12K37 to Mirra. Thereafter, Merrill Lynch wired the $300,000.00 to Mirra, without Jordan's knowledge or consent.

(ii)     On or about August 4, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $65,285.20 from the First Jordan-Mirra Joint Account 12K37 to an entity called Foster Framing Co.  Thereafter, Merrill Lynch wired the

$65,285.20 to Foster Framing Co., without Jordan's knowledge or consent.  Upon information and belief, the $65,285.20 wire transfer to Foster Framing Co. was in payment for goods and services provided by Foster Framing Co. to or for the benefit of the Defendants.

(iii)    On or about August 8, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $125,000.00 from the First Jordan-Mirra Joint Account 12K37 to AAA Paving, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $125,000.00 to AAA Paving, without Jordan's knowledge or consent.

(iv)    On or about August 20, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $150,000.00 from the First Jordan-Mirra Joint Account 12K37 to ARC, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $150,000.00 to ARC, without Jordan's knowledge or consent.

(v)    On or about September 15, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $1,525,000.00 from the First Jordan-Mirra Joint Account 12K37 to Mirra.  Thereafter, Merrill Lynch wired the $1,525,000.00 to Mirra, without Jordan's knowledge or consent.

(vi)    On or about September 15, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the First Jordan-Mirra Joint Account 12K37 to Logic Medical, for the benefit of the Defendants.  Thereafter, Merrill Lynch wired the $100,000.00 to Logic Medical, without Jordan's knowledge or consent. Upon information and belief, the $100,000.00 wire transfer to Logic Medical was in payment for goods and services provided by Logic Medical to or for the benefit of the Defendants.

(vii)    On or about September 24, 2003, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the First Jordan-Mirra Joint Account 12K37 to Mirra. Thereafter, Merrill Lynch wired the $100,000.00 to Mirra, without Jordan's knowledge or consent.

(viii)    On or about January 21, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to

authorize Merrill Lynch to wire $1,600,000.00 from the First Jordan-Mirra Joint Account 12K37 to Mirra. Thereafter, Merrill Lynch wired the $1,600,000.00 to Mirra, without Jordan's knowledge or consent.

(ix)    On or about February 9, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the First Jordan-Mirra Joint Account 12K37 to RAM Consultants, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $100,000.00 to RAM Consultants, without Jordan's knowledge or consent.

(x)    On or about March 30, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $3,184,395.04 from the First Jordan-Mirra Joint Account 12K37 to an entity called Lawyers Title Co. Thereafter, Merrill Lynch wired the $3,184,395.04 to Lawyers Title Co., without Jordan's knowledge or consent.  The $3,184,395.04 wire transfer to Lawyers Title Co. resulted in a real estate purchase for the benefit of Defendant RAM Realty.

(xi)    On or about March 31, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $180,000.00 from the First Jordan-Mirra Joint Account 12K37 to Pridecare, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $180,000.00 to Pridecare, without Jordan's knowledge or consent.

(xii)    On or about April 12, 2004, Defendants Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged or caused to be forged Jordan's signature on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $345,631.96 from the First Jordan-Mirra Joint Account 12K37 to West Highland.   Thereafter, Merrill Lynch wired the $345,631.96 to West Highland, without Jordan's knowledge or consent.

(xiii)    On or about April 26, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $2,141,759.77 from the First Jordan-Mirra Joint Account 12K37 to an entity called Lawyers Title Co.  Thereafter, Merrill Lynch wired the $2,141,759.77 to Lawyers Title Co., without Jordan's knowledge or consent. The $2,141,759.77 wire transfer to Lawyers Title Co. resulted in a real estate purchase for the benefit of Defendant RAM Realty.

(xiv)    On or about June 4, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer

authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $55,375.00 from the First Jordan-Mirra Joint Account 12K37 to an entity called Twenty Wine Merchants.  Thereafter, Merrill Lynch wired the $55,375.00 to Twenty Wine Merchants, without Jordan's knowledge or consent.  Upon information and belief, the $55,375.00 wire transfer to Twenty Wine Merchants was in payment for goods and services provided by Twenty Wine Merchants to or for the benefit of the Defendants.

(xv)   On or about June 4, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $35,108.00 from the First Jordan-Mirra Joint Account 12K37 to an individual named Peter Sartini.  Thereafter, Merrill Lynch wired the $35,108.00 to Sartini, without Jordan's knowledge or consent. Upon information and belief, the $35,108.00 wire transfer to Sartini was in payment for goods and services provided by Sartini to or for the benefit of the Defendants.

(xvi)  On or about April 13, 2006, Defendants Mirra, Molieri, Troilo, Kolleda Kovinsky Tropiano and Walsh forged or caused to be forged Jordan's signature on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $1,240,000.00 from the First Jordan-Mirra Joint Account to Valley Creek Estate LLC, an entity owned and controlled by the Defendants. Thereafter, Merrill Lynch wired the $1,240,000.00 to Valley Creek Estate LLC without Jordan's knowledge or consent.

(xvii) On or about April 13, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $707,000.00 from the First Jordan-Mirra Joint Account 12K37 to RAM Capital, for the benefit of the Defendants.  Thereafter, Merrill Lynch wired the $707,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xviii) On or about May 10, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $271,000.00 from the First Jordan-Mirra Joint Account 12K37 to RAM Capital, for the benefit of the Defendants.  Thereafter, Merrill Lynch wired the $271,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xix)  On or about May 27, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the Second Jordan Merrill Lynch Account 21268 to Enterprise Company ARC, for the benefit of the Defendants.

Thereafter, Merrill Lynch wired the $100,000.00 to ARC, without Jordan's knowledge or consent.

80. In all, over $17,500,000.00 was misappropriated from Jordan's asset accounts at Merrill Lynch as a direct result of the Defendants' fraudulent wire transfer authorizations, which were forged without Jordan's knowledge or consent.[1]

## 5. The Fraudulent Merrill Lynch Lines of Credit

81. In addition to these fraudulent transfers of funds, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh fraudulently obtained millions of dollars in loans beginning in 2003 through March of 2008, using Jordan's asset accounts as collateral, without Jordan's knowledge or consent.

82. Sometime in or about 2003, Defendants Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh fraudulently pledged Jordan's assets held in the fraudulent Second Joint Jordan-Mirra Joint Account 20610 to "Portfolio Reserve Plus Loans", without Jordan's knowledge or consent. Periodic loan disbursement requests were faxed to Walsh at Merrill Lynch by Victor Battaglia, an accountant working for the Defendants. These loan disbursement requests resulted in loan amounts extended by Merrill Lynch to the Defendants or for their benefit in excess of $3,500,000.00 between 2003 and 2004.[2]

83. For instance:

(i) On or about August 28, 2003, Victor Battaglia executed a Loan Disbursement Request for $500,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180. On the "Portfolio Reserve Plus Loan Worksheet"

---

[1] Tens of millions were wire transferred out of Jordan's accounts to the Defendants or for their benefit without her knowledge for which Merrill Lynch has not provided any wire transfer authorization at all.

[2] Merrill Lynch has been unwilling at the time of this writing to provide loan application documents and numerous other documents requested by Plaintiff related to these "Portfolio Reserve Plus Loans," in fact, repeatedly denying their existence for months. As such, it is not clear the total amount of damages to Jordan as a result of these fraudulent loans.

for the loan, the Applicant is listed as Pridecare, Inc., the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan #4-1363.

(ii)     On or about August 28, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to AAA Grading & Paving, Fleet Bank Account #9429282881. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as AAA Grading & Paving LLC, the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1364.

(iii)    On or about August 28, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as Stone Ridge Enterprises LLC, the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan #4-1362.

(iv)    On or about September 16, 2003, Victor Battaglia executed a Loan Disbursement Request for $200,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as Stone Ridge Enterprises LLC, the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1415.

(v)     On or about September 24, 2003, Victor Battaglia executed a Loan Disbursement Request for $300,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as Pridecare, Inc., the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1428.

(vi)    On or about September 29, 2003, Victor Battaglia executed a Loan Disbursement Request for $300,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the same date, Patrick Walsh

23

faxed the Loan Disbursement Request to Jeremy Jewkes to fax # 801-521-6466. On the fax cover sheet, Walsh writes, "Jeremy, Please do as soon as possible *Please email when approved and completed."

(vii)   On or about October 8, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720.

(viii)  On or about October 8, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720.

(ix)    On or about October 28, 2003, Victor Battaglia executed a Loan Disbursement Request for $300,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as Stone Ridge Enterprises LLC, the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1474.

(x)     On or about November 10, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the same date, Patrick Walsh faxed the Loan Disbursement Request to Jeremy Jewkes to fax # 801-521-6466. On the fax cover sheet, Walsh writes, "Please complete per conversation $132,000 Stone Ridge / Email or call w/ confirm – Amity Jacobson or Ryan Crooks."

(xi)    On or about December 23, 2003, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the same date, Patrick Walsh faxed the Loan Disbursement Request to Jeremy Jewkes to fax # 801-521-6466. On the fax cover sheet, Walsh writes, "Please complete for Stone Ridge for 100m draw 118M moved today info attached."

(xii)   On or about January 14, 2004, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720. On the same date, Patrick Walsh faxed the Loan Disbursement Request to Jeremy Jewkes to fax # 801-521-6466. On the fax cover sheet, Walsh writes, "Please complete per conversation 'Stone Ridge' Please cfm via email. Amily Jacobson 1-801-526-8337."

(xiii)   On or about January 19, 2004, Victor Battaglia executed a Loan Disbursement Request for $200,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720.

(xiv)   On or about January 19, 2004, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Pridecare, Inc., Fleet Bank Account #9429244180. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as Pridecare, Inc., the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1581.

(xv)   On or about February 16, 2004, Victor Battaglia executed a Loan Disbursement Request for $200,000 from ML to AAA Grading & Paving, Fleet Bank Account #9429282881. On the "Portfolio Reserve Plus Loan Worksheet" for the loan, the Applicant is listed as AAA Grading & Paving LLC, the Financial Advisor listed is Patrick Walsh, the Guarantor/Pledgor is listed as Raymond A. Mirra, and the account collateralizing the loan is ML account 870-20610 (Jordan/Mirra account fraudulently made joint). Loan # 4-1616.

(xvi)   On or about February 20, 2004, Victor Battaglia executed a Loan Disbursement Request for $200,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180.

(xvii)  On or about March 1, 2004, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Stone Ridge Enterprises, Inc., Fleet Bank Account # 9429272720.

(xviii) On or about March 9, 2004, Victor Battaglia executed a Loan Disbursement Request for $200,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180.

(xix)   On or about March 16, 2004, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180.

(xx)    On or about March 19, 2004, Victor Battaglia executed a Loan Disbursement Request for $100,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180.

(xxi)   On or about March 25, 2004, Victor Battaglia executed a Loan

Disbursement Request for $100,000 from ML to Pridecare, Inc., Fleet Bank Account # 9429244180.

84.     In all, as a result of the Defendants' interrelated Merrill Lynch schemes, concealment and misappropriation, more than $3,500,000.00 was converted from Jordan's Second Joint Jordan-Mirra Joint Account 20610 without Jordan's knowledge or consent for the benefit of Defendants through the extension of unauthorized loans.

85.     In 2005, these fraudulent extensions of credit by Merrill Lynch to the Defendants were now offered through a different but effectively identical financial instrument now called "loan management accounts" ("LMAs"), again pledged against assets held in Jordan's asset accounts at Merrill Lynch.

86.     Between June of 2005 and August of 2006, further capitalizing on the fraudulent machinations of Jordan's accounts, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on loan account applications in order to open several LMAs at Merrill Lynch, using the Pledge Accounts listed above as collateral for loans, the proceeds of which were then transferred to or for the benefit of the Defendants, which was the purpose behind creating the multiple asset accounts in the first place.

87.     For instance:

(i)     On or about October 11, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to extend a loan of $50,000.00 from the Fifth LMA Account to Mirra, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $50,000.00 to Mirra, without Jordan's knowledge or consent.

(ii)    On or about October 11, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to extend a loan of $240,000.00 from the Fifth LMA Account to RAM Capital, for the benefit of the Defendants. Thereafter, Merrill

Lynch wired the $240,000.00 to RAM Capital, without Jordan's knowledge or consent.

(iii)     On or about October 18, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano, and Walsh forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to extend a loan of $200,000.00 from the Fifth LMA Account to RAM Capital, for the benefit of the Defendants. Thereafter, Merrill Lynch wired the $200,000.00 to RAM Capital, without Jordan's knowledge or consent.

(iv)     On or about October 25, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature, or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $175,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $175,000.00 to RAM Capital, without Jordan's knowledge or consent.

(v)     On or about November 8, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $350,000.00 from the Fifth LMA Account to RAM Capital.  Thereafter, Merrill Lynch wired the $350,000.00 to RAM Capital, without Jordan's knowledge or consent.

(vi)     On or about November 22, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $250,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $250,000.00 to RAM Capital, without Jordan's knowledge or consent.

(vii)     On or about November 30, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $50,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $50,000.00 to RAM Capital, without Jordan's knowledge or consent.

(viii)     On or about November 30, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $50,000.00 from the Fifth LMA Account to Mirra. Thereafter, Merrill Lynch wired the $50,000.00 to Mirra, without Jordan's knowledge or consent.

(ix)     On or about December 1, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $300,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $300,000.00 to RAM Capital, without Jordan's knowledge or consent.

(x)      On or about December 6, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $430,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $430,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xi)     On or about December 7, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $75,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $75,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xii)    On or about December 7, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire *another* $75,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $75,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xiii)   On or about December 20, 2006, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $200,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $200,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xiv)    On or about January 17, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $300,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $300,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xv)     On or about January 31, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $250,000.00 from the Fifth LMA Account to

RAM Capital. Thereafter, Merrill Lynch wired the $250,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xvi)    On or about February 9, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $125,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $125,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xvii)   On or about March 1, 2007 Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $100,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xviii)  On or about March 15, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $100,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xix)    On or about March 29, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $250,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $250,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xx)     On or about April 9, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $100,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $100,000.00 to RAM Capital, without Jordan's knowledge or consent.

(xxi)    On or about April 10, 2007, Mirra, Troilo, Molieri, Kolleda, Kovinsky, Tropiano and Walsh forged Jordan's signature or caused it to be forged on a wire transfer authorization that they transmitted to Merrill Lynch, purporting to authorize Merrill Lynch to wire $235,000.00 from the Fifth LMA Account to RAM Capital. Thereafter, Merrill Lynch wired the $235,000.00 to RAM Capital, without Jordan's knowledge or consent.

88.     In all, as a result of the Defendants' interrelated Merrill Lynch schemes, concealment and misappropriation, more than $17,500,000.00 was converted from Jordan's asset accounts, and $12,400,000.00 was converted for the benefit of Defendants through the extension of unauthorized loans.

**B.      The Fraudulent Smith Barney Scheme**

89.     On August 29, 1997, when Jordan sold APS to IHS, Jordan, as sole owner and stockholder of APS, was to receive in excess of $34,000,000.00. Jordan was contractually obligated to incrementally limit her sale of the stock over a one-year period.

90.     After the IHS deal was consummated in August 1997, Mirra encouraged Jordan to open a Smith Barney ("SB") Brokerage account. He explained that Jordan's opening of an account at SB, to be funded with $17,000,000.00 from the IHS sale, would earn their various mutually-held businesses goodwill at SB.

91.     Mirra provided Jordan with an application that he had filled out for her execution. In reliance on Mirra's representations, Jordan executed two applications as presented at different times by Mirra for her signature but for the same account number, SB Account 6520131019665. The SB account was opened in or about March 1998.

92.     In June of 1998, Mirra presented Jordan with a SB options trading agreement already filled out by him for her execution. The agreement was then faxed to SB account broker John E. Hoch, at SB's Philadelphia office.

93.     In late 1998, as the IHS stock certificates matured for sale, Defendants Mirra, Troilo, Molieri, Kolleda and Tropiano coordinated the liquidation of Jordan's stock residing in Jordan's SB brokerage account, resulting in deposits in excess of $17,500,000.00 into her SB

account. These funds were ultimately fraudulently transferred out of the account, without Jordan's knowledge or consent, through the execution of a forged wire transfer authorization.

94.    In early 1998 Mirra approached Jordan proposing an elaborate "offshore asset protection" plan involving multiple off-shore trusts, LLC's and bank accounts.

95.    Mirra told Jordan that he was concerned about an investigation by the Office of Inspector General ("OIG") into his healthcare business HPC America, Inc. ("HPC").  He said that the HPC business was being destroyed by the investigation and as a result the companies would be wound down or enter bankruptcy, causing him to lose millions. Mirra expressed serious concern that while the government allegations about his company were untrue and he would ultimately "win the fight", he feared that the government might freeze his assets before he was able to defend the charges against the company, leaving him without adequate funds to wage the legal battle necessary, and as such he intended to move $7,000,000.00 "offshore."

96.    Mirra told Jordan that although her business, APS, was unrelated to HPC in all respects, it would still be prudent for her to move some of her assets offshore as well, "just in case." Mirra stated that there was a possibility due to their longtime business and personal involvement, APS, and potentially Jordan herself, might also get caught up in the investigation. Although reluctant, Jordan agreed to evaluate his plan.

97.    Defendants Mirra and Troilo were additionally assisted by Richard Carl Jans, Esq. ("Jans") an offshore trust, estate and asset protection expert. Ian Swindale ("Swindale"), a Jersey Channel Island Institutional trustee, and John Silvin ("Silvin"), investment advisor at IAM – Independent Asset Management S.A. in Geneva, Switzerland.

98.    Mirra arranged a meeting with Swindale of the Atlas Trust Company, Jersey Channel Islands at Jordan's Florida home in the late spring of 1998.   Mirra and Swindale

proposed a complex offshore asset protection structure. Under their proposed plan, both Jordan and Mirra would each transfer $7,000,000.00 to a bank account to be opened at Bank Julius Baer ("BJB") at their Geneva, Switzerland offices.

99.     Mirra and Swindale further explained that a Nevis based LLC would be established; the West-Highland Company LLC ("West Highland") to be owned initially by Jordan and that the bank holding Jordan and Mirra's respective contributions of $7,000,000.00 each would be held in an account to be established in the name of West Highland at BJB in Geneva, Switzerland.

100.    In or about late 1998, Jordan signed an asset management agreement with Independent Asset Management ("IAM") permitting Silvin to manage the funds that would be held at BJB for both LLC's.

101.    In September 2001, Mirra informed Jordan that his concerns regarding the government investigation had subsided and asked that Jordan assign to him a 50 percent interest in the West Highland account.  Jordan, relying on Mirra and Swindale's false representations that Mirra had contributed half of the funds held in the West Highland BJB account, agreed.

102.    On or about November 1, 2001, Jordan signed documents assigning a 50 percent interest in West Highland to Mirra. But for the misrepresentation that Mirra had matched her initial contribution to the fund, Jordan would not have executed those documents, through which she unknowingly assigned Mirra a joint interest in funds that were exclusively hers.

103.    In fact, in July 1999, unbeknownst to Jordan, nearly all of the $17,950,000.00 in funds in Jordan's SB account had been wired out of the account via a wire transfer authorization that was forged or caused to be forged by Mirra, Troilo, Molieri, Kolleda, Tropiano, and were

ultimately deposited at BJB, composing the total initial funding for the West Highland Co. LLC account at BJB. [3]

104.     This forged and fraudulent wire transfer authorization was relied upon by SB in effectuating the transfer of the funds, and was used to fraudulently conceal the transfer from Jordan.

105.     In fact, despite his misrepresentations, Mirra had contributed nothing to the West Highland BJB account. Mirra lied to Jordan for the express purpose of inducing her to afford him a 50 percent interest in West Highland to which he had falsely claimed to be entitled in order to gain control of the funds held at BJB and to falsely induce Jordan to retitle a 50 percent interest in the West Highland Co. LLC, owner of the West Highland BJB account, in his name.

## C.     The Fraudulent Property Schemes

106.     In conjunction with the Defendants systematically stripping away Jordan's liquid assets through numerous acts of forgery, they also engaged in a scheme to divest Jordan of her equity in several real properties through additional acts of forgery and fraudulent concealment.

## 1.     The Fraudulent 2932 North Atlantic Boulevard Scheme

107.     On June 30, 1995, Jordan purchased a property located at 2932 North Atlantic Boulevard in Fort Lauderdale, Florida (the "2932 North Atlantic Boulevard Property") for $1,650,000.00, solely with her own funds.

108.     At all relevant times, Jordan was the sole legitimate owner of the 2932 North Atlantic Boulevard Property.

---

[3] In addition, as of this writing, Plaintiff has been unable to obtain statements for the West Highland Co. LLC account at BJB prior to the year 2000.   The earliest 2000 BJB account statement provided by BJB shows approximately $14,000,000.00 in funds held in the West Highland Co. LLC account. It is unknown at this time what happened to the remaining approximate $3,950,000.00 transferred out of Jordan's SB account in 1999.

109.    On July 12, 1996, Defendants Mirra and Troilo forged Jordan's signature, or caused it to be forged, on a warranty deed that purported Jordan's assent to add Mirra as a co-owner of the 2932 North Atlantic Boulevard Property, and caused Jordan's putative signature to be falsely witnessed by an attorney Kevin D. Stepanuk, Mirra's in house counsel at the time, and falsely notarized by another of Mirra's employees, Mala Sue Robertson.

110.    Then, on or about July 12, 1996, Defendants Mirra and Troilo caused the forged warranty deed to be submitted to the Broward County Records, Taxes, and Treasury Division.

111.    This forged and fraudulent document was relied upon by the Broward County Records, Taxes, and Treasury Division, who recorded the deed on or about July 12, 1996, without Jordan's knowledge or consent.

112.    On or about April 10, 2002, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signatures, or caused them to be forged, on mortgage loan application documents, through which Mirra obtained a $375,000.00 mortgage from National City Bank on the 2932 North Atlantic Boulevard Property. Mirra, Troilo, Kolleda, and Tropiano caused Jordan's putative signatures on the mortgage documents to be falsely witnessed by one of their employees, Defendant Frederick Forte, and falsely notarized by another of their employees, Defendant Virginia Hall.

113.    On or about April 10, 2002, Mirra caused the forged mortgage documents to be submitted to the Broward County Records, Taxes, and Treasury Division.

114.    The forged and fraudulent documents were relied upon by the Broward County Records, Taxes, and Treasury Division, who recorded the mortgage on or about April 10, 2002, without Jordan's knowledge or consent.

115.    In reliance on the forgeries of Jordan's signature on the mortgage loan documents, and on the warranty deed that falsely listed Mirra as a co-owner of the 2932 North Atlantic

Boulevard Property, National City Bank loaned Mirra $375,000.00, secured by the fraudulent mortgage on the 2932 North Atlantic Boulevard Property.

116.    On or about August 16, 2006, Mirra, Troilo, Kolleda, and Tropiano sold the 2932 North Atlantic Boulevard Property to an individual named Rocco Meliambro, or caused it to be sold.

117.    To accomplish the sale, on or about August 16, 2006 Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signatures, or caused them to be forged, on the sales contract and settlement statement, and caused Jordan's putative signatures to be falsely notarized by one of their employees, Defendant Stewart.

118.    These forged and fraudulent documents (including the sales contract, the settlement statement and the warranty deed that falsely listed Mirra as a co-owner of the 2932 North Atlantic Boulevard Property) transmitted by mail and/or wire, were each and all relied upon by Meliambro, who paid Mirra $4,800,000.00 for the 2932 North Atlantic Boulevard Property, and the Broward County Records, Taxes, and Treasury Division, who recorded the sale.

119.    Jordan was aware of the transaction but assumed she would receive the proceeds. However, she did not receive any portion of the $4,800,000.00 proceeds from the fraudulent sale; Mirra, Troilo, Kolleda, and Tropiano converted and retained the $4,800,000.00 proceeds, without Jordan's knowledge or consent.

120.    As a proximate result, Jordan was damaged in the sum of $4,800,000.00.

**2.      The Fraudulent 2937 North Atlantic Boulevard Scheme**

121.    On June 23, 2000, Mirra, Troilo, Kolleda, and Tropiano caused APS – which at that point had been repurchased by and was co-owned by Mirra and Jordan  – to purchase a

property located at 2937 North Atlantic Boulevard, Fort Lauderdale, Florida (the "2937 North Atlantic Boulevard Property") for $660,000.00.

122.     Though Jordan was a co-owner of APS, Mirra, Troilo, Kolleda, and Tropiano did not advise Jordan of the purchase, and intentionally concealed the purchase from her.

123.     Then, on or about December 27, 2001, Mirra, Troilo, Kolleda, and Tropiano caused the 2937 North Atlantic Boulevard Property to be sold for $10.00 by APS to West Highland, which – like APS – was jointly owned by Mirra and Jordan.

124.     Though Jordan was a co-owner of West Highland, Mirra, Troilo, Kolleda and Tropiano did not advise Jordan of the sale, and in fact intentionally concealed the sale from her.

125.     Thereafter, on or about April 12, 2004, Mirra, Troilo, Kolleda and Tropiano caused the 2937 North Atlantic Boulevard Property to be sold for $1.00 by West Highland to Jordan and Mirra.

126.     Though Jordan was a co-owner of West Highland, and purportedly a party to the sale, Mirra, Troilo, Kolleda, and Tropiano did not advise Jordan of the sale, and in fact intentionally concealed the sale from her.

127.     On or about April 12, 2004, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature, or caused it to be forged, on a wire transfer authorization that they sent to Merrill Lynch, purporting to authorize Merrill Lynch to wire $345,631.96 from the First Jordan-Mirra Joint Account 12K37 to a West Highland account at Fleet Bank.  Thereafter, Merrill Lynch wired the $345,631.96 to the West Highland Fleet Bank account, without Jordan's knowledge or consent.

128.    Also on or about April 12, 2004, Mirra, Troilo, Kolleda, and Tropiano caused West Highland to use the $345,631.96 to pay off the mortgage on the 2937 North Atlantic Boulevard Property, without Jordan's knowledge or consent.

129.    Shortly thereafter, on April 28, 2004, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano forged Jordan's signature, or caused it to be forged, on a warranty deed whereby they purported to sell the 2937 North Atlantic Boulevard Property to Bruce Goldman and Maureen Goldman for $850,000.00.  Mirra, Troilo, Kolleda, and Tropiano caused Defendant Sigloch and another of their associates, Deborah Touni, to falsely witness the forged deed and caused Defendant Hall to falsely notarize the deed.

130.    In reliance on the forged warranty deed, the Goldmans paid $850,000.00 for the 2937 North Atlantic Boulevard Property, and the Broward County Records, Taxes, and Treasury Division recorded the sale.

131.    Jordan never was apprised of the sale, or the amount received, and never received the benefits of the sale, despite being entitled to at least 50 percent of any proceeds by virtue of her joint ownership of APS and West Highland.

132.    As a proximate consequence, Jordan has been damaged in the sum of at least $425,000.00.

**3.      The Fraudulent 352 West End Avenue Scheme**

133.    In early 2000, Mirra, Troilo, Kolleda, Kovinsky, and Tropiano incorporated RAM Developers, ostensibly to engage in real estate investments.

134.    Thereafter, in late 2000 to early 2001, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano falsely represented to Jordan that she was a 50 percent owner of RAM Developers, a representation upon which Jordan reasonably relied.

135.    In actuality, however, Jordan was not a 50 percent owner of RAM Developers. Rather, after incorporating the company, Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano caused Jordan to only hold a minority ownership interest in the company, to the extent that they allotted any ownership interest in RAM Developers to her at all.  In fact, an IRS form K-1, prepared at the direction of Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano, reported Jordan's ownership interest as 2.877 percent of RAM Developers in 2001. This fact was intentionally withheld from Jordan by the Defendants.

136.    On April 4, 2001, at the request of Mirra, Troilo, Molieri, Kovinsky, Kolleda, and Tropiano, and in reliance on their misrepresentations that she was a 50 percent owner of RAM Developers, Jordan provided $4,100,000.00 to RAM Developers to be used to purchase a property located at 352 West End Avenue, New York, New York (the "West End Avenue Property").

137.    In connection with the transaction, Mirra, Troilo, Molieri, Kovinsky, Kolleda, and Tropiano falsely represented to Jordan that it was in her interests for the West End Avenue Property to be titled in the name of RAM Developers, because it would decrease Jordan's tax liability.

138.    In actuality, however, Mirra, Troilo, Molieri, Kolleda, Kovinsky and Tropiano intended to title the West End Avenue Property to RAM Developers so that they could later sell the property while concealing from Jordan the total amount of proceeds of the sale.

139.    On April 5, 2001, in reliance on the misrepresentations by Mirra, Troilo, Molieri, Kolleda, Kovinsky, and Tropiano that she was a 50 percent owner of RAM Developers, and that it was in her interests to title the West End Avenue Property with RAM Developers, Jordan permitted the West End Avenue Property to be titled in the name of RAM Developers, rather

than with Jordan's name, individually.  But for her fraud-induced belief that she was a 50 percent owner of RAM Developers, Jordan would not have permitted the property to be so titled and would have retained title in her individual capacity.

140.    On or about July 8, 2002, Mirra, Troilo, Molieri, Kolleda, Kovinsky and Tropiano caused RAM Developers to sell the West End Avenue Property to a third party for $4,350,000.00.

141.    Jordan never received any of the proceeds of that sale, as the Defendants fraudulently converted those monies for their own individual benefit.

142.    As a proximate result, Jordan was damaged in the sum of $4,350,000.00.

**4.      The Fraudulent Stone Ridge Property Scheme**

143.    On April 5, 2002, a deed was recorded in Appomattox County, VA, conveying the property at 1 Route 2 Box 63, Concord, VA, 24538 (the "Stone Ridge Property") to Mirra and Jordan for $3,265,000.00.

144.    On May 7, 2002, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature, or caused it to be forged, on an Affidavit of Ownership for the Stone Ridge property, located at 220 Ridge Road, Concord, Virginia (previously Route 2 Box 63, Concord, VA).  Mirra's signature also appears on the Affidavit of Ownership of the property.

145.    Jordan's forged signature on the Affidavit of Ownership was notarized by Defendant Virginia Hall in Burlington County, New Jersey; in fact Jordan was in San Francisco, CA continuously from May 4, 2002 through May 15, 2002.  Jordan had no knowledge of, nor did she consent to, holding legal title to the Stone Ridge property.

146.    This forged and fraudulent document was relied upon as genuine by the Appomattox County Assessor, Recorder and Clerk, who recorded it.

147.    On August 27, 2002, Mirra took out a $2,000,000.00 mortgage from Merrill Lynch Credit Corporation on the Stone Ridge property. Jordan did not consent to, authorize, and was unaware of, this mortgage, nor was she a signatory, even though the mortgage lists Mirra and Jordan as owners of the Stone Ridge property to which the mortgage is pledged.

148.    Between February 2003 and June 2004, Defendants Mirra, Troilo, Kolleda, and Tropiano purchased additional lots to add to the existing acreage on the Stone Ridge property, again without Jordan's knowledge, consent or authorization.

149.    On June 3, 2004, Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature, or caused it to be forged on a deed of trust instrument #200401403 executed with JPMorgan Chase; Jordan's forged signature was falsely notarized by Virginia Hall on June 3, 2004 in Burlington, NJ and Mirra's employee Steve Steiner purported to witness Jordan's signature; in fact, Jordan was in Santa Barbara, CA on June 3, 2004.

150.    By this document, Mirra and Jordan borrowed $3,000,000.00 from JPMorgan Chase for payment on the purchase of the Stone Ridge property, using Jordan's forged signature to co-pledge her individual assets to secure the loan. This forged and fraudulent document was relied upon as genuine by the Appomattox County Recorder, who recorded the mortgage, and JPMorgan Chase as the mortgagor.

151.    On March 31, 2005, the $3,000,000.00 JPMorgan mortgage on the Stone Ridge property was increased by $1,000,000.00 and converted to a Home Equity Line of Credit for $4,000,000.00. The line of credit was secured with the Appomattox County, VA property located at Route 2, Box 63, Concord, VA 24538-9330, (the Stone Ridge Property). The Home Equity Line of Credit was executed by Mirra in his individual capacity, as well as Manager of Stone Ridge Enterprises and RAM Realty.

152.    Mirra, Troilo, Kolleda, and Tropiano, forged Jordan's signature, or caused it to be forged on the Home Equity Line of Credit; her forged signature was falsely notarized by Defendant Danielle Stewart and falsely witnessed by Karen Tuono on March 29, 2005 in Delaware County, PA; in fact Jordan was in New York in all of February, March and April 2005.

153.    This forged and fraudulent document was relied upon as genuine by JP Morgan Chase, which increased the mortgage loan/line of credit to $4,000,000.00.

154.    A Second Home Rider on the line of credit dated March 29, 2005 amended the above mortgage by adding the following language regarding default of the borrower: "Borrower shall be in default if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information (or failed to provide Lender with material information) in connection with the loan." Mirra signed the Second Home Rider in his individual capacity as well as Manager of Stone Ridge Enterprises and RAM Realty. Jordan's forged signature also appeared on the Second Home Rider.

155.    In addition, also on March 29, 2005, Mirra executed two affidavits, both notarized by Defendant Danielle Stewart.  In the first Affidavit, Mirra averred that RAM Realty Holdings LLC was the sole member of Stone Ridge Enterprises, an owner of the premises Route 2 Box 63, Concord, VA 24538, that Mirra was manager of Stone Ridge Enterprises, and that the mortgage loan of $4,000,000.00 from JPMorgan Chase had been duly authorized by Stone Ridge Enterprises.

156.    In the second affidavit, Mirra averred that Jordan and Mirra were the sole members of RAM Realty, that Mirra was manager of the LLC, and that the mortgage loan of $4,000,000.00 from JPMorgan Chase had been duly authorized by Stone Ridge Enterprises.

41

157.    The second affidavit was a materially false statement by Mirra because Jordan, being member and 50 percent owner of RAM Realty, had no knowledge of the $4,000,000.00 loan from JPMorgan Chase (even though her assets were fraudulently used to secure the loan), and therefore did not authorize the mortgage loan.  This fraudulent document was relied upon as genuine by JP Morgan Chase in extending the $4,000,000.00 mortgage loan/line of credit.

158.    Defendants Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature, or caused it to be forged on other documents as well, all dated March 29, 2005, including a "Documents Correction Agreement," and an "Affiliated Business Arrangement Disclosure Statement" in connection with the $4,000,000.00 Home Equity Line of Credit from JPMorgan Chase.  These forged and fraudulent documents were relied upon as genuine by the Appomattox County Recorder, and JP Morgan as the holder of the mortgage/home equity line of credit.

159.    In addition, on March 29, 2005 Defendant Troilo wrote to JPMorgan Chase Bank regarding the Home Equity Line of Credit.  Troilo fraudulently vouched for the "genuineness" of the signatures on all the underlying documents for the Line of Credit.  He also fraudulently represented that the borrowing documents had been "*duly authorized by all necessary actions on the part of each of them...* [including Jordan].  Finally Troilo misrepresented that "*[t]he Loan Documents have been duly and validly authorized, executed and delivered and, where necessary, customary and appropriate, properly acknowledged by Borrower, and constitute the legal, valid and binding obligations of Borrower...*"  As Jordan was unaware of the Line of Credit, and had not signed any document annexed thereto, each of these was a material misrepresentation, the falsity of which Troilo was fully aware. These fraudulent misrepresentations were relied upon JP Morgan Chase.

160.    On or about June 3, 2005, the Third LMA Account 07093 at Merrill Lynch was used to provide Stone Ridge Enterprises, as the owner of the Stone Ridge property, with a loan in the amount of $2,000,000.00.   Defendant Walsh signed the Merrill Lynch LMA Business Account profile, on which Jordan's name appeared as an authorized account individual. Defendants Mirra, Troilo, Kolleda, and Tropiano, forged Jordan's signature or caused it to be forged on a "Federal Reserve Form U-1," dated July 6, 2005.   This forged and fraudulent document was relied upon as genuine by Merrill Lynch.

161.    The Second Jordan-Mirra Joint Merrill Lynch Account 20610 was listed as the collateral for this LMA; this entire transaction was carried out without Jordan's knowledge, consent and/or authorization.

162.    Thus, through the fraudulent Merrill Lynch and JP Morgan Chase mortgages perpetrated by the Defendants, Jordan was proximately caused to be deprived of approximately $4,000,000.00, as Jordan had no knowledge she was a titleholder on the Stone Ridge Property, had no knowledge that her assets were used to collateralize the $8,000,000.00 in loans on the property, and then had to assume half of the $8,000,000.00 debt on the Virginia Ranch in the SDA Agreements discussed below, receiving absolutely no benefit from the property.

**5.     The Fraudulent Taylors Gap Road Scheme**

163.    On or about May 31, 2002, Jordan and Mirra purchased a property located at 1887 Taylors Gap Road, North Garden, Virginia (the "Taylors Gap Road Property") for $1,800,000.00.

164.    On or about December 4, 2003, defendants Mirra, Troilo, Kolleda, and Tropiano forged Jordan's signature, or caused it to be forged on a putative deed that purported to convey the Taylors Gap Road Property from Jordan and Mirra to RAM Realty, and caused the forgery to be falsely notarized by Defendant Hall.

165.    This forged and fraudulent document was transmitted to the County Assessor for Albemarle County, which relied upon it, and recorded the deed without Jordan's knowledge or consent.

166.    Thereafter, Defendants Mirra, Troilo, Kolleda, and Tropiano caused RAM Realty to subdivide and sell off the Taylors Gap Road Property, without Jordan's knowledge or consent, resulting in sales proceeds of $2,151,000.00.

167.    In particular:

(i)     On May 4, 2005, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to an individual named Mariah Dean for $220,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to Dean via the mails, Dean paid $220,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

(ii)    On November 30, 2005, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to an individual named Brian Chase for $915,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to Chase via the mails, Chase paid $915,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

(iii)   On December 20, 2005, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to individuals named John and Janice Mann for $194,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to the Manns via the mails, the Manns paid $194,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

(iv)    On December 21, 2005, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to individuals named Larry and Dorothy Gregory for $375,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to the Gregorys via the mails, the Gregorys paid $375,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

(v)     On January 12, 2006, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to individuals named Anthony Antonio and Megan Bray for $227,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to Antonio and Bray via the mails, Antonio and Bray paid $227,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

(vi)     On February 27, 2006, Mirra caused RAM Realty to sell a portion of the Taylors Gap Road Property to individuals named Gregory and Joy Clark for $220,000.00. In reliance on the forged December 4, 2003 deed, which was transmitted to the Clarks via the mails, the Clarks paid $220,000.00 for a portion of the Taylors Gap Road Property, and the County Assessor for Albemarle County recorded the sale.

168.    As a proximate result, Jordan was damaged in the sum of $1,075,500.00 representing one half of the sale proceeds.

**D.     The Fraudulent Separation and Distribution Agreement**

169.    The Defendants' interrelated fraudulent schemes to convert and misappropriate Plaintiff's assets culminated in the fraudulent execution of a Separation and Distribution Agreement ("SDA") entered into between Jordan and Mirra on March 12, 2008.

170.    The breadth and depth of the Defendants' fraud in the SDA ranged from outright lies about the largest of Jordan's interests to intentional omissions about small but clearly valuable companies, and extended across the entire universe of Jordan/Mirra assets, including holdings and ownership companies, interests in trusts and LLCs, real estate ownership, equitable holdings, and liabilities.

171.    As set forth below, the SDA was fraudulent both on its face and in its inducement, the product of collusion between Defendants Mirra, Troilo, Tropiano, and Kolleda to further deprive Jordan of her rightful share in the joint assets, business ventures, and real estate properties and cause her to unknowingly surrender substantial rights and claims to and interests. Jordan reasonably relied on material misrepresentations by the Defendants in executing the SDA Agreements; but for these intentional and willful misrepresentations, Jordan would not have executed these agreements as drafted

172.    In early 2008 Jordan decided to pursue a business and financial separation from Mirra. To that end she retained Mark Petersen ("Petersen") as counsel from the San Francisco

45

law firm Farella Braun & Martel LLP to represent her in the termination and to negotiate the separation terms.

173.    Despite knowing that Jordan had engaged separate counsel, Mirra contacted Jordan directly by phone on or about February 2008. Mirra represented to Jordan that he was positioning a major transaction to take place in March 2008 whereby Allion Healthcare, Inc. would acquire Biomed America, Inc. and its subsidiaries, companies in which Jordan and Mirra jointly held substantial interests. Mirra told Jordan that any separation agreement between them would have to be completed before the Allion/Biomed deal occurred.

174.    Jordan was unaware that Mirra's "timeline" was premised on the Defendants' desire to steal the value her true interests in Biomed, and prevent her from discovering the conversion until after the SDA had been executed.

175.    In addition, at some time in the later part of February or early March of 2008, Mirra falsely represented to Jordan that all financial obligations and issues between them had been satisfied and resolved prior to January 31, 2003, so that the proposed SDA Agreements related only to the division of their assets and holdings after that time.

1.      **SDA Misrepresentations and Fraudulent Concealment:  The Largest Assets**

(i)     **The Biomed Scheme**

176.    Prior to the execution of the SDA, Defendants Mirra, Troilo, Molieri, Kolleda, and Tropiano represented that Jordan's and Mirra's joint and co-equal interest in Biomed America, Inc. ("Biomed") was 240 shares, which purportedly represented 30 percent of Biomed.

177.    On or about February 21, 2008, a pro forma "Schedule of Net Assets" was sent by the Defendants via facsimile to Petersen reflecting that Jordan owned 15 percent of the Biomed stock.

178.   On or about March 4, 2008, to fraudulently induce Jordan to enter into the SDA, and to relinquish her rightful interests Defendants Mirra, Troilo, Molieri, Kolleda, and Tropiano falsely represented to Brian Donnelly, who was Petersen's partner in representing Jordan, that Jordan's half of Jordan's and Mirra's Biomed stock was valued at $4,900,000.00.

179.   In actuality, Defendants Mirra, Troilo, Molieri, Kolleda and Tropiano knew that Jordan's ownership interest in Biomed was worth far more than $4,900,000.00, because at the time they were engaged in negotiations to sell Biomed to Allion Healthcare, Inc. in a transaction that would actually value a 15 percent interest in Biomed at over $24,000,000.00.

180.   On or about March 12, 2008, in reliance on these misrepresentations and acts of fraudulent concealment, Jordan entered into the SDA and – pursuant to the SDA – transferred her 15 percent ownership interest in Biomed to Parallex, Mirra's sole member LLC, owned and created by Mirra for the purpose of shielding himself from liability in the Allion/Biomed transaction, for only $4,954,000.00.

181.   In truth, as a result of the Defendants' fraud, Mirra received (through his sole ownership of Parallex) a payout worth more than $78,000,000.00 of the merger consideration paid by Allion, consisting of approximately $36,000,000.00 in cash and $42,000,000.00 worth of Allion stock.

182.   But for Defendants' fraud, Jordan would have received half of what Mirra received through Parallex, or $39,000,000.00 for her rightful interest in the value of the Allion/Biomed transaction.

183.   Indeed, when the Allion/Biomed transaction was consummated, the same day the SDA Agreements were signed, Mirra's Parallex re-sold Jordan's interest in Biomed to Allion for approximately $39,000,000.00. In addition, Defendants Troilo, Tropiano, and Kovinsky, as

minority shareholders in Biomed, received a payout worth over $42,000,000.00, approximately $19,000,000.00 in cash and $23,000,000.00 in Allion stock.

184.    As a proximate result of the Defendants' outright fraudulent misrepresentations Jordan has been damaged in the sum in excess of $34,000,000.00.

**(ii)    The U.S. Bioservices/ABC Transaction**

185.    In similar fashion to the Biomed scheme, in which the Defendants lured Jordan into a deal based on claims that she and Mirra held "equal" interest enabling Mirra to receive substantially greater proportion of the proceeds through a subsequent "side" deal, Mirra orchestrated two transactions resulting in the sale of Jordan's ownership interests in APS and Specialty Pharmacy, Inc. ("Specialty Pharmacy") to AmerisourceBergen Corporation ("ABC") in 2002.

186.    At that time, Mirra represented to Jordan that they would receive sixty percent of the total transaction consideration, or approximately $60,000,000.00 of the anticipated $100,000,000.00 for the sale of their interests in these companies in a two-step transaction. Jordan and Mirra were each to receive $15,000,000 in an initial transaction with a private venture capital firm, Whitney V, LP ("Whitney"), and in a later merger with ABC another $15,000,000.00 each, for a total of $30,000,000.00 each in consideration of both transactions.

187.    As to the first step, to position these entities for an ultimate acquisition and merger with ABC, in April 2002 Mirra represented that he had arranged with Whitney to engineer the acquisition of APS and Specialty Pharmacy in a merger and stock purchase transaction with U.S. Bioservices Corporation ("Bioservices").

188.    Mirra, Troilo, Molieri, Kolleda, Tropiano, and Kovinsky engineered and controlled the distribution of funds from these transactions.

189.    On April 29, 2002 (the date on which the Bioservices transaction closed), the fraudulent First Jordan-Mirra Joint Account 12K37 received a wire transfer from Whitney in the amount of approximately $14,262,000.00, ostensibly Jordan's portion of the proceeds from the Bioservices deal.

190.    As set forth above, Defendants fraudulently caused Merrill Lynch to open and fund the First Jordan-Mirra Joint Account 12K37 as an account held jointly by Jordan and Mirra without Jordan's knowledge, consent or authorization. In connection with the Bioservices transaction, Mirra also should have received an equal payment from Whitney for his shares of Bioservices stock in the purported joint account.  Surely, if the sham "joint" account had been truly intended as a receptacle for the jointly held assets of Mirra and Jordan, his "equal" share of $14,262,000 from Whitney should have had the same destination.  Instead, both the amount and the depository of Mirra's "share" of the proceeds remain a mystery.

191.    Later that same year, in December 2002, Mirra and Whitney arranged for U.S. Bioservices to be acquired by ABC for a total purchase price of more than $159,000,000.00.  As a result of having acquired the majority of the Bioservices stock from Jordan and Mirra in the April 2002 transaction, Whitney then sold those interests for in excess of $159,000,000.00, yielding $75,000,000.00 more than Mirra had represented to Jordan as the valuation for the companies.

192.    Moreover, in anticipation of the substantial proceeds expected from the ABC acquisition, Mirra, Troilo, Molieri, Kolleda, Tropiano, and Kovinsky arranged for the proceeds of the second deal with ABC to be received by Jordan and Mirra's respective LLCs, Hawk Mountain LLC ("HM LLC") and Conundrum, LLC. As a controlling stockholder of Bioservices, the HM LLC was party to the principal transaction documents with ABC.

193.    Mirra, Troilo, Molieri, Kolleda, Tropiano, and Kovinsky forged Jordan's signature or caused it to be forged as the Manager of the HM LLC on The Agreement and Plan of Merger between ABC and Bioservices and its controlling stockholders, dated December 13, 2002.  Mirra, Troilo, Molieri, Kolleda, Tropiano, and Kovinsky forged Jordan's signature or caused it to be forged in her individual capacity and as the Manager of the HM LLC, on all of the transactional documents related to the ABC acquisition.  In fact, Jordan did not execute any of the above documents, as required to effectuate the transaction with ABC.

194.    The forgeries of Jordan's signature engendered by Mirra, Troilo, Molieri, Kolleda, Tropiano, and Kovinsky were designed to prevent Jordan from learning of Mirra's double-dealing with Whitney

195.    While Jordan's $14,262,000.00 diminished "share" of the proceeds of the sale were engineered by the Defendants into a fraudulent joint account, the actual profits earned by Mirra were routed to some other destination.  Upon information and belief, Mirra established another entity through which he routed his proceeds from the transaction, and Jordan's share of the additional proceeds of the ABC transaction, which he converted and misappropriated from Jordan.

196.    As a proximate consequence of the Defendants' misrepresentations and fraudulent transmission of these forged and fraudulent documents, Jordan was substantially damaged in an amount to be discovered at trial, as the fraudulent concealment by the Defendants makes present calculations impossible.

**(iii)    VasGene, ARC, Pridecare and Other Valuable Undisclosed Corporate Interests**

197.    On or about March 4, 2008, to fraudulently induce Jordan to enter into the SDA and to relinquish her rightful interests, Defendants Mirra, Troilo, Kolleda, and Tropiano falsely

represented to Jordan and her agents, in financial *pro formas*, that four other companies in which they represented that Jordan at the time had a 50 percent interest – VasGene, PrideCare, ARC and Cancer Innovations – had no value.

198.    At the time when Defendants Mirra, Troilo, Kolleda and Tropiano made these false representations, they knew them to be false, since as late as fall of 2007, the value of these companies as follows: (i) VasGene was valued at $75,000,000.00; (ii) PrideCare was valued  at $2,500,000.00; (iii) ARC was valued at $3,000,000.00; and (iv) Cancer Innovations was valued at $250,000.00.00.

199.    The Defendants' repeated representations that these companies had no value were outright lies, calculated to induce Jordan to surrender her rightful interests in these companies and induce her to execute the SDA.

200.    On or about March 12, 2008, in reliance on these misrepresentations and acts of fraudulent concealment, Jordan executed the SDA and, pursuant to the SDA, relinquished her 50 percent ownership interest in VasGene, PrideCare, and ARC to Mirra.

201.    As a proximate result of the Defendants' material misrepresentations, Jordan suffered damages of approximately $40,000,000.00.

**(iv)    The RAM Network of Companies – RAM Capital and Its Related Holding Companies and Subsidiaries**

202.    In or about late February 2008, Defendants Mirra, Troilo, Kolleda, and Tropiano falsely represented to Petersen that RAM Capital – in which Jordan at the time had a 50 percent interest – had no assets and no value whatsoever.

203.    At the time when Defendants Mirra, Troilo, Kolleda, and Tropiano made these false representations, they knew that RAM Capital held promissory notes from a variety of entities which – as of February 22, 2008 – obligated those entities to pay RAM Capital

51

$11,448,779.17 plus interest.  For instance, in September 2006, RAM Capital had extended the following loans to companies with a reported joint value of more than $73,000,000:

    (i)        Stone Ridge Enterprises - $3,466,640.00

    (i)        Pridecare - $1,865,971.48

    (ii)       Atlas Respiratory - $1,704,077.00

    (iii)      Advanced Research Corporation - $1,489,205

    (iv)      RAM Realty - $1,238,953.00;

    (v)       Cancer Innovations - $456,944.00

    (vi)      Indago HealthCare - $451,037.003

    (vii)     PRN Health Services - $192,088.30

    (viii)    Apogenics Healthcare, Inc.- $175,000.00

    (ix)      Atlas Nursing - $164,398.39

    (x)       West Highland LLC - $118,600.00

    (xi)      PRN Health Services- $75,000.00

    (xii)     Neurology Therapeutics - $38,000.00

    (xiii)    Delta Pharmaceuticals - $12,865.00

204.    Thus, unbeknownst to Jordan at the time of the SDA, RAM Capital had substantial assets in the form of the promissory notes due to RAM from these companies in excess of $11,400,000.00 plus interest. Defendants Mirra, Troilo, Kolleda, and Tropiano intentionally failed to disclose the existence or amounts of these loans to Jordan or her agents at any time prior to her entering into and executing the SDA for the express purpose of inducing her to execute the SDA and preventing her from asserting a rightful claim to her interests in these holdings.

205.    Jordan reasonably relied on the representations, both express and implied, that the information relayed was accurate. As such, Jordan was proximately divested of her proper interest in 50 percent of the outstanding notes, or $5,724,389.59.

206.    In or about February 29, 2008 Mirra, Troilo, Kolleda, and Tropiano sent Petersen a purported schedule of the private companies in which Jordan and Mirra purportedly held joint interests, and falsely represented that the schedule set forth a complete list of the private companies in which Jordan and Mirra either directly or indirectly held any joint interest.

207.    Defendants Mirra, Troilo, Kolleda, and Tropiano intentionally failed to disclose the assets of subsidiaries, holding companies, and/or related companies to RAM Capital, in which Jordan had a vested and legitimate interests, including RAM Equity, RAM Capital Group I, and RAM Capital Group II.

208.    As of date of the execution of the SDA, RAM Equity Holding, LLC and/or RAM Capital Group, LLC wholly owned, had created as subsidiaries, or had interest in the following entities: Accentia Biopharmaceuticals, Inc. ("Accentia") and Idera Pharmaceuticals Inc. ("Idera").

209.    As late as March 2008, RAM Capital held shares of Idera with a reported value of approximately $1,660,000.00. Furthermore, SEC documents report that Ram Holdings, LLC owned Accentia stock worth more than $320,000.00.

210.    Yet, the February 29, 2008 schedule tendered by the Defendants made no reference whatsoever to either Accentia Biopharmaceuticals, Inc., or Idera Pharmaceuticals, Inc.

211.    The existence and value of these holdings was intentionally withheld from Jordan and her agents by Defendants Mirra, Troilo, Kolleda, and Tropiano prior to and during the execution of the SDA for the express purpose of preventing her from asserting a rightful claim to

her interests in those holdings. Jordan reasonably relied on the information that was presented, and but for the misrepresentations and/or omissions she would not have entered into the SDA as drafted.

212.    As a result Jordan was damaged to the extent of her loss of consideration of 50 percent of the true value of each of the companies set forth above; the actual monetary value will hereafter be proven at trial, as the fraudulent concealment by the Defendants makes present calculations impossible.

**(v)     Other Willful Non-Disclosures of Ownership Assets**

213.    In addition, the February 29, 2008 schedule failed to disclose other companies active and in good standing at the time of the execution of the SDA, in which Jordan and Mirra had joint interests, which include, among others, the following:

(i)      AHA Physician Services, Inc.

(ii)     Atlanta I.D. Group, P.C. (previously known as Infectious Disease Solutions, P.C.)

(iii)    Delta Pharmaceuticals, Inc.

(iv)     Eyegene Corporation

(v)      Ashland Pharmacy, Inc.

(vi)     Atlas Nursing Services, Inc.

(vii)    Hometech Therapies, Inc. (filed in PA)

(viii)   Hometech Therapies, Inc. (filed in DE)

(ix)     Complete Communications, Inc.

(x)      Home Infusion Therapies, Inc.

(xi)     Neurology Therapeutics, Inc.

(xii)    U.S. Neurology Corporation

214.     The existence and value of these holdings was intentionally withheld from Jordan and her agents by Defendants Mirra, Troilo, Kolleda, and Tropiano prior to and during the execution of the SDA for the express purpose of preventing her from asserting a rightful claim to her interests in those holdings.  Jordan reasonably relied on the information that was presented, and but for the misrepresentations and/or omissions she would not have entered into the SDA as drafted.

215.     As a result of these material misrepresentations, Jordan was damaged to the extent of her loss of consideration of 50 percent of the true value of each of the companies set forth above; the actual monetary value will hereafter be proven at trial, as the fraudulent concealment by the Defendants makes present calculations impossible.

**2.      SDA Misrepresentations and Fraudulent Concealment:  Real Estate Holdings**

216.     Defendants   Mirra,   Troilo,   Kolleda   and   Tropiano   made   material misrepresentations, false disclosures, and relevant omissions regarding the total value of the net real estate properties jointly held by Jordan and Mirra.

217.     These statements and omissions were false and fraudulent, and were made to induce Jordan to enter and execute the SDA and to divest her of her property, funds and assets. In turn, Jordan reasonably relied on these materially false statements and non-disclosures, and entered into and executed the SDA as a direct and proximate result therefrom.

218.     In or about February 2008, Defendants Mirra, Troilo, Kolleda and Tropiano falsely represented to Jordan and her agents that the total net value of the real estate properties jointly held by Jordan and Mirra was $15,710,000.00.  Upon information and belief, the total net value was much higher, in excess of $22,000,000.00.

219.    Moreover, the Defendants withheld from Jordan and her agents that real property they were fraudulently holding out as joint assets that were in fact purchased with funds exclusively belonging to Jordan.

**(i)      The Tahoe Property**

220.    In or about February 2008, Defendants Mirra, Troilo, Kolleda, and Tropiano misrepresented to Jordan and her agents that the property located at 272 Ridge Drive was a joint asset subject to distribution of 50 percent for both Jordan and Mirra.

221.    In fact, that property was purchased on or about August 30, 1999 using funds belonging exclusively to Jordan.

222.    At the time of the execution of the SDA the property was valued at $2.000,000.00, the entirety of which should have been accorded to Jordan.

223.    As a proximate consequence of the Defendants' fraudulent misrepresentation as to the ownership of the property, Mirra received the equivalent of 50 percent of the value of the property, thereby depriving Jordan of at least $1,000,000.00 to which she was rightfully entitled.

**(ii)     The Camino Del Rosario Property**

224.    On or about March, 2004, Defendants Mirra, Troilo, Kolleda, and Tropiano used money stolen from the First Jordan-Mirra Joint Account 12K37 through the use of a wire transfer authorization bearing Jordan's forged signature to purchase a property located at 2230 Camino del Rosario, Santa Barbara, California (the "Camino del Rosario Property") for $3,300,795.04, and then caused the property to be titled in the name of RAM Realty.

225.    Mirra did not provide any of the funds used to purchase the Camino del Rosario Property. Rather, all of the funds used to purchase the Camino del Rosario Property were

Jordan's, and were stolen by Defendants Mirra, Troilo, Kolleda, and Tropiano from the First Jordan-Mirra Joint Account 12K37.

226.   Though Defendants Mirra, Troilo, Kolleda, and Tropiano used Jordan's money, stolen from the First Jordan-Mirra Joint Account 12K37, to purchase the Camino del Rosario Property, Jordan was unaware that she was the sole source of the funds used to purchase the property, inasmuch as she was unaware of the existence of the First Jordan-Mirra Joint Account 12K37 in the first instance.

227.   In or about February 2008, Defendants Mirra, Troilo, Kolleda, and Tropiano misrepresented to Jordan and her agents that the property located at 2230 Camino del Rosario was a joint asset, and therefore subject to a 50 percent distribution for both Mirra and Jordan.

228.   In fact, the property was purchased using funds belonging exclusively to Jordan.

229.   At the time of the execution of the SDA the property was valued at $3,300,000.00, the entirety of which should have been accorded to Jordan.

230.   As a proximate consequence of the defendants' fraudulent misrepresentation through the mails and wires that Jordan and her agents relied upon, Mirra received the equivalent of 50 percent of the value of the property, thereby depriving Jordan of at least $1,650,000.00 to which she was rightfully entitled.

**(iii)   The Bella Vista Property**

231.   On or about April 2004, Mirra, Troilo, Kolleda, and Tropiano used money stolen from the First Jordan-Mirra Joint Account 12K37 through the use of a wire transfer authorization bearing Jordan's forged signature to purchase a property located at 2336 Bella Vista Drive, Santa Barbara, California (the "Bella Vista Drive Property") for $2,201,760.00, and then caused the property to be titled in the name of RAM Realty.

232.     Mirra did not provide any of the funds used to purchase the Bella Vista Drive Property.  Rather, all of the funds used to purchase the Bella Vista Drive Property were Jordan's, and were stolen by Mirra, Troilo, Kolleda, and Tropiano from the First Jordan-Mirra Joint Account.

233.     Though Defendants Mirra, Troilo, Kolleda, and Tropiano used Jordan's money, stolen from the First Jordan-Mirra Joint Account 12K37, to purchase the Bella Vista Drive Property, Jordan was unaware that she was the sole source of the funds used to purchase the property, inasmuch as she was unaware of the existence of the First Jordan-Mirra Joint Account 12K37 in the first instance.

234.     In or about February 2008, Defendants Mirra, Troilo, Kolleda and Tropiano misrepresented to Jordan and her agents that the property located at 2236 Bella Vista Drive was a joint asset, and therefore subject to a 50 percent distribution for both Mirra and Jordan.

235.     In fact, the property was purchased using funds belonging exclusively to Jordan. At the time of the execution of the SDA, the property was valued at $2,400,000.00, the entirety of which should have been accorded to Jordan.

236.     As a proximate consequence of the defendants' fraudulent misrepresentation through the mails and wires that Jordan and her agents relied upon, Mirra received the equivalent of 50 percent of the value of the property, thereby depriving Jordan of at least $1,200,000.00 to which she was rightfully entitled.

**(iv)     The Stone Ridge Property**

237.     Defendants Mirra, Troilo, Kolleda, and Tropiano also made material misrepresentations to Jordan and her agents regarding the Stone Ridge property.

238.    This property was encumbered by the Defendants with $8,000,000.00 in fraudulent loans using documents forged with Jordan's signature to obtain the loans.

239.    At the time of the execution of the SDA, the Defendants misrepresented that Jordan was responsible for 50 percent of the encumbrance, or $4,000,000.00.

240.    As a proximate consequence of the defendants' fraudulent misrepresentation through the mails and wires on which Jordan and her agents relied, Jordan's right to her fair distribution of the assets was diminished by $4,000,000.00.

241.    In addition, Defendants Mirra, Troilo, Kolleda, and Tropiano at the time of the execution of the SDA made material misrepresentations, upon which Jordan and her agents reasonably relied, that the value of the Stone Ridge Property was $12,000,000.00. In fact, the actual value was at least $18,000,000.00.

242.    As the SDA accorded ownership of the property to Mirra, Jordan was therefore proximately deprived of at least $3,000,000.00, representing her share of the true value of the property.

243.    Jordan and her agents reasonably relied upon the misrepresentations and omissions set forth above.  These false and fraudulent representations made to Jordan and her agents, concerning the purported value of Jordan's joint real estate holdings individually and cumulatively induced her into executing the SDA; but for these misrepresentations, Jordan would not have entered into and/or executed the SDA.

244.    These material misrepresentations, individually and cumulatively, proximately, resulted in damages to Jordan, the actual monetary value of which will hereafter be proven at trial, as the fraudulent concealment by the Defendants makes present calculations impossible.

3.      **SDA Misrepresentations and Fraudulent Concealment:  West Highland LLC**

245.    In February and March 2008, Defendants Mirra, Troilo, Kolleda, and Tropiano repeatedly falsely represented to Jordan and her agents in telephone calls, and financial schedules and *pro formas* tendered by email and fax that the West Highland Co. account at BJB was a joint asset of Mirra's and Jordan's and that Mirra had contributed half of the funds on deposit in that account, which by that point had grown to more than $29,000,000.00.

246.    In fact, Defendants Mirra, Troilo, Kolleda, and Tropiano knew that none of the funds on deposit in the West Highland account at BJB had been contributed by Mirra, and that all of the funds on deposit in the West Highland account at Bank Julius Baer were attributable to a forged July 13, 1999 wire transfer from the Jordan Smith Barney Account.

247.    In reliance on these fraudulent misrepresentations by Defendants Mirra, Troilo, Kolleda, and Tropiano in February and March 2008, Jordan entered into the SDA and, pursuant to the terms therein, permitted half of the funds in West Highland's BJB account – or more than $14,500,000.00 – to be distributed to Mirra.

248.    As a proximate result of the defendants' knowingly false representations made by mail and wire fraud, Jordan suffered damages in the sum of $14,500.00.00.

4.      **SDA Misrepresentations and Fraudulent Concealment: "Joint" Liabilities and Merrill Lynch Asset Accounts**

249.    In late February and early March of 2008, both in the negotiations prior to the execution of the SDA and in the SDA itself, Defendants Mirra, Troilo, Tropiano and Kolleda falsely represented that Jordan and Mirra had incurred certain joint liabilities in the form of mortgages, loans and lines of credit. In the actual SDA itself, Defendants Mirra, Troilo, Tropiano and Kolleda falsely represented and warranted that the listed joint liabilities represented "all of the liabilities to which the parties are jointly and/or severally liable."

60

250.    The representations that Jordan was jointly liable for these debts were false and fraudulent, as these were liabilities that were incurred without Jordan's knowledge, consent or authorization and based on fraudulent and forged documents purporting to contain Jordan's signature.

251.    As set forth above, the following purported joint liabilities were based upon fraudulent and forged documents that were not discovered until 2010 and thereafter, as follows:

| | |
|---|---|
| Merrill Lynch LMA 870-07091 | $1,527,437.00 |
| Merrill Lynch LMA 870-07093 | $2,036,749.00 |
| Merrill Lynch LMA 870-07131 | $263,006.00 |
| Merrill Lynch LMA 870-10434 | $5,318,269.00 |
| Merrill Lynch PPH a/k/a "PHH" Mortgage Account 70788336901 | $1,997,002.00 |
| JP Morgan Account 429258165495 | $4,000,000.00 |
| **Fraudulent Loans: Total Amount Alleged at SDA** | **$15,142,463.00** |

252.    Jordan reasonably relied on Defendant Mirra, Troilo, Kolleda and Tropiano's false representations concerning the purported joint liabilities, and as a result, was fraudulently induced into entering and executing the SDA in which she agreed to give up valuable rights and interests to Mirra as consideration for assuming for half of the total alleged liability. Jordan was thereby induced into paying Mirra to discharge her from fraudulent liabilities incurred for his own benefit and the benefit of the Enterprise, without her knowledge and authorization.

253.    As a proximate result of these material misrepresentations and acts of fraudulent concealment, Jordan was damaged in excess of  $7,500,000.00.

254.    In addition, Mirra's fraudulent and false assumption of 50 percent of the purported joint liabilities was intentionally calculated to induce Jordan to agree to surrender 50 percent of the value of the Merrill Lynch assets accounts as some fraudulent *quid pro quo*.

255.    By lying to Jordan about the scope and nature of the joint liabilities, the Defendants were able to induce Jordan into paying Mirra $3,392,487.05 as sham consideration for his assumption of "joint" liabilities that had been incurred by the Defendants alone, without Jordan's knowledge, consent or authorization.

256.    But for the Defendants' material misrepresentations, Jordan would not have agreed to the payment of 50 percent of the ML asset accounts.  Therefore, as a proximate result of these acts of mail and wire fraud, Jordan was further damaged in the amount of $3,392,487.05.

**5.    SDA Misrepresentations and Fraudulent Concealment: Mirra's Financial Obligations to Jordan**

257.    In late February 2008, as part of their scheme to induce Jordan to execute the fraudulent SDA, and dupe her into surrendering her rights to significant assets, Defendants Mirra, Troilo, Kolleda, and Tropiano, made material misrepresentations, false disclosures and relevant omissions to Jordan and her agents concealing Mirra's substantial outstanding financial obligations to Jordan.

258.    Specifically, Defendants Mirra, Troilo, Kolleda, and Tropiano represented that all of Mirra's financial obligations to Jordan prior to January 31, 2003 had been fully satisfied and resolved.

259.    On February 27, 2008 Defendants Troilo and Tropiano prepared and then faxed a document entitled "Raymond Mirra & Gigi Jordan Schedule of Net Assets" to Petersen and Donnelly's office. The document was one of several such schedules sent by Defendants Mirra,

Troilo, Kolleda, and Tropiano calculated to misrepresent the Jordan/Mirra purported joint assets and liabilities. This particular schedule, as was the case with many other such *pro formas,* was delineated "Balance @ 1/31/03 [vs.] 'Current Balances.'" These schedules were presented in furtherance of Mirra's false representations that he had satisfied all obligations to Jordan prior to that date.

260.    Each and all such statements and financial schedules were false and fraudulent because Mirra had not satisfied his obligations to pay Jordan substantial amounts due to her under several promissory notes that remained outstanding as of the SDA Agreements.

261.    Specifically, in 1997 and 1998, Mirra executed a number of promissory notes (the "Promissory Notes") guaranteeing payment to Jordan for significant funds borrowed by Mirra for himself and his company, HPC America, Inc.; these notes remained due and owing at the time of Jordan's entering into and executing the SDA as follows:

(i)      On or about October 15, 1997, Mirra executed a promissory note to Jordan establishing a loan of $2,500,000. The note is subject to an annual interest rate of 10 percent.  Additionally under the terms of this note, failure to pay on demand results in a penalty of ten percent on the amount then due.

(ii)     On or about March 3, 1998, Mirra executed a promissory note to Jordan establishing a loan of $100,000. The note is subject to an annual interest rate of 8 percent. Additionally under the terms of this note, failure to pay on demand results in a penalty of ten percent on the amount then due.

(iii)    On or about March 3, 1998, Mirra executed a promissory note to Jordan via the mails and wires, establishing a loan of $400,000. The note is subject to an annual interest rate of 8 percent.  Additionally under the terms of this note, failure to pay on demand results in a penalty of ten percent on the amount then due.

(iv)     On or about March 25, 1998, Mirra executed a promissory note to Jordan establishing a loan of $1,000,000. The note is subject to an annual interest rate of 8 percent.  Additionally under the terms of this note, failure to pay on demand results in a penalty according to which the entire unpaid principal balance of the note shall bear interest until paid at an augmented annual rate of eighteen percent

(v)      On or about May 4, 1998, Mirra executed a promissory note to establishing a loan of $1,200,000. The note is subject to an annual interest rate of 8 percent.

(vi)   On or about May 14, 1998, Mirra executed a promissory note to Jordan establishing a loan of $1,000,000. The note is subject to an annual interest rate of 8 percent.  Additionally under the terms of this note, failure to pay on demand results in a penalty according to which the entire unpaid principal balance of the note shall bear interest until paid at an augmented annual rate of eighteen percent.

(vii)   On or about September 11, 1998, Mirra executed a promissory note to Jordan establishing a loan of $500,000.  The note is subject to an annual interest rate of 8 percent.  Additionally under the terms of this note, failure to pay on demand results in a penalty according to which the entire unpaid principal balance of the note shall bear interest until paid at an augmented annual rate of eighteen percent.

(viii)   On or about October 1, 1998, Mirra executed a promissory note secured by real property, to Jordan establishing a loan of $200,000.  The note is subject to an annual interest rate of 8 percent.

262.   The knowing misrepresentations and omissions made by the Defendants to conceal Mirra's indebtedness to Jordan were made by the Defendants for the express purpose of inducing Jordan to enter and execute the SDA and to divest her of her rightful property, funds and assets. In turn, Jordan reasonably relied on these materially false statements and non-disclosures, and entered into and executed the SDA; but for the representations that Mirra had fully satisfied all outstanding obligations, Jordan would not have entered into and executed the SDA. These material misrepresentations, individually and cumulatively proximately resulted in damages to Jordan, the actual total monetary value of which will hereafter be proven at trial, as the fraudulent concealment by the Defendants makes present calculations impossible.

263.   Demand was duly made on the Promissory Notes on March 6, 2012.  Said Promissory Notes are now in default.

## 6.   The General SDA Release

264.   Defendants Mirra, Troilo, Kolleda, and Tropiano fraudulently induced Jordan to enter into and execute a document entitled "Mutual General Release Document" (the "General Release").

64

265.    This "release" was the means by which the Defendants purported to insulate themselves from liability for each and every act of fraud, forgery, misappropriation and conversion antecedent to its execution.

266.    In or about early March 2008, Defendant Troilo transmitted to Petersen a draft copy of the General Release; Petersen in turn transmitted the same to Jordan.

267.    The draft included the following language present in the "final" and fraudulent "executed" form of the SDA:

> Jordan, for and on behalf of (x) herself, her heirs and beneficiaries, (y) her affiliates and each of their limited and general partners, officers, directors, stockholders, members, managers, employees, attorneys, advisors and agents, and (z) each such foregoing person's or entity's predecessors, successors and assigns (collectively, the "Jordan Releasing Parties"), agrees to and hereby does irrevocably release and forever discharge (a) Raymond A. Mirra, Jr., (b) his heirs and beneficiaries, his affiliates and the officers, directors, stockholders, employees, agents, insurers and attorneys of each such affiliate, and (c) each such foregoing person's or entity's predecessors, successors and assigns (collectively the "Mirra Released Parties") from any and all manner of actions, causes of action, claims, offsets, demands, judgments, complaints, executions, regulatory challenges, losses, damages, expenses, fees, debts, representations, warranties or liabilities of any kind whatsoever, whether arising out of state, federal or foreign law, rule, regulation or equity, whether known or unknown, accrued or not accrued, asserted or not asserted, matured or not matured, suspected or not suspected, fixed or contingent, foreseeable or unforeseeable, direct or indirect (each, a "Claim", and collectively, "Claims"), which the Jordan Releasing Parties ever had, now have or hereafter can, shall or may have or acquire against the Mirra Released Parties, or any of them, by reason of any and all facts, circumstances, transactions, events,statements, representations, warranties, occurrences, acts, or omissions (whether or not knowingly, intentional, reckless or negligent; whether or not based on, due to or resulting from solely the conduct, action, activity, omission or fault of one or more of the Jordan Released Parties; and with or without any conduct, action, activity, omission or fault of the Jordan Releasing Parties), which occurred, arose or existed at any time on or before the date of this Release Agreement.

268.    In or about early March 2008, Jordan reviewed the terms and conditions set forth above, and communicated to Petersen that she would not agree to the overreaching scope of this language.

269.    On or about March 13, 2008, Petersen communicated to Troilo that Jordan did not agree to the language contained in the General Release that had been proposed by Troilo to Petersen, and wished to have the entire passage stricken.

270.    Mirra, Troilo, Tropiano and Kolleda agreed to strike the challenged language from the General Release, and made such express representations to Petersen, who in turn communicated to Jordan that the language to which she objected had been removed from the General Release.

271.    On or about March 13, 2008, Troilo sent to Petersen signature pages for Jordan to execute.  Troilo provided Petersen with neither a full original copy of the SDA nor did he require Jordan and Mirra to initial each and every page of the Agreement.

272.    Troilo pressed that he required the signature pages to be returned immediately as the Allion deal was set to be executed that day.

273.    On or about March 2008, genuinely believing that the overreaching language had been removed from the General Release, Petersen advised Jordan accordingly and counseled her to execute both the General Release and the SDA.

274.    On or about March 2008, relying upon the false impression that the overreaching language had been removed from the General Release, and relying upon Petersen's counsel and the good faith required of Troilo as her fiduciary, Jordan executed the signatory pages for both the General Release and the SDA. But for this intentional misrepresentation, Jordan would not have executed either the General Release or the SDA itself.

275.     Defendants Mirra, Troilo, Kolleda and Tropiano lied to Jordan and her counsel regarding the challenged language and fraudulently inserted that language into the General Release without Jordan's knowledge, consent or authorization. But for these material misrepresentations, Jordan would not have executed the General Release and the SDA.

276.     Troilo – in collusion with Mirra, Kolleda, and Tropiano – intentionally and willfully misrepresented to Jordan and her agents the final terms and conditions of the General Release, for the express purpose of inducing Jordan to execute the General Release and the body of the SDA.

277.     In reliance on: (i) the oral and written representations made by Mirra, Troilo, and Tropiano; (ii) the representations and warranties made by Mirra in the SDA; (iii) the duty of absolute good faith and loyalty of Mirra, Troilo and Tropiano as fiduciaries to ensure that such representations were true, complete, and in no way misleading; and (iv) the further duty of Mirra, Troilo and Tropiano as fiduciaries to disclose all material facts known to them that would affect the decision of Jordan to enter into the SDA, Jordan did sign the SDA, giving up valuable rights and interests to Mirra.

278.     After the signing of the SDA, Jordan continued to place her reliance and trust in Mirra and his agents and co-conspirators to manage her financial and business affairs until December 2009.

279.     In a response to a communication from Jordan's attorney concerning this relationship in December of 2009, Troilo characterized what was done by Mirra, himself, Tropiano and Kolleda for Jordan as follows:

> "hi gay ... what we do for gigi is extensive … we handle all of her personal and business affairs … do all her account set-up, bill paying…coordination with her cpa … involved in all legal transactions, interface with her professionals … maintain all of her records, etc. … manage or assist in managing her investment properties from a legal and accounting

standpoint … handle her investment accounts and accounting for same … i hope you have the resources lined up to handle all of these aspects….”

## E.     The Conundrum Trust

280.    In or about December of 2002, defendants Mirra and Troilo approached Jordan regarding the establishment of two grantor retained annuity trusts (“GRATs”) for the benefit of the respective children of Mirra and Jordan.  This resulted in the creation of the Hawk Mountain Trust (see previously supra, “HM Trust”) and the Conundrum Trust. The documents for the creation of these trusts were prepared and finalized in December 2002 by the defendants' trusts and estates attorney Bernard Eizen, who held himself as representing ***both*** Jordan and Mirra.

281.    Mirra and Troilo represented to Jordan that the both trusts and two LLC's to be established in the name of, and owned by the respective trusts would be mirror trusts, substantively identical in all respects. Jordan and Mirra would each be settlors of their own trusts; Jordan for the Hawk Mountain Trust, Mirra for the Conundrum Trust. At Mirra's direction, defendants Troilo and Kolleda were designated to serve as Trustees for both trusts.

282.    Mirra and Troilo represented to Jordan that the trusts were being created contemporaneously with the Hawk Mountain LLC (“HM LLC”) and the Conundrum LLC in anticipation of the substantial proceeds expected from the AmerisourceBergen Corp. (“ABC”) acquisition of U.S. Bioservices. It was intended that the approximate $15,000,000.00, designated to be received in each trust as result of Jordan and Mirra's expected receipt of cash and stock from the ABC transaction, would be contributed to LLCs, to be established and owned by the Trusts. Mirra and Troilo represented to Jordan that although Troilo and Kolleda would be Trustees of her trust, the cash and stock from the ABC transaction would be held directly by the HM LLC, of which Jordan would be the appointed manager and as manager would exercise sole

68

authority over the funds held therein; the business and affairs of the company were to be managed solely and exclusively by Jordan as Manager. Mirra and Troilo made these representations to secure Jordan's mistaken confidence that she would still control the assets of the HM LLC, knowing that she otherwise was disinclined to fund the Trust/LLC financial construct as proposed.

283.   Mirra and Troilo falsely represented to Jordan that through these trust vehicles, over $3,500,000.00 in capital gains tax would be saved by Mirra and Jordan, respectively, that would otherwise be due as a result of the upcoming merger.  In truth, any tax savings realized from the trust structure would be realized as estate tax savings, not as savings on capital gains from the transaction as alleged by Mirra and Troilo. Jordan would not have invested the proceeds of the merger in the proposed trust vehicles but for the false representations made regarding the purported capital gains tax savings falsely alleged by Mirra and Troilo.

284.   Mirra and Troilo also advised Jordan that as settlors, she and Mirra would each name a "protector," an individual empowered to remove and replace the Trustees at will; an important safeguard to ensure that the trustee(s) could be removed if they were not serving the best interests of the beneficiary. Defendants Mirra and Troilo falsely represented to Jordan that due to the irrevocable nature of the proposed trusts, as settlors, both she and Mirra were legally precluded from acting as protectors of their own trusts. Jordan reasonably relied on this false explanation, and consequently acquiesced to the appointment of Mirra as protector of the HM Trust. Thus, Mirra and Troilo fraudulently induced Jordan to accept Mirra's appointment as the protector for the HM Trust.

285.   As part of the Defendants' fraudulent efforts to induce Jordan to appoint Mirra as protector of the HM Trust, Mirra and Troilo told Jordan that she and Mirra would each serve as

protector for the other's trust.  Jordan received and reviewed the Conundrum Trust and found its provisions to be the same as those found in the Hawk Mountain Trust she was to execute. Jordan executed a document related to the Conundrum Trust appointing her as protector in 2002. From the execution of that document until 2010, Jordan reasonably believed that she remained as protector of the Conundrum Trust, with all rights and responsibilities attendant thereto.

286.    In April of 2010, Eizen contacted Jordan's attorneys in his capacity as attorney for Troilo and Kolleda, as Trustees of the HM Trust, and Mirra, as Protector, regarding the status of the trusts and the LLCs.  In his correspondence, it was clear that Eizen, despite having previously represented Jordan, was now taking a position directly adverse to Jordan interests.

287.    In April 2010, Jordan's attorney, Carlyn McCaffrey, Esq., challenged Eizen regarding, among other things, Eizen's conflicted representation of the Trustees in a posture adverse to Jordan, as well as Mirra and Troilo's false representations that Jordan could not serve as Protector for the HM Trust. McCaffrey informed Eizen of Jordan's appointed role as Protector of the Conundrum Trust and requested copies of that trust document and all related documents.

288.    By letter on May 24, 2010 defendant Eizen wrote McCaffrey falsely stating that Jordan had resigned as protector of the Conundrum Trust. Eizen tendered with this email a document dated June 30, 2009 and titled "RESIGNATION AND APPOINTMENT OF SUCCESSOR PROTECTOR", which fraudulently purported to document Jordan's resignation as protector of the Conundrum LLC, appointing Mirra's then wife Shauna Mirra as protector in her place. This document is fraudulent, as it bears the forged signature of Gigi Jordan. In fact, Jordan never signed any such document, nor did she authorize any person to affix her signature to the document.  Moreover, Jordan did not resign as protector of the Conundrum Trust, nor did

she express to any person her desire, willingness or consent to be so removed, nor did she consent to the appointment of Shauna Mirra as the protector of the Conundrum Trust.

289.    In addition, on March 9, 2011, in response to a request by McCaffrey regarding a reference to a "disclaimer" document noted in his billing records, Eizen's office produced a document titled "DISCLAIMER OF INTEREST IN THE CONUNDRUM TRUST", dated June 30, 2009, the same date as the alleged "RESIGNATION AND APPOINTMENT OF SUCCESSOR PROTECTOR." This disclaimer falsely purported that Jordan agreed to disclaim any right her son Jude Mirra may have had as the adopted child of Mirra to benefit from the Conundrum Trust and stated, *inter alia*, that:

> Whereas, since the execution of the Trust, Jude Mirra has ceased to be the adopted, child of the Settlor by virtue of the release of [Mirra's] parental rights and reversal of adoption…Jude Mirra…hereby disclaims, renounces, relinquishes and releases, any and all right, title and interest that Jude Mirra has or may have as a beneficiary of or arising under the Trust including, without limitation, any interest as a beneficiary arising from *Jude Mirra's former status as adopted child* of the Settlor or under provisions benefitting Settlor's intestate heirs, which is acknowledged to have been annulled, ab initio by virtue of the release of parental rights and reversal of adoption…

(Emphasis added.)

290.    This document is also fraudulent, as it bears a forged signature for Gigi Jordan, as well as a fraudulent attestation that her signature was personally witnessed in Delaware County, Pennsylvania on June 30, 2009 by Mirra's employee Danielle Stewart.  In fact, Jordan was not present in Pennsylvania on that date, did not sign the document, and did not agree to any disclaimer of Jude's interest in the Conundrum Trust.  Neither did she authorize, agree to or have knowledge of the creation and/or execution of any such document or the attendant disclaimer of Jude's proprietary interest in the Conundrum Trust and its assets.

291.    Thereafter, the defendants produced another fraudulent disclaimer of Jude Mirra's interests in the Conundrum Trust, also titled "DISCLAIMER OF INTEREST IN THE CONUNDRUM TRUST", dated November 19, 2009.  This disclaimer is virtually identical in all respects to the fraudulent June 30, 2009 forged disclaimer above, except for the following additional language appearing at the end of November 19, 2009 version:

> Jude Mirra shall have an interest solely in the Hawk Mountain Trust, and not the Conundrum Trust.  It is further agreed that the sole and exclusive beneficiaries of the Conundrum Trust are Settlor's natural children, who are Raymond Mirra III and Aidan Mirra, both of whom are also minors.

292.    As with the June 30, 2009 DISCLAIMER OF INTEREST IN THE CONUNDRUM TRUST, this document is fraudulent, as it bears the forged signature of Gigi Jordan, as well as a fraudulent attestation that her signature was personally witnessed in Delaware County, Pennsylvania by Danielle Stewart on November 17, 2009. In fact, Jordan was not present in Pennsylvania on that date, did not sign the document, and did not agree to any disclaimer of Jude's interest in the Conundrum Trust or its assets.  Neither did she authorize, agree to or have knowledge of the creation and/or execution of any such document or the attendant disclaimer of Jude's proprietary interest.

293.    As a result of the fraud by the Defendants, Jordan was wrongfully divested of the rights and powers attendant to her as protector of the Conundrum Trust, including but not limited to the power to remove trustees for any fiduciary or financial wrongdoing.

294.    As a result of the fraud by the Defendants, Jude Mirra was divested of his interest as beneficiary of the Conundrum Trust, which, would have entitled him and by familial extension, Kim Jordan, Gigi Jordan's mother as Jude Mirra's intestate heir, to an equitable distribution of monies held by the Conundrum Trust and/or the Conundrum LLC. Upon information and belief, the terms of the Conundrum Trust set forth as follows:

If Settlor survives the expiration of the Term for Settlor, then upon expiration of the Term for Settlor, the Trustee divide the remaining assets of the GRAT into as many equal shares as necessary so that a share will be allocated to each Child of Settlor who is then living and to each Child of Settlor who is then deceased but who leaves then living issue.

295.    Jude Mirra was the adopted son of Defendant Mirra as of formation of the Conundrum Trust in December 2002 and was so as of December 1, 2006 when the Term for Settlor expired, and thus, was entitled to an equal portion of the remaining assets in the Conundrum Trust to be held in a separate trust for his primary benefit, subject to Jordan's parental rights and privileges.

296.    The Defendants' fraud has obstructed the ability of Jordan to ascertain the value of any such interest, or the degree to which the defendants fraudulently siphoned off monies to which Jude and his grandmother may have been entitled. However, upon information and belief, over $3 million was taken from the Conundrum LLC, the sole asset of the Conundrum Trust, to pay the settlement costs of a conversion, breach of contract, breach of fiduciary duty of loyalty, civil conspiracy, and unjust enrichment lawsuit brought by ABC against defendant Mirra in December of 2004. Moreover, upon information and belief the defendants transferred money from the Conundrum LLC to RAM Capital, Mirra's principal corporate holding company, and in so doing wrongfully converted the assets of the Trust.

297.    As such, the plaintiff is entitled to a full accounting, and the declaratory relief sought herein.

**FIRST CAUSE OF ACTION**
**Against Mirra**
**(Breach of Contract on Promissory Notes)**

298.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 297, above.

73

299.    As set forth above, Mirra as obligor and guarantor promised to Jordan to pay the amounts set forth above at the specified interest rates in the eight promissory notes executed between October 1997 and October 1998.

300.    Demand has been duly made on the eight promissory notes, which are in default.

301.    Accordingly, Plaintiff is entitled damages of $6,900,000.00 for the unpaid principal due and owing on the promissory notes, plus interest, penalties, costs, attorneys' fees, and such other and further relief as to the Court may seem just and proper.

**SECOND CAUSE OF ACTION**
**Against Mirra, Troilo, Molieri, and Kolleda**
**(For an Accounting)**

302.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 301, above.

303.    As set forth above, Mirra, and his associates, Troilo, Molieri, and Kolleda, were in fiduciary relationship with Jordan and have a duty to account to her for the business, financial, legal and tax matters they were managing for her individually and for the businesses, interests and properties she held or owned jointly with Mirra, Jordan has no adequate remedy at law with respect to such an accounting.

304.    In the absence of a legal remedy with respect to such an accounting, Jordan demands and is entitled to a full and complete accounting from Mirra, Troilo, Molieri, and Kolleda concerning and relating to: (i) all offshore accounts in which Mirra and Jordan had a direct or indirect joint interest or which received funds or distributions from any direct or indirect joint interest; (ii) the distribution of all amounts received relating to the ABC transaction; (iii) the distribution of all amounts received relating to the Allion/Biomed/Parallex transaction;  (iv) the transfers out of the individual accounts of Jordan, the Jordan/Mirra joint accounts, the accounts

74

of and relating to businesses interests and properties jointly held or owned by Jordan and Mirra, as well as the loan management accounts for which Jordan and Mirra were purportedly liable; (v) any liability purportedly incurred by Jordan in connection with any Jordan/Mirra joint businesses, interests or properties and any use of the credit of Jordan regarding the same; and (vi) all undisclosed funds received by the Defendants from Whitney V LP, Great Point Partners LLC, and its related private equity partnerships, principles, partners, agents, parent companies, subsidiaries, affiliates, proprietors, and joint venturers.

### THIRD CAUSE OF ACTION
**Against Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, and Walsh**
**(Common Law Fraud)**

305.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 304, above.

306.    Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, and Walsh intentionally and knowingly made false and fraudulent statements of material fact to Jordan and her agents and concealed material facts from Jordan and her agents.

307.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) misrepresentations and fraudulent concealment attendant to the creation of joint Jordan-Mirra Merrill Lynch accounts without Jordan's knowledge or consent; (ii) misrepresentations and fraudulent concealment with respect to the forgery of wire transfer authorizations without Jordan's knowledge or consent; (iii) misrepresentations and fraudulent concealment with respect to the creation and utilization of lines of credit with Merrill Lynch and other banking institutions, collateralized with Jordan's assets, without her knowledge or consent; (iv) misrepresentations and fraudulent concealment attendant to the purchase of, encumbrance of, and transfer of Jordan's interest in real properties, without her knowledge or consent; and (v)

misrepresentations and fraudulent concealment with respect to the value of Jordan's business interests and assets.

308.    Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, and Walsh intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to divest Jordan of her rightful interests in her assets.

309.    Jordan justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in her business and property by reason of the above-described conduct in that she has been defrauded of assets valued in excess of $225,000,000.00.

310.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Jordan to recover punitive damages.

311.    Accordingly, by virtue of the foregoing, Jordan is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Stewart, Sigloch, Forte, Hall, Demora, and Kuo
### (Aiding and Abetting Fraud)

312.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 311, above.

313.    Stewart, Sigloch, Forte, Hall, Demora, and Kuo knowingly aided and abetted the fraudulent schemes that were perpetrated on Jordan by Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, and Walsh.

314.    The acts of Stewart, Sigloch, Forte, Hall, Demora, and Kuo in furtherance of the fraudulent schemes include knowingly witnessing and notarizing forgeries of Jordan's signature

in order to facilitate the Defendants' interrelated fraudulent schemes.

315.    The conduct of Stewart, Sigloch, Forte, Hall, Demora, and Kuo in furtherance of the interrelated fraudulent schemes was significant and material. The conduct of Stewart, Sigloch, Forte, Hall, Demora, and Kuo was a necessary part of and was critical to the success of the fraudulent schemes because without their actions, including knowingly witnessing and notarizing forgeries of Jordan's signature, it would have been much more difficult, if not impossible, for the Defendants to defraud Plaintiff of her assets.

316.    Stewart, Sigloch, Forte, Hall, Demora, and Kuo aided and abetted the fraudulent schemes in order that they would continue profiting through the fraudulent schemes.

317.    The conduct of Stewart, Sigloch, and Forte enabled the Defendants to steal more than $225,000,000.00 from Plaintiff.

318.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

319.    Accordingly, by virtue of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Mirra, Troilo, Tropiano and Kolleda**
**(Fraudulent Inducement)**

320.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 319, above.

321.    As set forth above, Mirra, Troilo, Tropiano, and Kolleda knowingly misrepresented and fraudulently concealed material facts from Jordan, despite their superior

knowledge and duty to disclose the true facts to Jordan, in order to fraudulently induce Jordan to enter into the SDA and General Release.

322.    Mirra, Troilo, Tropiano, and Kolleda intended Jordan to rely on these misrepresentations and acts of fraudulent concealment so as to induce Jordan to enter into the SDA and General Release.

323.    Jordan reasonably relied on these misrepresentations and acts of fraudulent concealment, and suffered damages as a result.

324.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

325.    Accordingly, by virtue of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Mirra, Troilo, Molieri, and Kolleda
### (Breach of Fiduciary Duty)

326.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 325, above.

327.    As set forth herein, Mirra, Troilo, Molieri, and Kolleda acted as Jordan's fiduciaries and owed Jordan fiduciary duties in their capacities as Jordan's business partner and business and financial managers.

328.    The Defendants breached their fiduciary duties to Jordan by engaging in the pattern of forgery, fraud, conversion, and self-dealing described herein.

329.    As the result of Defendants' breaches of fiduciary duty, Jordan has been damaged.

330.    Defendants' breaches of their fiduciary duties demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

## SEVENTH CAUSE OF ACTION
### Against Mirra
### (Breach of Warranties)

331.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 330, above.

332.    Pursuant to the SDA, Mirra represented and warranted that the scheduled assets and liabilities within the SDA constituted a full and complete listing of Mirra's and Jordan's joint assets and liabilities.

333.    Jordan relied on these representations and warranties, and therefore entered into the SDA.

334.    As set forth above, such representations and warranties were false.

335.    As the result of Mirra's breach of these representations and warranties, Jordan has been damaged.

## EIGHTH CAUSE OF ACTION
### Against all Defendants
### (Unjust Enrichment)

336.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 335, above.

337.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Plaintiff.

338.    Defendants' retention of the cash and other assets they obtained from Plaintiff through their improper, unlawful, and/or unjust acts violates fundamental principles of justice, equity and good conscience.

339.    By reason of the above, Defendants have been unjustly enriched at Plaintiff's expense.

**NINTH CAUSE OF ACTION**
**Against all Defendants**
**(Conversion)**

340.    Plaintiff incorporates, as though fully set forth herein, each and every allegation set forth in paragraphs 1 - 339, above.

341.    Plaintiff had possessory interests in her cash and assets, as described above.

342.    Defendants interfered with Plaintiff's possessory interests in her cash and assets in derogation of Plaintiff's rights, by transferring Plaintiff's cash and assets to themselves or for their benefit as described above, and by encumbering Plaintiff's cash and assets as described above.

343.    As the result of Defendants' conversion of Plaintiff's cash and assets, Plaintiff has been damaged.

**TENTH CAUSE OF ACTION**
**Against Defendants Mirra, Troilo, Kolleda and Eizen**
**(Declaratory Relief under 28 U.S.C. §§ 2201 and 2202)**

344.    The Plaintiff incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-343 above.

345.    There is an actual case and controversy between Plaintiff Jordan and the Defendants regarding the manipulation and wrongful alteration of her rights and the rights of Jude Mirra, pursuant to trust agreements.

346.     As set forth above, the Defendants, through forged and fraudulent documents, wrongfully removed Jordan as the "protector" of the Conundrum Trust, thereby fraudulently divesting her of her rights and her ability to exercise her responsibilities in that capacity pursuant to the terms of the Conundrum Trust Agreement and the law.

347.     As set forth above, the Defendants, through forged and fraudulent documents, wrongfully divested Jude Mirra of his rights as beneficiary of the Conundrum Trust.

348.     As such, the Plaintiff is entitled to a judgment pursuant to the Declaratory Judgment Act, declaring that: 1) her removal as Protector was carried out through the use of forged and fraudulent documents; 2) she therefore presently remains as the Protector for the Conundrum Trust, with all the rights and responsibilities afforded her by the Trust Agreement and the law; 3) that the change of Jude Mirra's status as beneficiary of the Conundrum Trust was carried out through the use of forged and fraudulent documents; 4) at the time of his death in February 2010, Jude Mirra remained a beneficiary of the Conundrum as originally drafted and executed.

349.     A declaratory judgment is necessary and useful in resolving the actual, substantial, and justiciable controversy that has arisen between the parties as set forth above.

350.     A declaratory judgment is necessary, appropriate and useful at this time under all the circumstances to redress Defendants' fraudulent removal of Plaintiff as Protector of the Conundrum Trust.

351.     A declaratory judgment would further the public interest and considerations of practicality and of efficient judicial administration.

## JURY DEMAND

352.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff prays for:

A.     On the First Cause of Action a judgment in Plaintiff's favor and against Mirra, for $6,900,000.00 for the unpaid principal due and owing on the promissory notes, plus interest, penalties, costs, attorneys' fees, and such other and further relief as to the Court may seem just and proper.

B.     On the Second Cause of Action a judgment in Plaintiff's favor and against Mirra, Troilo, Molieri, and Kolleda, for a full and complete accounting from Mirra, Troilo, Molieri, and Kolleda concerning and relating to: (i) all offshore accounts in which Mirra and Jordan had a direct or indirect joint interest or which received funds or distributions from any direct or indirect joint interest; (ii) the distribution of all amounts received relating to the ABC transaction; (iii) the transfers out of the individual accounts of Jordan, the Jordan/Mirra joint accounts, the accounts of and relating to businesses interests and properties jointly held or owned by Jordan and Mirra, as well as the loan management accounts for which Jordan and Mirra were purportedly liable; (iv) any liability purportedly incurred by Jordan in connection with any Jordan/Mirra joint businesses, interests or properties and any use of the credit of Jordan regarding the same; and (v) all undisclosed fees received by the defendants from the Whitney V LP, Great Point Partners LLC, and its related private equity partnerships, principles, partners, agents, parent companies, subsidiaries, affiliates, proprietors, and joint venturers.

C.     On the Third Cause of Action a judgment in Plaintiff's favor and against Mirra, Troilo, Molieri, Kolleda, Eizen, Kovinsky, Tropiano, and Walsh, for more than $225,000,000.00

in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action a judgment in Plaintiff's favor and against Stewart, Sigloch, Forte, Hall, Demora, and Kuo, for more than $225,000,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action a judgment in Plaintiff's favor and against Mirra, Troilo, Tropiano, and Kolleda, for more than $225,000,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action a judgment in Plaintiff's favor and against Mirra, Troilo, Molieri, and Kolleda, for more than $225,000,000.00 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action a judgment in Plaintiff's favor and against Mirra, for more than $225,000,000.00 in compensatory damages, together with costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action a judgment in Plaintiff's favor and against all Defendants, for more than $225,000,000.00 in compensatory damages, together with costs, interest and such other and further relief as this Court deems just and proper; and

I.      On the Ninth Cause of Action a judgment in Plaintiff's favor and against all Defendants, for more than $225,000,000.00 in compensatory damages, together with costs, interest and such other and further relief as this Court deems just and proper.

J.      On the Tenth Cause of Action a judgment in Plaintiff's favor and against Defendants Mirra, Troilo, Kolleda and Eizen, a Declaratory Judgment declaring that 1) her removal as Protector was carried out through the use of forged and fraudulent documents; 2) she therefore presently remains as the Protector for the Conundrum Trust, with all the rights and responsibilities afforded her by the Trust Agreement and the law; 3) that the change of Jude Mirra's status as beneficiary of the Conundrum Trust was carried out through the use of forged and fraudulent documents; 4) at the time of his death in February 2010, Jude Mirra remained a beneficiary of the Conundrum as originally drafted and executed.

Date:   September 1, 2016
        Wilmington, DE

SULLIVAN · HAZELTINE · ALLINSON LLC

_S. S. Allinson III_

Elihu E. Allinson III (No. 3476)
901 North Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
zallinson@sha-llc.com

-and-

RIVKIN RADLER LLP
Max Gershenoff, Esquire
926 RXR Plaza
Uniondale, New York 11556
Tel. (516) 357-3000
Fax (516) 357-3333
max.gershenoff@rivkin.com

Allan L. Brenner, Esq.
536 West Penn Street- 2nd floor
Long Beach, New York 11561
(516) 897-6145
brennerlawlb@gmail.com

Attorneys for Plaintiff