**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GIGI JORDAN, | : | |
| | : | |
| Plaintiff/Counterclaim-Defendant, | : | CIVIL ACTION |
| | : | No. 14-1485 |
| v. | : | |
| | : | |
| RAYMOND A. MIRRA, JR. | : | |
| | : | |
| Defendant/Counterclaim-Plaintiff. | : | |

McHUGH, J.                                                    December 20, 2019

## MEMORANDUM OPINION

Before me are cross motions for summary judgment in which breach of contract is the principal question. In March 2008, Raymond Mirra and Gigi Jordan executed a Mutual General Release Agreement. In that Release Agreement, each party "irrevocably release[d] and forever discharge[d]" the other party "from any and all manner of actions . . . by reason of any and all facts . . . which occurred, arose or existed at any time on or before the date of this Release Agreement." ECF 303-1, Ex. 5, ¶¶ 2-3. After the parties executed the Release Agreement, in 2012 and then again in 2013, Jordan filed two diversity actions in federal court asserting various state law claims against Mirra and Mirra-related individuals and entities. In both suits, the majority of Jordan's claims fell within the broad scope of the Release Agreement and were subsequently dismissed.

After the majority of Jordan's claims were dismissed, in January 2018, Mirra answered Jordan's complaint in this Action and filed two counterclaims. In the counterclaims, Mirra alleged that Jordan breached the Release Agreement by pursuing the two lawsuits barred by the

Agreement and, as a result, suffered damages equivalent to the attorneys' fees and costs he expended in defending against the suits. To support his argument for an award of fees and costs, Mirra pointed to a separate contractual provision in a Separation and Distribution Agreement ("Distribution Agreement"), which the parties executed contemporaneous to the Release Agreement. The relevant provision in the Distribution Agreement provides that "[t]he prevailing party in any Dispute that is resolved by . . . a court shall recover his, hers or its actual attorneys fees incurred with regard to such Dispute." ECF 303-1, ¶¶ 5.6.1, 5.6.5.

Now, after a round of extensive motions practice, Mirra has moved for summary judgment on his counterclaims. Mirra argues that the record indisputably demonstrates that the Release Agreement is a valid and enforceable contract containing a covenant not to sue; that Jordan breached that Agreement; and, as a result of Jordan's breach, that he incurred significant attorneys' fees and costs to which he is now due as damages. ECF 301, at 1-2. In opposing summary judgment, Jordan argues that Mirra did not "incur" those attorneys' fees and costs because corporate entities he controls (and not he personally) paid them. ECF 346, at 1. Since Mirra the person did not pay the fees and costs, says Jordan, he has suffered no cognizable injury, thus lacks standing, rendering this Court without subject-matter jurisdiction to adjudicate the counterclaims. ECF 346, at 7-8. In the alternative, Jordan argues that other waiver and release agreements have superseded the Mutual General Release Agreement, and that those agreements prevent Mirra from pursuing his counterclaims. ECF 346, at 15-20.

In previous rulings, I have concluded that the Release Agreement is a valid and enforceable contract, in which both parties covenanted not to sue the other. Memorandum Denying Jordan's Motion to Dismiss, ECF 265, at 5-6. Previous rulings in this Action and the related action also have confirmed that Jordan breached that covenant by pursuing the two

lawsuits that gave rise to Mirra's counterclaims. Report & Recommendation, ECF 199, at 22 (adopted by this Court at ECF 202); Report & Recommendation, ECF 457, *The Hawk Mountain LLC, et al. v. RAM Capital Group, LLC, et al.*, No. 13-2083 (D. Del. Dec. 23, 2013) (adopted by the district court at ECF 472 and affirmed by the Third Circuit on appeal by *Hawk Mountain LLC, et al. v. RAM Capital Group LLC, et al.*, 689 F. App'x 703 (3d Cir. 2017)).

I now conclude that Mirra is the prevailing party on nine of ten counts in this Action and the two counts in the related action, and that he "incurred" the attorneys' fees and costs paid by corporate entities he controls to defend against this and the related action. Accordingly, I will partially grant Mirra's motion for summary judgment on his counterclaims. In so doing, I address and reject Jordan's argument that Mirra lacks standing such that this Court is unable to exercise subject-matter jurisdiction. I also reject Jordan's remaining arguments.

## I. Background

### A. The release agreements

The parties' pending motions chiefly turn on the interpretations of the Distribution and Release Agreements, which the parties executed in the spring of 2008. In the Distribution Agreement, Jordan and Mirra, among other things, agreed to sever their business relationship and distribute the assets and liabilities they jointly held. ECF 303-1, Ex. 4. They also agreed "to execute [a] waiver and release of rights agreement." *Id.* ¶ 7.1. Pursuant to that provision, the parties subsequently executed the Release Agreement. ECF 303-1, Ex. 5, ¶¶ 2-3. Both the Distribution Agreement and Release Agreement were signed and became effective March 12, 2008.

The Release Agreement and the Distribution Agreement together contain five provisions relevant to the pending motions:

- **Release Agreement Paragraphs 2 and 3**—Through these parallel paragraphs—one applying to Mirra and one to Jordan—each party (and that party's heirs, affiliates, and the like) agreed to "irrevocably release and forever discharge" the other party (and that other party's heirs, affiliates, and the like) "from any and all manner of actions, causes of action, claims" and the like, "whether known or unknown, accrued or not accrued," which the releasing party "ever had, now have or hereafter can, shall or may have or acquire against" the other party, "by reason of any and all facts, circumstances" and the like, "which occurred, arose or existed at any time on or before the date of this Release Agreement." ECF 303-1, Ex. 5, ¶¶ 2-3.

- **Release Agreement Paragraph 5**—Through this paragraph, each party "acknowledges hereby that he or she is aware that he or she may hereafter discover facts or circumstances in addition to or different from those which he or she now knows or believes to be true with respect to the subject matters of this Release Agreement, but that it is such Party's intention to, and such Party hereby does, fully, finally, completely and forever release, discharge, compromise, settle, satisfy and extinguish any and all such Claims, without regard to the subsequent discovery or existence of such different or additional facts or circumstances. Each of the Parties further expressly acknowledges that the release set forth herein extend to Claims which are presently unknown, as well as known Claims." ECF 303-1, Ex. 5, ¶ 6.

- **Distribution Agreement Paragraphs 5.6.1 and 5.6.5**—Through these provisions, the parties agreed that "[t]he prevailing party in any Dispute"—defined broadly as any "dispute, controversy or claim"—that is resolved by . . . a court shall recover his, hers or its actual attorneys fees incurred with regard to such Dispute." ECF 303-1, ¶¶ 5.6.1, 5.6.5.

As I discussed in denying Jordan's motion to dismiss these counterclaims, the Distribution and Release Agreements must be read in conjunction to be given full effect. *See* ECF 265, at 2-3 (noting that "I am persuaded that the documents must be considered together"). A main reason supporting that conclusion was the extensive referencing of each agreement in the other. In the Distribution Agreement, for example, the parties agreed "to execute [a] waiver and release of rights agreement," ECF 303-1, Ex. 4, ¶ 7.1, which they did the same day, ECF 303-1, Ex. 5, pmbl. The parties also agreed, in the Distribution Agreement, that they "intend[ed] in this Agreement . . . *and the exhibits and schedules attached to each agreement*, to set forth the principal arrangements and the monetary and proprietary consideration to be exchanged between them in effectuating the Separation." ECF 303-1, Ex. 5, pmbl (emphasis mine). The Release

Agreement likewise refers to the Distribution Agreement. In its preamble, the Release Agreement details the parties' "desire to enter into, concurrently with this Release Agreement, that Separation and Distribution Agreement." The parties also "acknowledge[d] and agree[d] that this Release Agreement . . . and the Distribution Agreement"—along with two other agreements not relevant here—"represent the entire agreement between them." ECF 303-1, Ex. 5, ¶ 6. The referencing of each agreement in the other, together with the Agreements being executed on the same day, led me to conclude that they "form one contract and must be examined as such." ECF 265, at 2 (citing *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985), which holds that "[w]here two agreements are executed on the same day and are [sufficiently coordinated], in essence, they form one contract and must be examined as such").

Reading the Agreements together, then, the overall effect of the relevant provisions is twofold. First, the relevant Release Agreement provisions broadly release each party and that party's associates from any claim brought by the other party if the claim is supported by facts or circumstances that "occurred, arose or existed" before the execution date of the Release Agreement. Second, the relevant Distribution Agreement provisions provide that the prevailing party in any dispute concerning the performance of the Release Agreement or the Distribution Agreement shall recover the attorneys' fees it incurred with regard to such claim.

### B. The lawsuits

After executing the Release Agreement, Jordan filed two federal lawsuits against Mirra and corporations and individuals associated with Mirra. Jordan's filing of these lawsuits forms the basis of Mirra's counterclaims.

*1. Jordan files parallel actions in the Southern District of New York and the District of Delaware.* In March 2012, four years after executing the Distribution and Release Agreements,

Jordan filed her original Complaint in this Action in the Southern District of New York. Complaint, ECF 1, *Jordan v. Mirra*, No. 14-1485 (S.D.N.Y. Mar. 9, 2012). In that complaint, Jordan asserted nine causes of action against Mirra, including fraud and fraud in the inducement, breaches of various contracts, breach of fiduciary duty, and an accounting. ECF 1, ¶ 2. Each of Jordan's claims were based on numerous financial transactions in which she and Mirra allegedly jointly engaged during their business partnership.

When Jordan filed her civil complaint, she also was a defendant in a criminal proceeding before the Supreme Court of the State of New York, County of New York, in which she had been charged with second degree murder for the poisoning of her eight-year old son. Because the civil and criminal proceedings allegedly involved overlapping questions of law and fact, New York County's district attorney sought a stay of the civil proceeding pending resolution of the criminal matter, arguing that a stay was necessary to prevent Jordan from gaining access to evidence through civil discovery to which she would not be entitled in the criminal matter. ECF 23, at 2. The District Court granted the motion to stay the civil action pending the resolution of Jordan's criminal trial. ECF 23. The civil stay remained in place until February 2015, when Jordan was sentenced in her criminal matter. ECF 82.

While the civil stay was in place, in December 2013, Jordan, Hawk Mountain LLC, and two other individuals filed a RICO action in the District of Delaware. *See* Complaint and Demand for Jury Trial, ECF 1, *The Hawk Mountain LLC, et al. v. RAM Capital Group, LLC, et al.*, No. 13-2083 (D. Del. Dec. 23, 2013) ("RICO Action"). The operative complaint alleged largely the same facts as the action filed in the Southern District of New York. RICO ECF 47. Jordan and the RICO Plaintiffs alleged that Mirra, his companies, and employees perpetuated a "massive fraud" by establishing "a highly complex network of holding companies, active

businesses and real estate holdings and trusts, which were falsely represented to the Plaintiffs as established for the mutual and equal benefit of Jordan and Mirra." RICO ECF 47, ¶¶ 1, 7. The RICO Plaintiffs further alleged that, through the operation of the fraudulent enterprise, the RICO Defendants were able to cheat Jordan of her share of those assets by inducing her to execute the Separation and Distribution Agreement. *See* RICO ECF ¶¶ 10-11.

Eventually, the parties jointly petitioned the district court to transfer this Action from the Southern District of New York to the District of Delaware. ECF 68. The District Court granted that request, and the case was transferred to this District, where the RICO Action was pending. ECF 69.

*2. Mirra seeks to dismiss all claims filed against him.* In September 2014, Mirra and the other RICO Defendants moved to dismiss the RICO Complaint. In its memorandum supporting dismissal, the RICO Defendants argued, among other things, that the RICO claims were barred by the statute of limitations and failed to allege the "essential elements" of a civil RICO claim. RICO Action, ECF 64, at 2. Magistrate Judge Sherry R. Fallon recommended dismissing the federal RICO claims on virtually every ground raised by the RICO Defendants. RICO ECF 457. In August 2016, the District Court adopted Judge Fallon's recommendations in full and dismissed the RICO Action in its entirety. RICO ECF 472. A unanimous three-judge panel of the Court of Appeals affirmed the dismissal in May 2017. *Hawk Mountain LLC v. RAM Capital Grp. LLC*, 689 F. App'x 703 (3d Cir. 2017).[1]

Parallel to Mirra and the other RICO Defendants securing dismissal of the RICO claims, the parties were engaged in extensive motions practice in this Action. On March 9, 2015, after

---

[1] Soon after the District Court dismissed the federal RICO Action, two RICO Action Plaintiffs filed a claim against RAM Capital for nonpayment of a 2005 promissory note in an action currently pending in the Supreme Court of the State of New York. ECF 302, ¶ 12; *see also id.* ¶ 6.

this Action was transferred to the District of Delaware, Jordan filed an Amended Complaint, which added multiple new causes of action and defendants, including certain Mirra-controlled corporate entities, known as the "RAM Defendants."[2]  ECF 84.  A few months later, Mirra and the RAM Defendants moved to dismiss the Amended Complaint on numerous grounds, including that the Release Agreement barred the suit, that the statute of limitations had run, and that the operative complaint contained various pleading deficiencies.  ECF 113.  After a preliminary recommendation from Magistrate Judge Fallon and a renewed Motion to Dismiss, *see* ECF 179, Judge Fallon eventually recommended that this Court grant the RAM Defendants' motion with respect to all claims but breach of warranties.  ECF 199.  Judge Fallon supported that recommendation on several grounds, including that the counts for which she recommended dismissal were barred by the Release Agreement.  In particular, Judge Fallon recommended the district court find as a matter of law that the language in Paragraphs 2 and 3 of the Release Agreement "demonstrates the parties' intent to enter into a broad, mutual release of all claims." ECF 199, at 16.  I adopted Judge Fallon's recommendations on November 28, 2017, leaving a single claim by Jordan against Mirra for breach of warranties.  ECF 202.

 *3. Mirra files his counterclaims and the aftermath*.  Soon after I adopted Judge Fallon's recommendation to dismiss all claims but one in this Action, in January 2018, Mirra answered Jordan's Second Amended Complaint and, in doing so, asserted two counterclaims.  Those counterclaims alleged that Jordan breached the Release Agreement by pursuing the actions in the District of Delaware and the Southern District of New York.  ECF 205, ¶¶ 60-71.

 In March 2018, Jordan moved to dismiss Mirra's counterclaims, arguing that a release without a covenant not to sue can only be a defense to a claim, and cannot form the basis of an

---

[2] The corporate name "RAM" is an acronym representing Mirra's initials—Raymond A. Mirra.  ECF 359, ¶ 9.

independent claim for breach of contract; that, in any case, the Release Agreement did not contain a covenant not to sue; that the so-called American Rule proscribed the type of fee shifting for which Mirra was advocating; and that the fees and costs "incurred in defense of the dismissed claims were inextricably expended in defense of the surviving warranty claim." ECF 215, at 1.

I denied Jordan's motion to dismiss in its entirety on July 17, 2018, holding that Mirra could proceed with his counterclaims. ECF 265. In doing so, I concluded that the language of the Release Agreement that released each party from claims brought by the other "clear[ly] and unambiguous[ly]" operated as a covenant not to sue. ECF 265, at 5. I also explored the implications of the so-called American Rule, which generally prohibits shifting fees and costs to prevailing parties. While I declined to conclude whether Delaware state law permits a claim for attorneys' fees solely on the basis of language in a release, I found it unnecessary to explore that complex question in the context of this case because I concluded that "this Release explicitly incorporates a promise not to sue" and, as such, the shifting of attorneys' fees and costs "is covered by a provision in the [Distribution Agreement] that effectively sets aside the American Rule." ECF 265, at 6.

Mirra filed his motion for summary judgment on the counterclaims on November 20, 2018, and Jordan responded on October 7, 2019. In his motion for summary judgment, Mirra argues that "Jordan breached the Release by pursuing claims in this Action and the RICO Action that are barred by its terms," ECF 301, at 4, and that, as a result, "Mirra was forced to incur $7,264,477.46 in attorneys' fees and legal costs to defend against the released claims." *Id.* at 1. In opposing summary judgment, Jordan raises a justiciability argument. Jordan argues that Mirra did not "incur" those fees and costs because corporate entities he controls paid them, not Mirra

personally. ECF 346, at 1. According to Jordan, because Mirra did not pay the fees and costs, he has not suffered injury and thus lacks standing, which means this Court is without subject-matter jurisdiction to adjudicate Mirra's counterclaims. ECF 346, at 7-8. Jordan also argues that other waiver and release agreements have superseded the Mutual General Release Agreement, and that those agreements prevent Mirra from pursuing his counterclaims.

Thus, the principal question I must answer is this: Did Mirra "incur" the legal fees paid to his lawyers to defend claims brought by Jordan in breach of their agreements?

## II.     Standard for cross motions for summary judgment

The parties' cross motions for summary judgment are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard does not change when the parties cross-move for summary judgment. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). When both parties move for summary judgment, the "court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* Thus, when resolving the allegations in each party's motion, I will view the evidence "in the light most favorable" to the nonmoving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).

## III.    This Court has subject-matter jurisdiction because Mirra is a party to a contract he alleges was breached

In her cross motion for summary judgment, Jordan argues that this Court lacks subject-matter jurisdiction to adjudicate Mirra's counterclaims. Because Jordan's argument operates at the threshold and would, if correct, prevent me from going further, I will address it first.

Jordan's justiciability argument contains four steps. First, Mirra did not personally "incur" the fees and costs he claims to be due for breach of the Release Agreement because corporate entities he controls paid the fees and costs, not him. Second, because Mirra did not incur the fees and costs, he did not suffer any injury. Third, because Mirra cannot show injury, a necessary condition of standing, he does not have standing. Fourth, Mirra's lack of standing means this Court cannot exercise subject-matter jurisdiction over the counterclaims.

Jordan's error occurs at step two. Even if Mirra did not "incur" the fees and costs expended defending these Actions, Jordan's conclusion—that Mirra has not suffered Article III injury—does not follow. The root of Jordan's misstep is her conflation of "incur," as that term is used in the Distribution Agreement, and "injury," as that term is employed in a standing analysis. The injury Mirra alleges is not the breach of the "incur" provision of the Distribution Agreement, but that Jordan's pursuit of actions subject to the Release Agreement breaches the Release Agreement.

To have suffered an injury necessary for standing purposes, a party need show "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Kamal v. J. Crew Group, Inc.*, 918 F.3d 102, 110 (3d Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Violations of common law rights, including those arising out of a contract, generally satisfy the injury prong of the standing analysis. *See, e.g.*, *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939) (recognizing that standing is typically available when "the right invaded is a legal right— one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege"); *see also* Erwin Chemerinsky, Federal

Jurisdiction § 2.5, at 72 (5th ed. 2015) (noting that "violations of common law rights remain sufficient for standing purposes").

Here, Mirra alleges a quintessential common law injury. Mirra and Jordan entered into a valid and binding agreement (the Release Agreement), supported by adequate consideration, including the exchange of valuable assets for a promise not to sue. Then, after Mirra and Jordan executed the Agreement, Jordan reneged on that bargain by filing two lawsuits ultimately barred by that Agreement. Whether Jordan's breach of the Release Agreement caused Mirra to "incur" fees and costs as that term is used in the Distribution Agreement does not implicate Article III justiciability concerns. Rather, Mirra's allegation that Jordan breached an agreement to which both were party is sufficient for this Court, sitting in diversity, to exercise subject-matter jurisdiction.

## IV. Mirra "incurred" the fees and costs expended to defend the Actions

Because I have subject-matter jurisdiction to adjudicate Mirra's counterclaims, I now turn to the principal questions presented by them. In his counterclaims, Mirra alleges that Jordan materially breached a contract (the Release Agreement) to which both he and Jordan were party by pursuing claims in actions that were barred by the terms of that contract. Those allegations turn, then, on the proper interpretation of the Release Agreement.

Under Delaware law, a breach of contract claim contains three elements: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). I analyze each element and conclude as follows. First, I conclude that the Release Agreement is a valid and enforceable contract containing a covenant not to sue. Second, I conclude Jordan breached that covenant by filing the

federal actions. And, third, I conclude that Mirra is the prevailing party in this and the related action and that he "incurred" attorneys' fees and costs defending them.

A.  **The Release Agreement is a valid and enforceable contract, and contains a covenant not to sue**

Three reasons support the conclusion that the Release Agreement is a valid and enforceable contract containing a covenant not to sue. First, Jordan, in her cross motion for summary judgment, does not seem to contest the validity or enforceability of the Release Agreement, or my previous finding that the Release Agreement is a valid and enforceable contract containing a covenant not to sue. *See* Memorandum Denying Jordan's Motion to Dismiss, ECF 265, at 5 (concluding that the language of the Release Agreement that released each party from claims brought by the other "clear[ly] and unambiguous[ly]" operated as a covenant not to sue); *id.* at 6 (acknowledging no need "to explore [the distinction between releases and covenants not to sue] in detail given my conclusion that this Release explicitly incorporates a promise not to sue").

Second, my previous conclusion that the Release Agreement is a valid and enforceable contract containing a covenant not to sue is now the law of the case, and nothing warrants my upsetting that conclusion. *See Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (internal quotation marks omitted). Certain extraordinary circumstances may cause a court to revisit a prior decision, including where "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Id.* at 188. But in the

absence of such extraordinary circumstances, "courts should be loathe" "to revisit prior decisions of its own or of a coordinate court." *Christianson*, 486 U.S. at 817.

No such extraordinary circumstances are present here. No party has introduced new evidence suggesting that the Release Agreement is invalid or unenforceable, or that it lacks a covenant not to sue; no court or other body has announced an applicable supervening decision or law; and the earlier decisions concluding that the Release Agreement is valid and enforceable, and contains a covenant not to sue, far from being clearly erroneous, were comprehensive and supported by extensive reasoning. *See* Report & Recommendation, ECF 199, at 22; Memorandum Denying Jordan's Motion to Dismiss, ECF 265, at 5-6.[3]

Third, and finally, reevaluation of my previous decision confirms that the Release Agreement is valid and enforceable, and contains a covenant not to sue. Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Each condition is satisfied here.

The parties evidently intended that the contract would bind them. Jordan conceded in her Second Amended Complaint that she "executed the signatory pages for both the General Release and the SDA." ECF 176, ¶ 274. Another paragraph of the Release Agreement—which appears

---

[3] Two additional caveats applicable to the law-of-the-case doctrine warrant discussion. First, prior determinations of legal rules ought not foreclose a different conclusion at a later stage of the proceeding if the standard of review at the later stage is different. *See Kaufman v. Alexander*, 625 F. App'x 129, 133 (3d Cir. 2015). Here, for example, the prior determination was made on Mirra's motion to dismiss, where the Court accepted as true all factual allegations in Jordan's complaint and viewed them in the light most favorable to Jordan to determine whether Jordan stated a claim for relief. ECFs 199, 202. Now, however, we are at the summary judgment stage, where the Court must determine whether any genuine issues of material fact remain. The evolution of the burden does not change the outcome here, but it may in some circumstances. Further, I acknowledge that the law-of-the-case doctrine cannot insulate an issue from appellate review. *Id.* (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)).

on the page Jordan admittedly signed—states that she "carefully read" the agreement, "had [its]

terms . . . explained by [her] legal counsel," "understands such terms," and "voluntarily and

knowingly agreed to such terms." Release Agreement ¶ 8.[4]  Another section of the Release

Agreement, in turn, makes specific reference to the Distribution Agreement, noting that "the

Parties desire to enter into, concurrently with this Release Agreement, that certain Stipulation

and Distribution Agreement." ECF 303-1, pmbl.  And the Distribution Agreement contemplates

that Mirra and Jordan will enter into "Mutual Releases." Distribution Agreement ¶ 7.1.

     Further, the terms of Release and Distribution Agreements are sufficiently definite and

certain to be enforceable.  This Court, across multiple opinions, already has interpreted,

analyzed, and synthesized the Agreements.  *See, e.g.*, ECF 265, at 4-7; *see also* ECF 199, at 22.

The Release Agreement includes extensive detail explicating what each party had promised the

other.  Through Release Agreements Paragraphs 2 and 3, for example, each party (and that

party's heirs, affiliates, and the like) agreed to "irrevocably release and forever discharge" the

other party (and that other party's heirs, affiliates, and the like) "from any and all manner of

actions, causes of action, claims" and the like, "whether known or unknown, accrued or not

accrued," which the releasing party "ever had, now have or hereafter can, shall or may have or

acquire against" the other party, "by reason of any and all facts, circumstances" and the like,

"which occurred, arose or existed at any time on or before the date of this Release Agreement."

Release Agreement, ECF 303-1, Ex. 5, ¶¶ 2-3.  Paragraph 6 of the Release Agreement provides

that "[n]either Mirra nor Jordan will assert any Claims against the other Party arising from or

---

[4] Jordan's admission that she was presented only with the signature page before being asked to sign implies that she read all paragraphs on the signature page, including those stating that she "carefully read" the agreement, "had [its] terms . . . explained by [her] legal counsel," "understands such terms," and "voluntarily and knowingly agreed to such terms."  Thus, Jordan's argument that she did not comprehend all the agreement's terms lacks merit.  *See* ECF 176, ¶¶ 264-74.

relating to Mirra's or Jordan's negotiation, execution and delivery of this Release Agreement . . . and the Distribution Agreement except with respect to Claims that arise under the express terms and conditions of, and specified in, [the aforementioned agreements]." Release Agreement, ECF 303-1, Ex. 5, ¶ 6. As such, I have no trouble "ascertain[ing] what the parties have agreed to." *See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018).

Finally, each Agreement is supported by valid consideration. Under Delaware law, "mutual promises [between parties] to release each other" from claims is sufficient consideration to support a release. *Fuller v. Gemini Ventures, LLC*, 2006 WL 2811708, at *4 (Del. Super. Ct. Oct. 2, 2006) (finding that "[t]he Release recites mutual promises and agreement which support consideration for a valid release"). The preamble to the Release Agreement identifies that the parties executed the Agreement "in consideration of the Distribution Agreement . . . and the mutual promises set forth in this Release Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." ECF 303-1, Ex. 5, pmbl. The "other good and valuable consideration" becomes clear upon reviewing the Release Agreement. Through the Release Agreement, both parties relinquished most legal remedies they may have had against the other. Release Agreement, ECF 303-1, Ex. 5, ¶¶ 2-3, 6.

Jordan, in an effort to prevent Mirra from pursuing his counterclaims, argues that the parties executed other agreements that supersede the Release Agreement and prevent Mirra from pursuing his counterclaims. These agreements, each titled Waiver and Release of Rights Agreement (WRRA), were executed by Mirra and Jordan three weeks after they executed the Release Agreement. The purpose of the WRRAs was "to separate and distribute certain of their jointly held assets including certain privately held corporations in which Mirra and Jordan, legally or equitably, maintain an ownership interest." ECF 347-1, at 123, 125, 127. As far as the

record reveals, Mirra and Jordan executed three WRRAs—for companies called Advanced Research Corporation, Cancer Innovations, Inc., and Pridecare, Inc.

In finalizing those separations, Jordan "agree[d] to relinquish all of her rights, title and interest" in each of the corporations "for the consideration described in the Distribution Agreement and the payment by Mirra to Jordan of the sum of Ten Dollars." *Id.* In exchange, Mirra agreed to what appears to be an expansive covenant not to sue Jordan. Specifically, Mirra (and each of the corporate entities subject of the WRRAs) agreed

> not to sue and release Jordan from liability for any and all acts or omissions, including but not limited to, those occurring during or in connection with any period of time in which Jordan maintained an ownership interest in [Advanced Research Corporation, Cancer Innovations, Inc., and Pridecare, Inc.] or with regard to any ownership rights which Jordan may have ever acquired in [Advanced Research Corporation, Cancer Innovations, Inc., and Pridecare, Inc.]. This covenant not to sue and general release shall apply to all disputes, claims, liens, injuries and damages, whether known or unknown, whether arising at law or in equity, from the Effective Date of this Agreement to the end of time.

Jordan points to this language to argue that the covenants not to sue in the WRRAs "conflict" with the covenant not to sue in the Release Agreement and, because the WRRAs were executed after the Release Agreement (March 31 versus March 12), the WRRAs' covenants not to sue "supersede[] and control[], barring [Mirra's] counterclaims." ECF 346, at 16.

Examining the WRRAs in their totality, I cannot agree with Jordan. When I denied Jordan's motion to dismiss Mirra's counterclaims, I concluded that the various agreements executed by the parties "were sufficiently coordinated" such that they "form one contract and must be examined as such." ECF 265, at 2 (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985)). That same principle applies to the relationship of the WRRAs to the Distribution and Release Agreements. In the Distribution Agreement, for example, the parties contemplated the "closing of transactions" to occur "as soon as possible

after the Effective Date but in no event later than March 31, 2008." ECF 303-1, Ex. 4, at 1-2. The WRRAs were signed on March 31, 2008. Further, in Paragraph 2.2.2.2 of the Distribution Agreement, the parties referenced a "schedule" of "Recognized Joint Assets to be transferred to Mirra." *Id.* That schedule, attached to the Distribution Agreement, lists the three corporations subject of the WRRAs. The references to the WRRA corporations in the Distribution Agreement demonstrate that the parties contemplated further executory instruments that would carry out specific transfers. And take the text of the WRRAs themselves. Each WRRA was executed "pursuant to the terms of the Distribution Agreement." *E.g.*, ECF 347-1, at 123. The terms of the Distribution Agreement, of course, include the attorneys' fees provision and reference to the Release Agreement. The cross-references between the WRRAs and the Distribution Agreement and their temporal proximity suggest that the parties intended for the agreements to be read in concert, not opposition.

Reading the corpus of agreements in concert, then, I must give meaning to each release provision. To do so, I read the release provisions in the WRRAs to be limited in scope by the stated purpose of each WRRA. Under Delaware law, "words of general application used in the release which generally follow a specific recital of the subject matter concerned are not to be given their broadest significance but will be restricted to the particular matters referred to in the recital." *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982).[5] In each WRRA, the stated purpose is to finalize the distribution of a specific asset that had been held jointly by Mirra and Jordan pursuant to the Distribution Agreement. Applying the *Adams* principle here, the limiting

---

[5] *Adams*, which remains good law in Delaware, has been relied upon by the Ninth Circuit in holding that "general language [in a release] is restricted by the specific recital." *Matsuura v. Alston & Bird*, 166 F.3d 1006, 1010 (9th Cir. 1999) (citing *Adams*); *see also Fuku-Bonsai, Inc. v. E.I. Du Pont de Nemours and Co.*, 187 F.3d 1031, 1034 (9th Cir. 1999) (same).

language in the WRRAs' recitals plus each WRRAs' reference to the Distribution Agreement suggests the WRRA release language is properly understood as applying only to disputes arising out of the transfer of ownership of those specific entities or, at the least, as not vitiating the covenant not to sue in the Release Agreement.

Such a conclusion is supported by the overall structure of the transaction. The cash consideration transferred in each WRRA ($10) pales in comparison to the cash and assets transferred through the Distribution Agreement (approximately $50 million). Through the Distribution and Release Agreements, Mirra (and Jordan) successfully negotiated both a covenant not to sue and a provision granting prevailing parties attorneys' fees. It defies belief that Mirra would surrender such protections for nominal consideration just three weeks later.

In sum, the combination of the cross-references between all release agreements, the temporal proximity between the signing of the Distribution and Release Agreements and the signing of the WRRAs, the specific and limited purpose of the WRRAs, and the nominal consideration offered to effectuate the WRRAs, supports a conclusion that the WRRAs in no way nullified the essential provisions of the Distribution and Release Agreements. Instead, the WRRAs are most reasonably viewed as procedurally implementing rather than substantively revising or revoking the underlying agreements.

For these reasons, the Release Agreement is a valid and enforceable contract, in which each party generally agreed to "irrevocably release and forever discharge" the other party "from any and all manner of actions . . . by reason of any and all facts . . . which occurred, arose or existed at any time on or before the date of this Release Agreement." ECF 303-1, Ex. 5, ¶¶ 2-3. Further, the covenants not to sue in the WRRAs in no way impair the legal validity of the covenant not to sue in the Release Agreement.

**B. Jordan breached the Release Agreement's covenant not to sue provisions**

In addition to concluding that the Release Agreement is a valid and enforceable contract containing a covenant not to sue, I also conclude that Jordan breached that covenant by pursuing claims in this Action and the RICO Action. The Release Agreement provides that the (1) "Jordan Releasing Parties" agree to "irrevocably release and forever discharge" the "Mirra Released Parties" (2) "from any and all manner of actions . . . by reason of any and all facts . . . . which occurred, arose or existed at any time on or before the date of this Release Agreement." ECF 301-3, Ex. 5, ¶ 3. Thus, the release provision contains two main components. First, the action must be brought by a "Jordan Releasing Party" against a "Mirra Released Party." Second, the facts or circumstances that gave rise to the claim must have occurred "on or before the date of this Release Agreement."

*1. Each federal action was brought by a Jordan Releasing Party against a Mirra Released Party.* The "Jordan Releasing Parties" include a broad range of individual and entities, including Jordan herself, "her heirs and beneficiaries"; "her affiliates and each of their limited and general partners, officers, directors, stockholders, members, managers, employees, attorneys, advisors and agents"; and "each such foregoing person's or entity's predecessors, successors and assigns." ECF 303-1, Ex. 5, ¶ 3. The "Mirra Released Parties" are similarly expansive. They include Mirra himself, "his heirs and beneficiaries; his affiliates and the officers, directors, stockholders, employees, agents, insurers and attorneys of each such affiliate, and each such foregoing person's or entity's predecessors, successors and assigns." *Id.* (internal itemization removed).

Both this Action and the RICO Action were filed by Jordan Releasing Parties. In this Action, Jordan brought claims in her individual capacity. *See* Second Amended Complaint, ECF 176, *Gigi Jordan v. Raymond A. Mirra, Jr., et al.*, No. 14-1485 (D. Del. Sept 1, 2016).

Similarly, the RICO Action was filed by Jordan and several "Jordan Releasing Parties." The claims in the RICO Action were asserted by Jordan, Hawk Mountain LLC, Kim Jordan, and Michelle E. Mitchell (in her capacity as trustee of the Intercession Trust). Each party qualifies as "Jordan Releasing Parties." Hawk Mountain LLC is Jordan's "affiliate." The complaint notes that "at all relevant times Jordan was the H[awk] M[ountain] LLC's member, sole manager, and the only person authorized to manage [its] business and affairs." RICO ECF 47, ¶ 17. Kim Jordan and Mitchell (as trustee of the Intercession Trust) are both beneficiaries of the Hawk Mountain Trust, a trust settled by Jordan. *Id.* ¶¶ 18-19, 138, 183-84. As Jordan's "beneficiaries," they are "Jordan Releasing Parties" within the meaning of the Release Agreement.

Moreover, both this Action and the RICO Action were filed against "Mirra Released Parties." In this Action, Jordan never has disputed that each defendant is a "Mirra Released Party" within the meaning of the Release Agreement. *See* ECF 122, at 3-8; ECF 194; *see also* ECF 278 ¶¶ 33-34 (denying knowledge as to whether the RAM Defendants are "Mirra Released Part[ies]"). Jordan's decision not to dispute that each action was brought against a Mirra Released Party makes sense, of course: Jordan's own pleadings acknowledge that each is either Mirra's affiliate (the two RAM Capital entities and RAM Realty) or an officer, employee, or agent of Mirra (Troilo, Molieri, Kolleda, Kovinsky, Tropiano, Stewart, Sigloch, Kuo, Forte, Hall, and Demora). ECF 84 ¶¶ 10-14, 17-24; ECF 176 ¶¶ 10-14, 17-24.

Further, in the RICO Action, Jordan alleged counts against the RAM Defendants, which included Mirra, RAM Capital Group, LLC, RAM Capital II, LLC, RAM Realty Holdings, LLC, Joseph A. Troilo, Jr., Joseph T. Molieri, Bruce Kolleda, Mark A. Kovinsky, Joseph J. Tropiano,

Jr., Danielle Stewart, Renee M. Sigloch, Bari Kuo, Frederick Forte, Virginia L. Hall, and Shelly Demora. Each of these entities or individuals qualifies as a Mirra Released Party.

2. *Each of the federal actions related to events occurring on or before the date of the Release Agreement.* In this Action, Jordan never has disputed that Counts 1 through 6, 8, and 9 are predicated on facts occurring on or before the date of the Release Agreement. *See* ECF 122, at 3-8; ECF 194. Moreover, reviewing the complaint makes it clear that Jordan's allegations relate to conduct that occurred before the execution of the Release Agreement. Even Jordan admitted in the complaint that the Release Agreement "insulate[s] [the RAM Defendants] from liability for each and every act of fraud, forgery, misappropriation and conversion antecedent to its execution." ECF 176, ¶ 265. And this court has already concluded that the events that gave rise to Jordan's complaints were covered by Release Agreement. *See* ECF 202 (adopting Report & Recommendation, ECF 199, at 22, which recommended finding counts 1 through 6, 8, and 9 in this Action barred by the Release).

Further, the counts in the RICO Action were predicated on facts that occurred on or before the date of the Release Agreement. Judge Fallon, in the report recommending dismissal, determined that the RICO claims accrued no later than March 12, 2008, when Jordan and Mirra executed the Release and Distribution Agreements. RICO ECF 457, at 24. The district court adopted Judge Fallon's report in its entirety, RICO ECF 472, and that decision was affirmed on appeal by a unanimous three-judge panel of the Third Circuit. *Hawk Mountain LLC, et al. v. RAM Capital Group LLC, et al.*, 689 F. App'x 703 (3d Cir. 2017).[6]

---

[6] Count 3 in the RICO complaint asserted a state law claim against RAM Capital for nonpayment of a promissory note between Hawk Mountain LLC as lender and RAM Capital as borrower. RICO ECF 47, ¶ 156. The promissory note was executed in April 2005, approximately three years before the execution of the Release Agreement. Thus, it too is a claim by "Jordan Releasing Parties" against a "Mirra Released Party" that arose "by reason of" facts that occurred on or before the date of the Release Agreement.

I thus conclude that Jordan breached the provision of the Release Agreement in which each party "irrevocably release[d] and forever discharge[d]" the other party "from any and all manner of actions . . . by reason of any and all facts . . . which occurred, arose or existed at any time on or before the date of this Release Agreement." ECF 303-1, Ex. 5, ¶¶ 2-3. This conclusion is buttressed by my review the Release Agreement as a whole. As I observed at the motion to dismiss stage, it is "particularly striking" that, in addition to the general release paragraphs, the parties reiterated in a subsequent paragraph their intent to "fully, finally, completely and forever release, discharge, compromise, settle, satisfy and extinguish any and all such Claims," including unknown claims. ECF 265, at 3 (citing Release Agreement, ECF 301-3, Ex. 5, ¶ 5).

### C. Mirra "incurred" the fees and costs expended to defend the Actions because he was liable for them

At this point, I have concluded that the Release Agreement is a valid and enforceable contract containing a covenant not to sue, and that Jordan breached that covenant by pursuing claims in this Action and the RICO Action. Thus, the only remaining question I must answer is whether Mirra "incurred" the attorneys' fees and costs expended by corporate entities he controls in defending against the released claims. I conclude that he did.

The Distribution Agreement states that "[t]he prevailing party in any Dispute that is resolved by . . . a court shall recover his, hers or its actual attorneys fees incurred with regard to such Dispute." ECF 303-1, ¶¶ 5.6.5. This Action and the RICO Action qualify as a "Dispute," which is defined broadly to include any "dispute, controversy or claim." ECF 303-1, ¶¶ 5.6.1.

Moreover, Mirra "incurred" the fees and costs because he was liable for them. According to Black's Law Dictionary, "to incur" means "to suffer or bring on oneself (a liability or expense)." This definition accords with how "incur" is used in every day speech. In every day

speech, "to incur" something means "to become liable or responsible" for that thing. *See Incur*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com (last visited Dec. 17, 2019). Here, Mirra undoubtedly was liable for the fees and costs accrued by his law firm for the services it carried out in defending against the actions filed by Jordan. Why? Because he agreed to be. After Jordan amended her complaint in the RICO Action to add Mirra (along with other defendants), Mirra executed an engagement letter with Quinn Emanuel, his current law firm. In that engagement letter, RAM Capital is listed as the party to which the firm would bill, with Mirra agreeing to be "jointly and severally liable for the payment of [the firm's] fees and costs" in the event of nonpayment by RAM Capital. ECF 358-1, Ex. C, at 7.[7] Moreover, in the firm's internal records, supplied by Mirra, RAM Capital (an entity fully controlled by Mirra) is listed as the party that tendered payment while Mirra the person is listed as the "payor." *See* ECF 358, Ex. D. In short, RAM Capital simply was the vehicle through which Mirra chose to pay the bills.

Mirra does not have an engagement letter with Quinn Emanuel for its work on this Action. But Mirra's lawyers have demonstrated in their summary judgment filings why that is so. ECF 358, ¶¶ 3-7. Mirra initially hired another law firm to represent him in this Action. Mirra retained Quinn Emanuel to represent him in a separate lawsuit against Jordan for libel, for which Mirra and the firm executed an engagement letter. ECF 358, Ex. A. While Quinn Emanuel was representing Mirra in the libel actions, Jordan filed the RICO Action. Since Mirra already had been a client of the firm for the libel actions, the firm did not ask him to sign a separate engagement letter when he switched from his original firm to Quinn Emanuel for

---

[7] As I previously mentioned, the corporate name "RAM" is an acronym representing Mirra's initials, and the record is clear that RAM Capital is an entity fully controlled by Mirra. ECF 359, ¶ 9 (declaration of Mirra).

representation in this Action.  Such engagement agreements by Mirra, even if limited, are

sufficient to establish that he "incurred" fees and costs associated with his firm's representation

of him in this Action and the RICO Action.[8]

Jordan also challenges the specific amounts claimed by Mirra.  And as to that I agree

there are disputed issues of material fact that must be submitted to the jury.  But concluding that

those issues must be resolved by a factfinder does not prevent me from entering partial summary

judgement where the record is clear that Jordan breached the Release Agreement and Mirra

personally incurred fees as a result of her breach. [9]

---

[8] Of course, reading "incur" as I do promotes the overall intent of the parties.  As I have discussed in detail (in both this opinion and past opinions), each party used the Distribution and Release Agreements to broadly insulate them against the plethora of legal claims that the other party could raise.  A method of accomplishing that goal was to provide that the prevailing party in any dispute concerning the Distribution Agreement or Release Agreement would recover the legal fees and costs that the instigating party caused to be spent.  The principal effect of the "incur" provision, in other words, was prophylactic; it was intended to deter, not remediate.

[9] Because I conclude that Mirra "incurred" the fees and costs he claims as damages as that term is used in the Distribution Agreement, I need not address whether Mirra should be awarded the fees and costs as a form of expectation damages.  In his motion for summary judgment, Mirra argues that he "is entitled to expectation damages that will put him in the same position as if Jordan had complied with the Release."  ECF 301, at 18.  Mirra points to the fact that, under Delaware law, expectation damages may include the fees and costs expended in defending against released claims.  ECF 301, at 18 (citing *Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB*, 2001 WL 946521, at *7 (Del. Super. Ct. Aug. 16, 2001) (awarding "costs and expenses, including attorneys' fees, incurred by the Defendant" as damages for breach of release)).  Mirra may very well be correct that expectation damages would "put him in the same position as if Jordan had complied with the Release."  ECF 301, at 18.  But perhaps not.  Mirra's argument that refusing to award him expectation damages would put him in a worse economic position than if Jordan had not filed her complaints begs the question.  I take Jordan's argument to be that Mirra *the person* is no worse off (financially at least) as the result of breach of the Release Agreement, even if the companies he controls are.  In any case, I need not address that argument.  Here, the award of fees and costs to Mirra for prevailing on this and the related action is accomplished simply by the interstitial operation of the Distribution and Release Agreements.  While expectation damages may be the standard remedy for breach of contract in common law breach of contract cases, here the parties have preemptively chosen the form of redress, and I am in no position to second guess that choice.

Further, my conclusion here is in no way inconsistent with the so-called American Rule, which generally prohibits shifting fees and costs to prevailing parties.  In my opinion denying Jordan's motion to dismiss, I concluded that "this Release [Agreement] explicitly incorporates a promise not to sue" and, as such, the provision of attorneys' fees and costs "is covered by a provision in the [Distribution Agreement] that effectively sets aside the American Rule."  ECF 265, at 6.  That a contract may provide for the shifting of attorneys' fees should a litigation arise from a dispute over it has long been permitted and is uncontroversial.  *See, e.g.*, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975) (noting "the general rule" that litigants pay their own attorneys' fees and costs but that a "statute or enforceable contract" is an exception to that general rule).

**V.      Conclusion**

For these reasons, I will grant Mirra's motion for summary judgment on his

counterclaims as to the issue of Jordan's breach of the covenant not to sue in the Release

Agreement and Mirra having incurred attorneys' fees and costs recoverable under the

Distribution Agreement.  Correspondingly, Jordan's cross motion for summary judgment will be

denied. An appropriate Order follows.


        /s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Judge