## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GIGI JORDAN | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 14-1485** |
| | : | |
| RAYMOND A. MIRRA, JR. | : | |

**McHUGH, J.**                                   **February 22, 2022**

### MEMORANDUM

This case and related litigation has been ongoing for the better part of a decade. It traces the bitter fallout of a dispute that followed the division of the extensive financial, real estate, and business assets of former spouses and business partners Plaintiff Gigi Jordan and Defendant Raymond Mirra, which was amicable at the beginning.  The respective parties have now brought competing motions for summary judgment to resolve the final surviving claim of Jordan's Second Amended Complaint, ECF 176, which is the breach of warranty claim pleaded in Count VII.[1]

Jordan alleges that Mirra breached the warranty, found in the parties' Separation and Distribution Agreement ("SDA"), in which both parties warranted that the SDA listed all assets in which both Jordan and Mirra shared an interest.  The gist of Jordan's argument is that, although Mirra listed all the entities in which Mirra or Jordan had a  legal interest personally, he failed to include various subsidiaries, intellectual property, and revenue streams owned by the listed business entities that may have augmented her assessment of the value of the parent companies.

---

[1] Counts I-VI and VIII-X were dismissed pursuant to the Court's Memorandum and Order of November 28, 2017, ECF 202 and 203, which adopted in whole Magistrate Judge Sherry R.  Fallon's Report and Recommendation on the Motion to Dismiss, ECF 199.  Claims I-VI, VIII-IX were principally dismissed as barred by the Release Agreement that was found to apply to all the claims at issue except for the warranty claim arising from the Separation and Distribution Agreement, with alternative grounds for dismissal found applicable to individual claims including statute of limitations and insufficient pleadings.

She further complains that he failed to list an assortment of assets owned by him personally in which she had an interest.  From there Jordan argues that Mirra's failure to list these assets deprived Jordan of the opportunity to negotiate a better deal with Mirra.  The damages she alleges are based on the purported value of the assets at the time the parties entered into the SDA.  As to most of the items, I conclude that Jordan has not pointed to evidence that supports a breach related to Mirra's failure to disclose, either because they were subsidiary assets of listed companies, because Jordan did not in fact have an interest in the assets, or because they did not have any value at the time of the SDA.  Additionally, in light of the terms of the SDA and the course of negotiation that led to it, I conclude Jordan has not adduced sufficient evidence from the record to support a finding that Mirra's alleged breach of the SDA's warranty caused damages.  I will therefore deny Plaintiff Jordan's motion for summary judgment and grant Defendant Mirra's motion for summary judgment as to Count VII of the SAC.[2]

I.  **Procedural Background**

The litigation between these parties has been long and contentious.  While much of it has been recounted in other opinions in this and related cases, I will briefly summarize it again here.

In the spring of 2008, Jordan and Mirra entered into several agreements that purported to sever their business relationship and distribute the assets and liabilities which they jointly held.  Both parties were represented by counsel. Jordan was represented by Mark Petersen and Brian Donnelly of Farella Braun + Martel LLP.  *See* Jordan Opening Br. at 4, ECF 458.   Mirra was represented by his in-house counsel Joseph Triola and Jerald David August of Fox Rothschild.

---

[2] Jordan's motion is found at ECF 457 and Mirra's at ECF 470.  Both parties also have pending motions to exclude the testimony of their opponent's expert witness.  Jordan has moved to exclude the testimony of Yvette Austin Smith, ECF 467, and Mirra has moved to exclude the testimony of Charles Lunden, ECF 472.  In the order accompanying this memorandum these motions to exclude will both be denied.

*See* Mirra Opening Br. at 5, ECF 471. Of particular relevance to this litigation and described in more detail in the following section of this opinion, were the Separation and Distribution Agreement ("SDA") and the Release Agreement.[3]

In 2012 and 2013, Gigi Jordan filed parallel actions in the Southern District of New York and the District of Delaware.  The present action was first brought in the Southern District of New York and later transferred to the District of Delaware.  ECF 69.  It originally alleged nine causes of action against Mirra, including fraud and fraud in the inducement, breaches of various contracts, breach of fiduciary duty, accounting, and the breach of warranty claim at issue today.[4]  ECF 1.  The other action, originally filed in Delaware, alleged RICO claims based largely on the same operative facts in which the SDA provided the crux of a scheme to defraud Jordan.  *See* Complaint, ECF 1, *The Hawk Mountain LLC v. RAM Capital Group LLC*, No. 13-2083 (D. Del.  Dec. 23, 2013) (the "RICO Action").

The RICO Action was dismissed on statute of limitations grounds as well as for failure to state a claim.  RICO ECF 457 (Report & Recommendation of M.J. Fallon); RICO ECF 472 (Order Adopting R&R).  A panel of the Third Circuit affirmed the dismissal in May 2017.  *Hawk Mountain LLC v. RAM Capital Group LLC*, 689 Fed. App'x 703 (3d Cir. 2017).

Following the transfer of the present action to the District of Delaware, Mirra and then co-defendants moved to dismiss the operative Amended Complaint.  ECF 113.  In November 2017, the Court, adopting the Report and Recommendation of Magistrate Judge Sherry R. Fallon, ECF 199, dismissed nine out of ten of the counts pleaded.  ECF 202.  The only claim to survive was the

---

[3] The final and apparently complete set of agreements can be found at ECF 458, Ex. 7.  All references to these respective agreements in this memorandum shall be to that location in the docket.

[4] There was a tenth count for declaratory judgment.

breach of warranty claim against Mirra that is being decided in the present opinion.  The other claims were dismissed on the principal ground that, as a matter of law, the Release Agreement operated as a broad release of all claims that might arise between the parties related to the agreements, except for those that arose "under the express terms and conditions of, and specified in," the various agreements.  ECF 199, at 16 (quoting the Release Agreement).[5]

Having largely prevailed on the motions to dismiss in the two actions, Mirra filed a Counterclaim in the present action to recover legal fees and costs spent in defense of both those actions on breach of contract claims based in the Release Agreement's covenant not to sue.  ECF 205.  The Court granted summary judgment to Mirra on these claims, finding that Jordan breached the Release Agreement's covenant not to sue and that a provision in the SDA made attorneys' fees and costs available to prevailing party in any dispute.  ECF 368 (Memo).  The amount of recoverable fees and costs has been left to be determined by a jury.  ECF 369 (Order).[6]

## II.    **Factual Background**

### A.  The Nature of the Parties' Business Relationships Prior to the SDA

A clear understanding of the nature of the assets in question is necessary to resolve the pending motions.  The parties' jointly held interests derive from a business and romantic relationship that lasted over a decade and a half.  Their relationship began in the early 1990s and involved various jointly held businesses, real estate investments, and investment accounts.  Mirra Dep. 43:21-44:22 (Nov. 24, 2015), ECF 458, Ex. 8.  Perhaps the most successful of these

---

[5] Magistrate Judge Fallon also found that many claims were barred by statute of limitations, insufficient pleading as to fraud, and, as to the declaratory relief, no surviving predicate claim.  ECF 199, 22-43.

[6] A motion filed by Mirra to exclude the testimony of Jordan's expert Richard L. Bazelon, whose testimony concerns the reasonableness of Mirra's requested attorneys' fees, is currently pending and will not be resolved in this memo or accompanying order.  ECF 475.

enterprises were Ambulatory Pharmaceutical Services Inc. and Specialty Pharmacy Inc., which the parties sold to Amerisource Bergen in 2002. *Id.* 51:8-53:23. The parties viewed their interests in these endeavors as a 50/50 relationship. *See* Resp. No. 2, Jordan's Sec. Am. Resp. to Mirra's Aug. 22, 2018 Interrog. (adopting position and citing Mirra's deposition testimony), ECF 460, Ex. 3. Until at least the early 2000s, both Jordan and Mirra appear to have played active roles in the creation and development of these interests, though by the time of the SDA in 2008, Jordan had largely stepped back into a passive investing role. *See, e.g.,* Jordan Dep. 67:10-73:13 (Dec. 4, 2019), ECF 474, Ex. 55; Mirra Dep. 52:2-9, 53:10-55:11, 88:20-89:22 (Nov. 24, 2015), ECF 458, Ex. 8.

Two of the parties' business entities are at the center of the present dispute. The first is RAM Capital Group LLC. RAM Capital Group LLC, which was listed on Schedule 2.1.1 "Recognized Joint Assets" of the SDA, was the parties' principal investment and business services vehicle. RAM Capital invested capital, made loans, and earned revenue by providing management services to other companies that were owned by the parties. Both parties understood that RAM Capital's various interests were complex, but that the company generally functioned as a pass-through for the parties' shared business interests. *See* RAM Capital Balance Sheet, ECF 474, Exs. 37, 38; Email between Jordan's lawyers (Mar. 4, 2008), ECF 474, Ex. 21 ("I was told that this LLC held notes, A/R and various investments."); Jordan Dep. 72:19-24 (Dec. 4, 2019), ECF 474, Ex. 55 ("Just as a general holding company for many of the other – managed and sort of implicated overall the investing and operations of many other companies."). There were various other entities that also used the "RAM" name including, as relevant here, RAM Business Holdings LLC, and RAM Realty Holdings LLC. By the time of the SDA, RAM Realty Holdings was the only other

active and distinct RAM entity in which the parties shared a joint interest,[7] and it was listed on Schedule 2.1.1, with its real estate holdings also separately identified on the schedule. Jordan alleges that Mirra breached the warranty found in the SDA by failing to list "various undisclosed RAM Capital notes, investments, and intangible assets," Jordan Opening Br. at 16, ECF 458, and values that breach at approximately $15 million.[8]

The other business entity at the center of the present dispute is Biomed America Inc. In 2007, Mirra formed Biomed America along with numerous state-specific subsidiaries wholly owned by Biomed America. Unlike their other assets, which both parties agreed were shared 50/50, the parties recognized that Mirra held a greater interest in Biomed than Jordan. Mirra suggested in his deposition that this was because "Gigi hadn't helped me build the company [for] almost ten years," which is why he "requested more of the stock" and suggested that they split their 65% interest in the company 50/15. Mirra Dep. 88:22-89:19 (Nov. 24, 2015), ECF 458, Ex. 8. Jordan in her deposition claimed to have participated in some marketing efforts of Biomed up to the SDA, though the extent is not clear. Jordan Dep. 66:9-67:24 (Dec. 4, 2019), ECF 474, Ex.

---

[7] RAM Business Holdings filed for and was issued a certificate of cancelation by the Delaware Secretary of State in June 2006. ECF 474, Ex. 4. However, Mirra's general ledger from 2008 still reflected an investment balance of approximate $1.6 million. ECF 474, Ex. 12 at 32-33. Jordan argues that, despite the LLC's dissolution two years prior, the general ledger entry reflects an undisclosed asset in which both parties had an interest. Lunden Report at Ex. E, ECF 462-1.

There were many entities with the "RAM" name, most of which appear to have been dissolved before the assets were divided according to Mirra's interrogatory responses. *See* Resp. 1, Mirra's Sec. Am. Resp. to Jordan's First Interrogs., ECF 460, Ex. 2. Regardless, none of them appear to be directly at issue in the present dispute except a note from RAM Capital II LLC held by RAM Capital Group. Lunden Report at Ex. F, ECF 462-1.

[8] The report of Jordan's expert is less than clear but appears to envision three pots of damages related to the failure to disclose RAM's underlying assets including ~$10 million for its valuation based on management fee charges, ~$5 million for accounts receivable, and ~$15 million for various investments and notes. *See* Lunden Rep. at Exs. B, E, F, ECF 462. These values are then halved to reflect Jordan's share. *Id.* at Ex. A.

55.   Even if there wasn't complete agreement on the extent of Jordan's involvement in the new company, the course of negotiations indicate that the parties agreed that Biomed was not a clean 50/50 split.  As further detailed below, numerous communications from Mirra to Jordan proposed that the 50/50 split would not apply to Biomed.  *See, e.g.,* Schedule of Assets (Feb. 21, 2008), ECF 474, Ex. 15 (schedule of assets provided by Mirra at beginning of negotiations listing all other private company ownership as 50/50, but Biomed as "to be discussed"); Email of Mirra attorney Troilo to Jordan attorney Petersen (Feb. 26, 2008), ECF 474, Ex. 18 (with schedule of assets listing options for either lump sum deal or split ownership deal where "Gigi gets 15% of Biomed, 50% of other businesses, 50% of debt").  When the structure of the deal finally came together, the $4.9 million payment that would be made from Mirra to Jordan would be "really solely for [her] 15% interest in Biomed." Email from counsel to Jordan (Mar. 4, 2008), ECF 458, Ex. 2.  Jordan later executed a stock purchase agreement for 120 shares of Biomed, ECF 458, Ex. 7 at RAM000030020, which was done pursuant to the SDA's Plan of Distribution in consideration for the $4.9 million, *id.* at RAM000030017.[9] Jordan alleges that Mirra breached the warranty at issue by his "failure to list BioMed America's ownership stake in [] nine BioMed subsidiaries and their respective assets," Jordan Opening Br. at 16, ECF 458, and values that breach at approximately $65.5 million.  *See* Lunden Rep. at Ex. A, ECF 462.[10]

---

[9] Jordan's litigation posture recognizes the 120 shares as a 15% stake in Biomed in light of her accusation that, through Parallex (the straw entity used to accomplish the merger with Allion), Mirra held 408 shares of Biomed, which would be equivalent to 51% of the company were 800 shares issued prior to the merger, such that her 120 shares would be a 15% stake.  *See* Lunden Rep. at 10, ECF 462; Mirra Dep. 118:24-119:12 (Nov. 24, 2015), ECF 474, Ex. 51.

[10] Jordan's expert also provides two alternative models that value the damages from the Biomed transaction at $39 million and $47 million respectively.  *See* Lunden Rep. at Exs. G, H, ECF 462.

The final set of interests that Jordan alleges are at stake in the present litigation are more diverse.  Mirra's alleged failure to list them on the asset schedule would account for approximately $27 million of the damages claimed.  *See* Lunden Rep. at Ex. E, ECF 462.[11]  These assets include the private companies Apogenics and Hometech, shares in Vasgene held by Mirra personally, various fees and bonuses, various investments including in "RAM Bus" and "Asia Ame," debt relief from the payment of the CIT Loan, and various notes/loans including "Loan Receivable Kuo," "RAM Note to Mirra and Jordan," and "Note to Mirra – Consideration for Atlas Shares." *See* Jordan Opening Br. at 16, ECF 458; Lunden Rep. at Ex. E, ECF 462.[12]

B.  Negotiation of the SDA

The context in which the parties agreed to part ways, and the model adopted to accomplish that, are also important to an accurate understanding of the parties' agreements. By early 2008, Biomed America was in talks with Allion, a publicly traded pharmacy services company, regarding a possible merger.  Spurred by the anticipated merger, Jordan and Mirra began discussions over unwinding their shared financial situation.  *See* Mirra Dep. 88:8-90:19 (Nov. 24, 2014), ECF 474, Ex. 51.  As noted above, both parties were represented by multiple, sophisticated attorneys in the discussions.

---

[11] In Jordan's reply brief she withdrew "any request for damages as to Vasgene shares held by RAM Capital," Jordan Reply Br. at 16 n.5, ECF 498, which accounted for an additional $13.7 million in damages according to Lunden's report.

[12] As will be discussed further below, the various fees, excluding the alleged bonus, were all paid to RAM capital rather than Jordan personally; these account for $7.7 million ($3.85 million in damages). The debt relief related to the CIT loan is attributable to Biomed America; it accounts for $14.9 million ($7.45 million in damages).  After these assets are removed, the miscellaneous assets remaining account for approximately $15.7 million in alleged damages, $7.5 million of which is attributable to the Hometech note and $2.25 million of which is attributable to Vasgene shares held directly in Mirra's name.

8

The negotiations began amicably.  Email from counsel to Jordan (Feb. 20, 2008) ("Our conversation was very pleasant … Joe was very cordial … In other words, this will all be amicable.").  And Jordan's counsel confirmed at deposition that both parties were interested in getting a deal done quickly.  Email from counsel to Jordan (Feb. 22, 2008), ECF 458, Ex. 11; Donnelly Dep. 282:18-23 (Jan. 13, 2016), ECF 458, Ex. 1 ("[M]y marching orders were to determine what assets Mrs. Jordan was going to receive, what potential liabilities she would be exposed to post-closing, and to move quickly in light of the alleged child abuse and her concerns for her safety."); Petersen Dep. 153:21-23 (Oct. 14, 2015), ECF 458, Ex. 9.  The parties' desire to move quickly foreclosed the possibility of an exhaustive investigation of the then-present values of all the private companies, investments, and liabilities at stake.  Mirra's attorneys made it clear to Jordan's attorneys at the beginning that "Ray will not value these companies, and he will not buy [Jordan] out of them (Joe told me)."  Email from counsel to Jordan (Feb. 22, 2008), ECF 458, Ex. 11.  And Jordan's attorneys seem to have accepted as much, even over the course of the negotiations, admitting that they had "sufficient information to close the deal … with the caveat that [they] would have preferred to do more due diligence," which did not occur in light of the parties' desire to move quickly.  Petersen Dep. 153:4-18 (Oct. 14, 2015), ECF 458, Ex. 9.

Within these constraints, Mirra proposed two possible structures for a deal.  First, either Jordan and Mirra would split their assets/liabilities and explicitly divide their interests in the private companies so that Jordan would hold her interests directly in her name. Alternatively, Jordan would give up all her interests in the private companies in exchange for a lump sum payment which, when combined with a division of their then-present brokerage and investment accounts, would equal half of their combined net worth based upon when their shared interests were most liquid between 2002 and 2003, with an added a 5% annual interest calculation up to the

division in 2008.  As Jordan's attorney related Mirra's offer to Jordan, "He said that if you'd like to stay in them, and share the risk and cost, then you could participate in any upside.  He also said that Ray would be happy to figure out what your share was in 2002 when the business was sold, and apply some interest calculation to that, and then pay you that."  Email from counsel to Jordan (Feb. 22, 2008), ECF 458, Ex. 11; *see also* Mirra Dep. 120:18-121:22 (Nov. 24, 2015), ECF 474, Ex. 51 ("So I went back to 2003 when she wanted out, I thought the proposal we go back to when we have the highest number of cash, which is January of 2003, we applied an interest rate to that of, I believe, 5 percent.  Round that off through 2008 and that's where that number came from.").

Jordan and her attorneys from the outset preferred the lump sum structure.  In an unsent draft email, Petersen suggests that "Gigi is ultimately interested in extricating herself from all of these businesses, so if there is a mutually acceptable way to do that, we would be interested in exploring that idea.  That is, there might be a way for Ray to end up with all the upside in these companies for some modest adjustment in the other assets."  Email of Petersen to Jordan (Feb. 23, 2008), ECF 474, Ex. 18.  On February 26, Mirra's attorney sent Jordan's attorney a "proposal with the detail" which provided for an "Option 1" lump sum settlement of $46.6 million based on a schedule of net assets from 2003, with 5% interest added in, then divided in half, along with an "Option 2" where "Gigi gets 15% of Biomed, 50% of other businesses, 50% of debt." Email of Troilo to Petersen (Feb. 26, 2008), ECF 474, Ex. 18.  Jordan's attorney responded a couple days later, "Sorry that I couldn't get back to you sooner.  The bottom line is that the first option set forth in your proposal is conceptually acceptable to Gigi—we just need to get some of the supporting or underlying documents, and work out some of the details. … As I said, Gigi believes that Option 1 … is a reasonable approach to unwinding her from all of this, so we are proceeding in that way—

we just need updated figures and the backup to understand what has been proposed." Email of Petersen to Troilo (Feb. 28, 2008), ECF 458, Ex. 12.

Over the next week, the parties exchanged several communications, driven principally by Jordan's attorneys' desire to understand the underlying details about the private businesses at issue. After Mirra's counsel Troilo provided a schedule of the private companies on February 29, an edited version of which would later become part of Schedule 2.1.1's list of assets in the SDA, Email of Troilo to Petersen (Feb. 29, 2008), ECF 474, Ex. 21, Jordan's attorney responded by stating that "we'll want to understand the form of ownership for each property/business (LLC, LLP, S Corp, etc.), percent ownership interest, cost/tax basis of property and information on current debt. And we should get the most current audited or unaudited financial statements that exist for any of the entities. It would also be good for us to get the relevant tax returns as well." Email of Petersen to Troilo (Mar. 1, 2008), ECF 458, Ex. 13. When asked at his deposition if he received all the documents requested, Mr. Petersen, Jordan's attorney, was unable to remember but could point to no reason to believe that they didn't, conceding that they received "sufficient information to close the deal." Petersen Dep. 153:7-11 (Oct. 14, 2015), ECF 458, Ex. 9.[13]

During the first week of March, Jordan's lawyers' needs for additional documentation satisfied, the agreement began to take shape. The key arguments at this point appeared to be over

---

[13] There are references in the record to key documents that Jordan indisputably received. For instance, Jordan's attorney Donnelly acknowledges receipt of documents, including tax returns, from RAM Capital and perhaps other RAM entities that indicated how complex the network of assets and liabilities were for those companies: "Notwithstanding that, based upon the information we have received over the last several days, it appears that we will be able to structure this settlement with minimal tax impact, there are simply too many RAM entities, affiliate transactions, and moving parts for us to be in a position to give Gigi comfort that there will not be potential tax or other claims against Gigi post-settlement. … Note that I took a quick look through some of tax returns Mike sent earlier today and I noted that there were a lot of related party due-to's, and due-from's, there was an LLC (RAM Business Holdings, LLC) that held 90% of the interests in RAM Capital, and other material transactions." Email of Donnelly to Troilo (Mar. 11, 2008), ECF 474, Ex. 29

whether the schedules and proposed divisions that Mirra's lawyers provided would accomplish the goal of getting Jordan to the promised $46.6 million without her continued involvement in the companies or real estate interests.  In an email sent early in the morning of March 4, Jordan indicates that she spoke to Mirra the night before and that their conversation had addressed Mirra's suggestion to share interest in a piece of real estate until it could be profitably sold well past the SDA's settlement.  Jordan in no uncertain terms pushed back against this suggestion and communicated to Mirra that the lump sum deal was meant to be a "quick out," where she should "in an expeditious manner" receive consideration of "no ongoing involvement, as well as the dollar amount mentioned with no diminution of that final amount by tax implications (or otherwise)" in exchange for her "walking away from the substantial value on the Bio and Vasgene companies (for 6 million)."  Email of Jordan to counsel (Mar. 4, 2008), ECF 474, Ex. 23.  Later that day, Jordan's attorney Donnelly spoke with several of Mirra's advisers and was able to communicate an outline of how some of the more complicated assets, including debt and real estate would be divided.  Email between Jordan's lawyers, (Mar. 4, 2008), ECF 458, Ex. 2.

At this juncture a problem arose.  The deal on the table only included $4.9 million in cash for the business interest buyout, seemingly less than the approximate $6 million that Jordan and her attorneys thought was necessary to bring the total to $46.6 million.  *Id.*  ("Ray would make an immediate cash payment to you of $4.9M in cash. … This payment would be for your 15% interest in Biomed America, Inc. as well as your interests in the other corporations. … I know you had a certain $ amount in mind to walk away from the Biomed stock upside and I'm not sure the above proposal will get you there."); *see also* Email from counsel to Jordan (Mar. 5, 2008), ECF 474, Ex. 26 ("We will need to discuss: … Why the proposed payment from Mr. Mirra is $4.9M and not an amount that, when added to the cash and investments and real estate she is to receive, will equal

the $46.6M amount."). Around this time, the parties supplemented the $4.9 million cash payment

for the private company interests with a $1.2 million payment for a note related to the parties' real

estate holdings that brought the total cash to Jordan at settlement to $6.1 million.[14] Throughout

these discussions, the "conceptual agreement" dividing up the value of the 2003 net worth and

giving Jordan half of that out of the 2008 assets remained central to Jordan's bargaining. Donnelly

detailed Jordan's contemporaneous understanding in an email that was drafted as a possible

response during this phase of the negotiations:

> While the draft plan and detail schedule is consistent with the proposal you
> provided to me on our call yesterday, Ms. Jordan does not think it is consistent with
> the conceptual agreement that Ms. Jordan previously discussed with Mr. Mirra. As
> I understand it, the conceptual agreement was that the parties looked to their
> combined net assets as of 1/31/03 ($79.58M). This amount was split 50/50
> ($39.8M each). From this amount, taxes and personal expenses were backed out
> and a 5% interest component was added. This resulted in a current asset calculation
> of $93.2M, with 50% of this being $46.6M

Email of Donnelly to Jordan (Mar. 5, 2008), ECF 474, Ex. 26.

At this point, tax and post-closing liability concerns took center stage in the negotiations.

As Jordan's's counsel noted in an email to Mirra's counsel Troilo, "Now that it appears that the

parties are back to the $46.6M agreed upon amount, we had some questions and tax structuring

suggestions. … [I]t appears there is economic agreement on the $46.6M amount, so now the focus

should be shifting on how to transfer the assets in a tax efficient manner." Email of Donnelly to

---

[14] Paragraph 2 of the Plan of Distribution details where Jordan received an additional $1.2 million
to satisfy a loan payable to Jordan on a real estate holding company, Valley Creak Estate LLC, which Jordan
then relinquished her rights in. *See also* Email of Troilo to Petersen (Mar. 7, 2008), ECF 474, Ex. 27
(including draft schedule of assets that lists cash to Jordan at settlement of $6,192,000) *and* Email of Troilo
to Petersen (Mar. 5, 2008), ECF 474, Ex. 25 (adding consideration of Valley Creek note of $1,238,000 to
cash of $4,954,000 to total $6,192,000 consideration as a category distinct from investment accounts and
real estate).

Troilo (Mar. 9, 2008), ECF 474, Ex. 28.[15]  In a follow-up email a couple days later, Donnelly notes how the cash payment for the Biomed shares combined with the assumption of certain debts and the capital loss related to selling her interest in Ram Capital provided tax benefits for both Mirra and Jordan.  Email of Donnelly to Troilo (Mar. 11, 2008), ECF 474, Ex. 29.  Perhaps most importantly, Donnelly notes that the number of moving parts in the deal, especially as related to the RAM entities, might expose Jordan to "potential tax or other claims against Gigi post-settlement." *Id*.  Donnelly therefore requested "a broad indemnification from Ray with regard to any claims against Gigi in connection with any of the LLCs, stock holdings, debt, etc. that may be brought against Gigi post-closing." *Id*.  This is in line with Donnelly's later testimony that Jordan "was most concerned with any potential post-closing liability that she either was not aware of and she would be liable for or that was not appropriately addressed."  Donnelly Dep. 105:20-23 (Jan. 13, 2016), ECF 474, Ex. 52.  And it was out of these discussions that the parties developed an indemnification agreement that was included in the SDA.

With the indemnification issue settled, the next day was spent finalizing the papers.  On March 12, 2008, the parties exchanged a flurry of emails containing drafts of various components of the SDA.  One sent by Jordan's attorneys at 5:49 p.m. contained a liquidated damages provision in case Mirra delayed in transferring any assets, the warranty section, and the attorneys' fees section.  Email of Donnelly to Troilo (Mar. 12, 2008), ECF 458, Ex. 5 (including redline of SDA

---

[15] Internally, Jordan and her attorneys expressed some concerns about the Biomed deal and specifically wanted to request more information about "how the outstanding stock of Biomed is allocated" and some of the "fundamental economic terms [including] cash at closing, amount and type of preferred shares, [and the] additional contingent purchase price."  Draft email of counsel sent to Jordan (Mar. 10, 2008), ECF 458, Ex. 14.  But an hour after sending that draft to Jordan, and in the same email thread, Jordan's attorney suggests that the concerns were resolved by a phone call with Mirra or his attorneys, with Petersen noting that "In light of this call we're on right now, maybe we don't want to send the draft message presented below." ECF 458, Ex. 14.

with "FB+M Comments").[16]  The warranty section, which appeared unchanged on the signed versions, included a warrant from Mirra that "as of the Effective Date, the Recognized Joint Assets listed on Schedule 2.1.1 represent all of the assets in which the parties have a joint interest." SDA ¶ 5.3.1, ECF 458, Ex. 7.  Later that evening, in addition to other components of the SDA, the parties exchanged several drafts of Schedule 2.1.1, Recognized Joint Assets, which grounded the warranty.  Email of Petersen to Jordan (Mar. 12, 2008 at 6:46 p.m.), ECF 474, Ex. 31; Email of Donnelly to Troilo (Mar. 12, 2008 at 7:22 p.m.), ECF 474, Ex. 32; Email of Troilo to Donnelly (Mar. 12, 2008 at 9:40 p.m.), ECF 474, Ex. 35.  The content of these schedules was negotiated by both parties, with Donnelly noting on Jordan's behalf that some of the previously exchanged schedules included "assets that Ray and Gigi already hold separately" that were listed so as "to be clear as to what the parties were taking."  Email of Donnelly to Troilo (Mar. 12, 2008 at 7:22 p.m.), ECF 474, Ex. 32.  The critical objective for Jordan's team remained, through this eleventh hour of negotiations, ensuring that the assets that Jordan was taking from the deal added up to $46.6 million.  *Id.*  ("I am pretty certain I am not going to get Gigi comfortable with these agreements unless I can show her these schedules ultimately tie into the $46.610M amount.").  By late night, early morning, final versions of the documents had been exchanged with "no major issues outstanding;" Jordan's attorneys promised signature pages the next day following Jordan's final read through of all the documents.  Email of Donnelly to Troilo (Mar. 12, 2008 at 11:23 p.m.), ECF 474, Ex. 36.

It was against this background of negotiations that the parties ultimately reached the agreements, including the warranty, now before the Court.

---

[16] Jordan's attorneys also added the paragraph about Parallex, the straw company Mirra used to complete the Biomed merger, to the recitals section of the document.

### III.    Legal Standards

The parties' motions for summary judgment are governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That standard does not change when the parties cross-move for summary judgment, with each party's motion to be determined on its own merits in accordance with the Rule 56 standard.  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F. 3d 388, 402 (3d Cir.  2016).

### IV.    Discussion

Jordan's claim is brought as a breach of warranty claim against Mirra.  Delaware law treats general breach of warranty claims the same as it treats breach of contract claims.[17]  *Osram Sylvania Inc. v. Townsend Ventures, LLC*, CV 8123-VCP, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) (dismissing a breach of warranty claim as duplicative where breach of contract was also brought, noting that "[a]ny breach of an express warranty also would qualify as a breach of contract, however, and the remedies available under either claim are equivalent").   "For a successful breach of contract claim, a party must prove: '(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff.'" *In re G-I Holdings, Inc.*, 755 F.3d 195, 202 (3d Cir. 2014) (quoting H–M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003)).

"The proper construction of any contract … is purely a question of law." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  "When interpreting a contract, the role of a court is to effectuate the parties' intent.  In doing so, we are

---

[17] The parties agree that Delaware law governs the contract and the dispute. *See* ECF 458 at 8; ECF 471 at 16.

constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract." *N.W. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals*, 616 A.2d at 1196.

There is no dispute as to the terms of the warranty. Under the SDA, under the section "Representations, Warranties, Covenants, and Other Matters," "Mirra represents and warrants that as of the Effective Date, the Recognized Joint Assets listed on <u>Schedule 2.1.1</u> represent all of the assets in which the parties have a joint interest." SDA ¶ 5.3.1. The question is whether Mirra breached the warranty and if so, caused damages. After reviewing the record, I conclude that there are no material facts in genuine dispute as to these issues and that Defendant Mirra is entitled to judgment as a matter of law. Plaintiff Jordan cannot point to evidence to create a factual dispute for the vast majority of breaches alleged and, even if there were a breach, prove damages resulting from any alleged breach.

### A.  <u>The Breach of Warranty</u>

The question of breach turns on the interpretation of two words in the warranty: "assets" and "interest." The parties dispute whether the parties would have an "interest" in entities and assets that are owned by private companies in which they undisputedly do have an interest. Jordan

contends that if she has an interest in a company, she then also has an interest in the assets or other entities owned by that company. Jordan further contends that Mirra was obligated to list as "assets" even business entities with no operations or capital.  Mirra disagrees.

### 1. The Key Legal Issues in Interpreting the Warranty and Schedule 2.1.1

The definition of "interest" is critical to the question of whether Mirra breached the contract by failing to list the subsidiary entities of Biomed America, the various subordinate assets of RAM Capital, and the patents of Vasgene.  Both parties cite Black's Law Dictionary (11th ed. 2019), which defines an interest as "[a] legal share in something; all or part of a legal or equitable claim to or right in property."  Jordan leans on the "equitable claim" language to argue that her direct interests in Biomed America, RAM Capital, and Vasgene give her indirect interests in the subordinate assets of those entities that Mirra was responsible for listing.

For the purposes of this agreement, Delaware courts have defined an "interest" and a business owner's personal legal claim to a company's assets so as to be dispositive of this issue. Delaware courts have long recognized that a shareholder's equitable interest "in the profits and in the distribution of assets on liquidation" does not grant them any "interest [in] any specific assets of the corporation." *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 686 (Del. 1959). "The corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation." *Id.* at 686-87.  This holds equally true for the non-incorporated business entities such as LLCs.  The Delaware LLC Act states that "[a] member has no interest in specific limited liability company property." 6 Del. Code § 18-701; *see also Credit Suisse Securities (USA) LLC v. W. Coast Opportunity Fund, LLC*, CIVA 4380-VCN, 2009 WL 2356881, *3 (Del. Ch. July 30, 2009).  Thus, a plain reading of the contractual language,

18

interpreted through the prism of Delaware law, requires a construction of the contract that excludes the subordinate assets of the owned business entities.

Jordan's alternative reading, which is both internally inconsistent and fails to identify any limiting principal as to the obligations of the parties, would be "unreasonable since it would render the parties' rights and obligations uncertain and indefinite." *Gulf Oil Corp. v. F. P. C.*, 563 F.2d 588 (3d Cir. 1977).  Jordan argues that the warranties obligated both parties to disclose *"all* 'cash, inventory, real estate, accounts receivable, and goodwill' in which the parties had a joint interest— whether directly, indirectly, legally, or equitably—including the property held by their jointly owned holding companies." Jordan Opening Br. at 11 (quoting *Asset,* Black's Law Dictionary (8th ed. 2004)), ECF 458.  Jordan herself admits that she did not list several assets she owned or controlled for reasons that don't fit with her expansive definition of "interest." *See* Jordan Dep. 41:11-45:25 (Dec. 4, 2019), ECF 474, Ex. 55 (not listing a brownstone owned by Jordan and office building owned by Mirra because "for tax reasons, it would be better not to list certain assets that ... were individually titled in our respective names, and we were going to continue to maintain separate ownership after the SDA."); Jordan Dep. 360:18-362:17  (Dec. 5, 2019), ECF 474, Ex. 56 (not disclosing bank account in Jordan's name because it was funded by a trust that she controlled). Yet Jordan's understanding that the SDA permitted her to exclude interests for "tax reasons" or because she held them as a legal but not equitable owner, as with a trust, is plainly inconsistent with the expansive, all-inclusive definition of interest that Jordan has adopted for the purposes of this litigation.[18]

---

[18] Moreover, Jordan suggests no consistent limiting principal to define the universe of assets that the parties were obligated to list. In Appendix 1 to her Reply Brief where she poses a "demonstrative" example of how Mirra could have listed the assets in question, she includes at least one subsidiary of a subsidiary, and for one entity, RAM Capital, she includes a schedule of "Notes, Investments, and Intangible

Jordan also contends that Schedule 2.1.1's listing, in some instances, of several subordinate assets of closely held companies, proves her more expansive construction. Not so. Rather, in light of the agreement as a whole, what she points to is consistent with the primary purpose of Schedule 2.1.1: to identify the pool of assets that it was necessary for the SDA to reassign ownership in some way. The section of SDA that establishes Schedule 2.1.1, Article 2 "Identification of Assets and Liabilities," demonstrates this, as it shows how Schedule 2.1.1 identifies joint assets in the corresponding section of the agreement, ¶ 2.1.1, so that all those assets listed can be transferred to Jordan. Another paragraph of the agreement, and related schedule, accomplishes the same as to Mirra. (¶ 2.2.2 and Schedule 2.2.2). Where subordinate assets such as property were specifically listed on Schedule 2.1.1, it's because those subordinate assets were transferred between the parties independent of the business entity that formally held the interest. Thus, this was only the case for closely held companies such as RAM Realty Holdings, West Highland Co., and Valley Creek Estate, which the parties had the right to apportion at their discretion. This understanding of Schedule 2.1.1, that it operated to identify the assets that needed some combination of transfer and renunciation of rights, is borne out by Jordan's testimony that the parties agreed not to list certain assets that "were individually titled in [their] respective names, and [for which they] were going to continue to maintain separate ownership after the SDA." Jordan Dep. 41:11-45:25 (Dec. 4, 2019), ECF 474, Ex. 55. It also explains why the parties did not treat "assets" as an accountant might and list all "cash, inventory, real estate, accounts receivable, and goodwill" owned by any entity, as such granular details were not necessary to identify the overarching joint interests that needed to be transferred to implement the agreement.

---

Assets," something she does not demand for the other twenty-three entities. Jordan Reply Br. Appx 1, ECF 498.

Even if I were to assume some ambiguity in the agreement, the parties "prior agreements and communications" together with their "course of dealing" support the conclusion I reach here. *Eagle Indus. Inc. v. DeVilbiss Health Care, Inc.* 702 A.2d 1228, 1233 (Del. 1997). And where the evidence of record "points in one direction," it can serve to "conclusively resolve the ambiguity" in one party's favor. *Sunline Commercial Carriers Inc. v. Citgo Petroleum Corp.,* 206 A.3d 836, 849 (Del. 2019). The conclusion I reach here is entirely consistent with the history of the parties' relationship and negotiations discussed in detail above.

> 2. *The Subordinate Assets of Biomed America, RAM Capital, and Vasgene Were Not Separate Interests That Required Listing*

Because I have concluded the subordinate assets of business entities that were listed on Schedule 2.1.1 did not, according to the terms of the contract need to be listed, it follows as a matter of law that Mirra did not breach the warranty as to such interests. This conclusion applies to all the Biomed America subsidiaries,[19] the payment by Allion of the debt owed by Biomed America to CIT,[20] all of the fees paid or owing to RAM Capital[21] (including those which Jordan's expert lists as personal assets of Mirra)[22] and all RAM notes and investments,[23] the increased value

---

[19] Lunden Rep. Ex. C, ECF 462 ($131.1 million).

[20] *Id.* Ex. E ($14.9 million)

[21] *Id.* Ex. B ($10.0 million); *id.* Ex. E ($5.1 million)

[22] *Id.* Ex. E ($7.7 million). The Management Agreement between Biomed America and RAM Capital provided that the management fees were payable to the "Manager" defined as RAM Capital. ECF 474, Ex. 8. This was recognized on the draft due diligence report made to Allion prior to the merger. ECF 474, Ex. 13 at 5 ("The Company recognized management fees payable to RAM … "). Mirra affirms that all management fees would have been paid to RAM Capital and not to him personally. Mirra Aff. ¶ 5, ECF 481. And Jordan points to nothing in the record to create a genuine dispute of material fact against a finding that the management fees were paid to RAM Capital.

[23] *Id.* Ex. F ($15.5 million).

of Vasgene interests held by RAM Capital based on the undisclosed patents,[24] and the interest in

Apogenics.[25]   These assets represent the bulk of the damages Jordan claims.

### 3.   *Other Interests Where There Was No Breach of Warranty*

Jordan further argues that several items that she believes were owned by Mirra directly,

including interests in private entities, notes, loans, investments, and bonuses, were improperly left

off Schedule 2.1.1.  As an initial matter, the fact that an asset was listed in Mirra's name does not

rule out the possibility that Jordan might be able to assert a "joint" interest, given the way the

parties structured their dealings and given their model for unraveling their affairs. These interests

must be addressed individually.

By way of overview, it appears that the methodology of Jordan's expert Lunden was to

identify any asset where Jordan might conceivably claim an interest, and then list it as an item in

dispute. In evaluating a motion for summary judgment, a court is not grading a first-year law school

exam and awarding partial credit for "spotting an issue." The question is whether the party

opposing the motion can point to sufficient evidence of record to create an issue of material fact.

Here, with two exceptions discussed below, I conclude that Jordan does not meet that standard

---

[24] *Id.* Ex. E ($27.3 million).  There are also shares of Vasgene held directly in Mirra's name as opposed to those held in RAM's name, which Lunden values at $4.5 million.

[25] Lunden does not list Apogenics independently in his report, but merely lists it as an entity that paid management fees RAM Capital which, according to Jordan, deflated the company's value to zero.  *See* Lunden Rep. Ex. B, ECF 462; Jordan Opening Br. at 7, 16, ECF 458.  As discussed above, the management fees were assets owned by RAM Capital and did not need to be separately disclosed.  With respect to Apogenics, according to a draft due diligence report of Biomed prepared to Allion in February 2008, "On January 1, 2008, [Biomed America] acquired Apogenics Healthcare, Inc. ("Apogenics").  … Management asserts that the Apogenics transactions was [sic] effectuated to provide a certain amount of Biomed equity to the former shaerholders of Apogenics … ." ECF 474, Ex. 13.  Therefore, by the time the SDA was negotiated, Apogenics was no longer a joint interest of Jordan and Mirra.  Any shared interest they had was subsumed by their joint interest in Biomed America.

either because the record does not support her claim of an interest in the specific asset, or because the assets identified did not have any value within the relevant timeframe of the SDA.

<u>Interests in Private Companies</u>

**Parallex, LLC**.  Jordan lists Parallex LLC on Appendix 1 to her Reply Brief, which she styles as a "Demonstrative Schedule 2.1.1 with Unlisted Assets" that, per Jordan, shows "just one among myriad ways that Mirra could have met his obligations as we have described them." Jordan Reply Br. at 16, ECF 498.  "Parallex was a holding company established before the BioMed merger to accomplish the reverse merger." Lunden Rep. at 10, ECF 462. Through the SDA and plan of distribution, Parallex was the entity that would purchase Jordan's shares of Biomed.  The plan of distribution specifically identifies Parallex as an LLC "wholly owned by Mirra," ECF 474, Ex. 7 at Exhibit 3.1.1, and alongside the warranty at issue in this litigation, Mirra also "represents and warrants that he is the sole owner of Parallex LLC," *id.* at ¶ 5.3.5.  Jordan not only accepted that representation, but in fact edited the recitals to include reference to Parallex.  Email of Jordan's attorney to Troilo (Mar. 12, 2008), ECF 458, Ex. 5 (including redline of SDA with "FB+M Comments 3/12/08," with Parallex recital found at SDA at 1).  It is nonsensical for Jordan either to claim a breach when the asset was specifically identified in the agreement or to claim an interest in an asset that the agreement itself identifies as one Mirra wholly owned.

**Access Pharmaceutical Services, LLC.**  Jordan lists Access Pharmaceutical Services on Appendix 1 to her Reply Brief, which she styles as a "Demonstrative Schedule 2.1.1 with Unlisted Assets" that, per Jordan, shows "just one among myriad ways that Mirra could have met his obligations as we have described them." Jordan Reply Br. at 16, ECF 498. Jordan points to no evidence in the record that Mirra owned an entity called Access Pharmaceutical Services *at the*

*time of the SDA.* And her expert Lunden identifies no damages that flow from the failure to list Access Pharmaceutical Services.[26]

   **4.47% Vasgene Shares, Held by Mirra.**   Lunden lists this asset as a personal asset of Mirra valued at $4,516,498, Lunden Rep. at Ex. E, ECF 462, based on a common stock ledger that lists an issuance of 5,000 shares to Mirra in 2001 (reissued in 2002) in addition to several issues and reissues to RAM Capital through May of 2008, ECF 474, Ex. 13.   Although Schedule 2.1.1 lists Vasgene, it does so with a note of "Shares held by RAM Capital Group, LLC." Jordan contends that although the RAM-held shares were listed, there were separate shares held by Mirra that were not, in violation of the warranty.   At the time that the SDA was being negotiated, both parties appear to have believed that the shares were held by RAM Capital.   *See* Jordan Dep. 456:6-9 (June 9, 2021), ECF 474, Ex. 61 ("Q. And at the time when you signed the SDA, was it your belief that those shares were … held by RAM Capital? A. Correct."); Mirra Dep. 165:7-10 (Nov. 24, 2015), ECF 474, Ex. 51 ("I don't believe I ever owned stock personally in VasGene.  I may have, but I think it [was] only [held by] RAM Capital.").   There is no evidence of the existence of such separate shares aside from the ledger entry, and though the entry may raise a question, at summary judgement the question must be at least partially answered with evidence, and Jordan supplies none. Of some relevance, however, is how Jordan herself treated what appears to be the same 5,000 shares,[27] claiming half of them as hers in legal documents from 2001 when she was divorced from Mirra, ECF 474, Ex. 1 at 7 (assigning Jordan one half the interest in VBI Inc (the

---

[26] There are several similarly named companies distinct from Access Pharmaceutical Services that are subsidiaries (or sub-subsidiaries) of Biomed America from which Lunden claims various damages. Lunden Rep. Exs. C, E, ECF 462.  These relate to RAM and Biomed, and no breach of warranty can be claimed for the reasons set forth above.

[27] Jordan has not pointed to any stock reflecting a duplicate issue of 5,000 shares in the company.

24

original name of Vasgene)).  Specifically, she remarried another individual subject to a premarital agreement which listed as separate property of Jordan "VBI, Inc. (2,500 shares)," ECF 474, Ex. 2. This undercuts any inference that the ledger entry reflects an asset of which Jordan was unaware. Beyond that, by her own logic she would likewise be required to disclose them, and her failure to list them offsets any breach by Mira and forecloses any possibility that she could have been harmed as a result.  But in any event, the ledger entry alone does not create a triable issue of fact.

**Hometech Undisclosed Assets**.  Lunden lists this asset as a personal asset of Mirra, further described as "Hometech Note Sale in 2009," which he valued at $15,000,000, Lunden Rep. at Ex. E, ECF 462. But Lunden deemed it an asset of value based upon a later document, specifically a "Schedule of Advanced Research Corp. Acquisition as of 12/31/09," ECF 474, Ex. 49.  This schedule merely reflects that at some point in 2009 Hometech acquired Advanced Research Corp. in exchange for a $15 million note. Advanced Research Corp., which the note nominally values at $15 million, was in fact disclosed on Schedule 2.1.1. The fact that Hometech later purchased Advanced Research Corp provides no evidence that Hometech had any value at the time the SDA was negotiated in early 2008.  Mirra stated in his interrogatory answers that Hometech Therapies, Inc. had nominal or no value as of 3/11/08.  ECF 460, Ex. 2.[28]  Standing alone, evidence of this later transaction at the end of 2009 does not create a material issue of fact as to an agreement negotiated in early 2008.

---

[28] Jordan again resorts to Black's Law Dictionary, which provides that an asset is "[a]n item that is owned and has value." (11th ed. 2019) Jordan argues that the second entry in Black's Law Dictionary should apply, which treats assets as "entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill." Jordan Opening Br. at 9, ECF 458.  She also argues that this is consistent with "the meaning of 'assets' for accounting purposes," citing FASB accounting standards.  *Id.* This is inconsistent with her deposition testimony as to the model used for negotiation, where she conceded that "the SDA was a common sense deal." Jordan Dep. 359:13-15 (Dec. 5, 2019), ECF 474, Ex. 56.  As discussed in a review of the background of negotiations, neither party provided the granular detail that would be expected from an accounting-like treatment of "assets."

Other Financial Interests

**RAM Note to Mirra and Jordan.**  Lunden's report identifies as an undisclosed personal asset of Mirra an item entitled "RAM Note to Mirra and Jordan" valued at $6,959,299.  *Id.* Ex. E, ECF 462.  This note represents a loan made to RAM Capital out of the combined assets of Mirra and Jordan.  During their negotiations, Jordan's lawyers explained to her that "You and Ray have also each loaned [RAM Capital Group] approximately $3.6M each.  This debt would be contributed to the LLC prior to the split, and you would not get paid anything for this note."  Email of Donnelly to Petersen (Mar. 4, 2008), ECF 258, Ex. 2.  The SDA's Plan of Distribution then provided that "both Mirra and Jordan shall contribute all advances each has made to RAM Capital Group, LLC as a capital contribution upon execution of the Separation Agreement." SDA, Ex. 3.1.1 at ¶ 3(iii).  The loans are thus recognized by the SDA itself as separate assets of the respective parties and it would be inconsistent for them to also be listed as joint assets.  Furthermore, because Jordan agreed to its extinction upon the execution of the SDA, she cannot as a matter of law establish any damages related to Mirra's failure to disclose it on Schedule 2.1.1.

**Investment in RAM Business.**  Lunden lists this asset as a personal asset of Mirra valued at $1,635,063, Lunden Rep. at Ex. E, ECF 462, based on Mirra's general ledger trial balance in 2008, ECF 474, Ex. 12.  RAM Business Holdings had filed for and was issued a certificate of cancelation by the Delaware Secretary of State in June 2006.  ECF 474, Ex. 4.  According to an affidavit by Mirra's accountant Bruce Kolleda, the continued entry for RAM Business on Mirra's general ledger was an accounting error.  Kolleda Aff. ¶ 4, ECF 481.  Jordan contends that "[t]he liquidation of a company disperses its assets, here the $1.6 million investment was transferred to Mirra's personal ledger in February of 2006, just *before* he dissolved RAM Business, and he then held it on his ledger through at least December 2008."  Jordan Reply at 16-17, ECF 498.  Jordan

is correct that "the liquidation of a company disperses its assets." However, just as a map is not the territory it describes, a personal ledger is not a legal entity capable of holding capital, merely one that "record[s] financial transactions in the form of debits and credits." *Ledger*, Black's Law Dictionary (11th ed. 2019).  In February 2006, the general ledger records a $1,589,047.80 increase in the investment, to a balance of $1,635,062.80, described as "GENJ to reclass amount due from RAM Capital." ECF 499, Ex. 7. [29]  The $1.6 million figure represented some form of equity in RAM Business Holdings.  When RAM Business Holdings was dissolved in June 2006, that equity disappeared.  Whether the liquidation of the company resulted in assets being transferred to Mirra at that time or if the investment was effectively written off is unclear from the record. Nevertheless, there is no evidence in the record to suggest that by the time of the SDA negotiations in 2008 that the $1.6 million general ledger entry was anything but an artifact, or that at that time there still existed some tangible assets in the form of accounts or capital that might remain from the defunct entity.  Given the formal dissolution in 2006 and the explanation from the accountant, once again, a single ledger entry does not suffice to create a material issue of fact. I therefore conclude that there is no genuine issue of material fact.

**Loan Receivable Kuo.**  Lunden identifies this as a personal asset of Mirra valued at $31,343, Lunden Rep. at Ex. E, ECF 462, based on Mirra's general ledger trial balance in 2008, ECF 474, Ex. 12.  Mirra and his accountant Bruce Kolleda have submitted affidavits that this was a personal loan made to James Kuo who died in June 2007, and that it should have been written off at his passing and it has since been written off.  Mirra Aff. ¶ 4, ECF 479; Kolleda Aff. ¶ 6, ECF 481.  Jordan points to nothing in the record that suggests that this was not the case or that a claim

---

[29] The wording of this entry suggests that this was principally an accounting convention used to track the complex relationships between a variety of closely held entities. No other documents have been identified to demonstrate that any funds or property changed hands or were transferred among accounts.

was ever made against the estate related to this loan.  I therefore conclude that there is no genuine issue of material fact as to whether this remained an asset at the time that the SDA was negotiated.

**Year End Bonus from Biomed.**  Lunden lists this asset as a personal asset of Mirra that should have been listed, valued at $1,000,000, Lunden Rep. at Ex. E, ECF 462, based on a draft due diligence report for Biomed America from February 2008, ECF 474, Ex. 13. Notably, the report states that $1,000,000 and $500,000 bonuses were paid both to Mirra and Jordan, respectively, in their capacity as "principals/executives of RAM." Jordan argues that the bonus was "deposited to Mirra's unlisted bank account." Jordan Opening Br. at 8, ECF 458.  Jordan points to Mirra's ledger balance showing a $599,022.27 credit in February 2008 and argues that it reflects a $1 million payment minus taxes.  Jordan Reply Br. at 17-18, ECF 498. Mirra contends that given the timing of the due diligence report, it reflects bonuses paid in late 2007 that would have been deposited in joint accounts. Mirra's position rests on his deposition testimony, with no further documentation.  Mirra Opening Br. at 31, ECF 471.  Regardless of when or into which accounts the bonus payments were made, the warranty at issue specifically applies to assets in which the parties held a *joint* interest.  Given that Jordan's only proof is a report explicitly showing bonuses to *both* parties, albeit in different amounts, I am hard-pressed to see how this in any way supports an inference that Mirra was hiding an asset in which Jordan could claim an interest. The very document on which she relies seemingly refutes such a position.

4.  *Assorted Interests Where Genuine Factual Disputes Preclude Summary Judgment as to the Issue of Breach*

In two instances, Jordan identifies potential assets where, in addition to raising a question, there is some evidence in the record that might support an inference of a breach of the warranty to disclose.

**Investment in Asia Ame.**  Lunden lists this asset as a personal asset of Mirra valued at $25,000, Lunden Rep. at Ex. E, ECF 462, based on Mirra's general ledger trial balance in 2008, ECF 474, Ex. 12.  Mirra response is that the asset was actually owned by RAM Capital, based on RAM Capital's March 2008 balance sheet reflecting a $25,000 investment in "Colonial Amer. Bank." ECF 474, Ex. 37.  According to Mirra, the investment in Colonial American Bank was listed on his own ledger by mistake and was described as "Asia Ame" due to one of its director's involvements with Asia America Law Group.  Mirra Aff. ¶ 3, ECF 479.  Even if "Asia Ame" in fact refers to Colonial American, the Colonial American public offering lists Mirra's investment as $50,000.  ECF 474, Ex. 5.  In light of these conflicts in the documentary evidence, there is enough to raise a genuine dispute of material fact regarding whether Mirra personally held an interest in Colonial American Bank which should have been listed as a joint asset on Schedule 2.1.1.  Consequently, I cannot resolve the issue of breach as a matter of law.

**Note to Mirra – Consideration for Atlas Shares**.  Lunden lists this asset as a personal asset of Mirra valued at $3,000,000, Lunden Rep. at Ex. E, ECF 462, based on three things: (1) the Allion/Biomed merger documents that define the "Mirra Note" due to Mirra personally as the payee, ECF 474, Ex.39; (2) Biomed's Schedule of Notes listing Mirra and RAM Capital as separate lenders on separate obligations, ECF 474, Ex. 47; and (3) the note itself identifying Mirra as the payee, ECF 474 Ex. 9.  The note appears to be in consideration for Biomed's purchase of Atlas Respiratory Services, Inc.  Mirra argues that the value of the note to Mirra "is merely the value of Biomed's subsidiary Atlas" and that, as of March 2008, Mirra did not list the note as an asset on his personal ledger.  ECF 471 Appx. 1 at line 2.  Looking to Mirra's table of contested assets, he appears to contend that this note was disclosed through the disclosure of Biomed America because it is included in "Biomed Assets / Liabilities." *Id.* Although it is in fact a Biomed liability, it may

simultaneously be a Mirra asset.  Mirra's failure to list it on his personal ledger at the same time that he included a $3 million "Intangible Asset" on RAM Capital's balance sheet creates a genuine issue of fact as to whether Mirra or RAM Capital actually owned the asset, and whether disclosure was required.  *Compare ECF* 474, Ex. 12 (Mirra's ledger) *with ECF* 474, Ex. 37 (RAM Capital balance sheet).

      B.  <u>Jordan Cannot Establish Damages Caused by Any Alleged Breach</u>

      To prevail on her breach of warranty claim, Jordan must also be able to prove that she suffered damages that resulted from the alleged breaches. Under Delaware law, proof of damages is one element of a breach of contract claim. *H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del. Ch.2003). "Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed.*" Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-147 (Del. 2009).  Although Jordan at this stage need not prove the amount of damages, she must still "prove the *fact* of damages with reasonable certainty." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015), *as corrected* (Dec. 28, 2015) (emphasis in original).

      Jordan's sole argument on damages is that the "disclosure of assets was necessary for Jordan to have a full picture of the assets in which the parties had a joint interest so that she could reach an informed decision about whether the proposed consideration was equitable." Jordan Reply Br. at 18, ECF 498.  In her version of the case, Mirra's failure to disclose was apparently part of a scheme "to deflate the value of the parties' property, inducing Jordan to accept a lower amount than she would have had he been forthcoming about the parties' joint assets." *Id.*  Jordan goes on to argue that based on the parties' general principle of owning their property prior to the

SDA 50/50, "any failure by Mirra to list an asset necessarily caused damage to Jordan by depriving her of the information she needed to protect her 50% share." *Id.*

I note at the outset that Jordan's claim for fraudulent inducement related to the SDA has been dismissed as barred by the Release Agreement, ECF 203, and therefore her claims are barred to the extent that Jordan's damages flow specifically from misrepresentations made in the course of negotiations. Nevertheless, even assuming that Jordan's claim for damages here doesn't simply dress up her fraudulent inducement claim in a new outfit, the course of negotiations demonstrates that the parties did not negotiate the SDA based on a contemporaneous valuation of the parties' assets, but instead based on a valuation of the parties' assets as of 2003. As a result, a more complete picture of the 2008 assets would not have changed the course of negotiations.

At the core of her argument, Jordan wants a "Mulligan" on the 2008 deal. She believes that the Court should retroactively apply the 50/50 principle of divided ownership that governed the parties' assets from the early 1990s to the early 2000s to reform the deal the parties struck in 2008. Jordan Reply Br. at 19-20. But the record is clear that the parties did in fact use the 50/50 principle to guide their original negotiations of the SDA, choosing as their lodestar the year 2003, in light of various practical considerations including the liquidity (and therefore calculability) of their interests at the time and a preference for liquidity of Jordan's share going forward. To accomplish this 50/50 valuation as of 2003, they calculated the parties' shared assets as of 2003, added an interest calculation to bring them present to 2008, and then divide by two, with Jordan giving up her interests in the companies. *See* Email of Petersen to Jordan (Feb. 22, 2008), ECF 458, Ex. 11; *see also* Mirra Dep. 120:18-121:22 (Nov. 24, 2015), ECF 474, Ex. 51. Jordan's take from this method of distribution would be $46.6 million. Email from Mirra's counsel to Jordan's counsel (Feb. 26, 2008), ECF 474, Ex. 18.

She chose this path with an awareness of the complex nature of the financial interests that she and Mirra shared, particularly with regards to RAM Capital and its constellation of notes, investments, and liabilities.  Email between Jordan's counsel (Mar. 4, 2008.), ECF 474, Ex. 21; Email from Jordan's counsel to Mirra's counsel (Mar. 11, 2008), ECF 474, Ex. 29.  In that regard, specifically with respect to the Atlas note, though Mirra may not have listed it as a personal asset, it appeared as a $3 million "Intangible Asset" on RAM Capital's balance sheet, to which Jordan and her counsel had access. Jordan was well represented by attorneys who requested information about Mirra's various business interests and apparently received sufficient information to ensure that during the negotiations they could close the deal.  Email from Jordan's counsel to Mirra's counsel (Feb. 20, 2008), ECF 459, Ex. 1; Draft Email of counsel to Jordan (Mar. 10, 2008), ECF 458, Ex. 14. Petersen Dep. 153:4-18 (Oct. 14, 2015), ECF 458, Ex. 9.

Jordan knowingly gave up her potential upside from those business interests and particularly her potential upside in the Biomed America merger, as consideration for a "quick out" that provided her with extensive liquidity without any ongoing responsibilities or liabilities related to the business interests.  Email of counsel to Jordan (Feb. 23, 2008), ECF 474, Ex. 18; Email of Jordan to counsel (Mar. 4, 2008), ECF 474, Ex. 23.[30]  She set a price for this particular interest at around $6 million that fit into the structure of getting her to a total of $46.6 million.  Email between counsel (Mar. 4, 2008), ECF 458, Ex. 2; Email from Jordan to counsel (Mar. 4, 2008), ECF 474, Ex. 23; Email from counsel to Jordan (Mar. 5, 2008), ECF 474, Ex. 26. This was an express choice

---

[30] Jordan's email to her counsel on Mar. 4, 2008, where she explains how she refused Mirra's suggestion to maintain a shared interest in a property for 6 months post-closing in order to sell the property because it didn't represent "a quick 'liquid out' in terms of asset division," reinforces how even the disputed $3 million note Biomed owed Mirra for the Atlas shares would have had no bearing on Jordan's negotiation because it would only become valuable after Allion transaction. Email of Jordan to counsel (Mar. 4, 2008), ECF 474, Ex. 23.

by Jordan.  Early in the negotiations, Mirra indicated that he "[would] not value these companies, and he [would] not buy [her] out of them," but he offered that if Jordan wanted "to stay in them, and share the risk and cost, then [she] could participate in any upside." Email from Jordan's counsel to Jordan (Feb. 22, 2008), ECF 474, Ex. 16.  This was later formalized as "Option 2," where Jordan would have gotten "15% of Biomed, 50% of other businesses, 50% of debt." Email from Mirra's counsel to Jordan's counsel (Feb. 26, 2008), ECF 474, Ex. 18.  As an alternative, Mirra suggested that they "figure out what [Jordan's] share was in 2002 when the business was sold, and apply some interest calculations to that, and then pay [her] that." Email from Jordan's counsel to Jordan (Feb. 22, 2008), ECF 474, Ex. 16*.*  Jordan chose the latter path and doing so chose not to negotiate based on the value of the private business interests in 2008 because she put greater worth on extricating herself quickly from the shared enterprises. In choosing that path she knowingly gave up the potential upsides that her interests in the businesses represented.  Her only argument for damages now relies on a retrospective theory of the course of negotiations that has no support in the record.

Jordan would now prefer that 2008 be the lodestar year, so that the 50/50 principle can be applied to the shared business interests now forensically quantified with the benefit of hindsight and damages calculated accordingly.  Mirra cogently argues that this theory of damages would entitle Jordan to the benefit of a bargain she declined to make, and in the process risk a windfall. Jordan could have rejected a buy-out based on a 2003 evaluation and insisted upon a contemporaneous valuation.  She did not. In that respect, this action is very similar to *Interim Healthcare, Inc. v. Spherion Corp.,* 884 A.2d 513 (Del. Super. Ct.), *aff'd* 886 A.2d 1278 (Del. 2005). "The expectations of both parties …were shaped by the risks of which they were aware." *Id.* at 550.  And she could have bargained for specific warranties about the value of current assets,

*see, e.g., Aviation W. Charters, LLC v. Freer,* 2015 W.L. 5138285 (Del. Super. Ct. July 2, 2015), or bargained for protection if a quick sale of assets yielded a windfall to Mirra, *see, e.g., Charron v. Sallyport Global Holdings, Inc.,* 2014 W.L. 7336463 (S.D. N.Y. Dec. 24, 2014). Jordan ultimately seeks a windfall for herself, having already been compensated for the value of her interests according to a model Jordan embraced with full cognizance of the bargained for benefits and risks, linked to a specific timeframe, she now seeks additional compensation based upon a different series of assumptions.

The benefit of hindsight may leave Jordan with some regrets in how she conducted her negotiations, but those regrets do not translate into a viable claim.

## V.   <u>Conclusion</u>

Because Jordan cannot establish liability for breach as to the vast majority of items complained of as being left off the schedule of joint assets and cannot establish the existence of damages for any of those items, Plaintiff Jordan's motion for summary judgment is denied and Defendant Mirra's motion for summary judgment as to the breach of the warranty claim is granted. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge